1              IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
2
     UNITED STATES OF AMERICA,        )
3                                     )
                     Plaintiff,       )   VOLUME I
4                                     )
            vs.                       )   Case No. 06-10072
5                                     )   Peoria, Illinois
     CORY MOSBY,                      )
6                                     )
                     Defendant.       )
7

8      EXCERPTED TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                     APRIL 30, 2007
9

10                      BEFORE:

11          THE HONORABLE JOE BILLY McDADE,
               United States District Judge
12                    And a Jury

13

                      APPEARANCES:
14

            BRADLEY W. MURPHY, ESQUIRE
15            JERRY BROST, ESQUIRE
             United States Attorneys
16             One Technology Plaza
           211 Fulton Street, Fourth Floor
17            Peoria, Illinois  61602
           (Appeared on Behalf of the Plaintiff)
18

19          CHESTER SLAUGHTER, ESQUIRE
               Lyle & Slaughter
20        900 West Jackson Street, Suite 6-W
             Chicago, Illinois  60607
21        (Appeared on Behalf of the Defendant)

22

23

24      Jennifer E. Johnson, CSR, RMR, CRR, CBC
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer

1                              **INDEX**

2                                                    **PAGE**

**GOVERNMENT WITNESSES:**

3

4      **JONI LITTLE**

5          Direct Examination by Mr.Murphy        4
           Cross-Examination by Mr. Slaughter    12
6
       **LINDA YBORRA**
7
           Direct Examination by Mr. Murphy      14
8
       **JOHN COUVE**
9
           Direct Examination by Mr. Murphy      19
10         Cross-Examination by Mr. Slaughter    58
           Redirect Examination by Mr. Murphy    65
11
       **MICHAEL MUSHINSKY**
12
           Direct Examination by Mr. Murphy      67
13         Cross-Examination by Mr. Slaughter    78
           Redirect Examination by Mr. Murphy    90
14         Recross-Examination by Mr. Slaughter  91

15     **JOSEPH GRAY**

16         Direct Examination by Mr. Murphy      92
           Cross-Examination by Mr. Slaughter    95
17

18

19

20

21

22

23

24

25

<u>**INDEX**</u>

PAGE

<u>**GOVERNMENT EXHIBITS:**</u>

| Exhibit | Page |
|---------|------|
| 1       | 48   |
| 3A      | 17   |
| 3B      | 17   |
| 4       | 55   |
| 5A      | 7    |
| 5B      | 8    |
| 5C      | 8    |
| 5D      | 8    |
| 5E      | 8    |
| 5F      | 8    |
| 6A      | 10   |
| 6B      | 10   |
| 7       | 51   |
| 8       | 52   |
| 9       | 51   |
| 10A1    | 52   |
| 10A2    | 52   |
| 10B1    | 49   |
| 10B2    | 49   |
| 10B3    | 50   |
| 10C1    | 50   |
| 10C2    | 50   |
| 10C3    | 50   |
| 10C4    | 50   |
| 10C5    | 50   |
| 10D1    | 51   |
| 10D2    | 51   |
| 10D3    | 51   |
| 11      | 46   |
| 17      | 55   |
| 18      | 56   |
| 20      | 54   |

```
1            THE COURT:  All right.  Call the case.

2            THE CLERK:  Call the case of the United

3  States of America versus Cory Mosby, Criminal Case

4  06-10072.

5            Please enter your appearance.

6            MR. MURPHY:  Brad Murphy and Jerry Brost for

7  Government.

8            MR. SLAUGHTER:  Chester Slaughter on behalf

9  of Mr. Cory Mosby who is before the bench, Judge.

10                        *  *  *  *  *

11            THE COURT:  Thank you, Mr. Slaughter.

12            Mr. Murphy, you may call your first witness.

13            MR. MURPHY:  Thank you, Judge.  We would

14  call Joni Little.

15               (Witness sworn by the Clerk.)

16            THE CLERK:  Thank you.  Please have a seat.

17                        JONI LITTLE,

18  called as a witness, after being first duly sworn,

19  was examined and testified upon her oath as follows:

20                   DIRECT EXAMINATION

21  BY MR. BROST:

22  Q.   Would you state your name, please?

23  A.   Joni Little.

24  Q.   Okay.  And are you employed?

25  A.   I am.  I'm employed by the Illinois State
```

1  Police at the Morton Forensic Science Laboratory.

2  Q.   How long have you been employed at the Illinois

3  State Police forensic laboratory?

4  A.   Approximately 12 years.

5  Q.   What is your job title?

6  A.   I'm a forensic scientist, specializing in the

7  area of drug chemistry.

8  Q.   And what are your duties in regard to that?

9  A.   I obtain evidence from police agencies and test

10  that evidence for the possible presence of cannabis

11  and/or controlled substances.  I also issue reports

12  and testify in court when necessary.

13  Q.   Besides cannabis, would that include cocaine

14  and cocaine base?

15  A.   Yes, that's correct.

16  Q.   Another word for cocaine base is crack; is that

17  correct?

18  A.   Yes.

19  Q.   Okay.  What's your educational background?

20  A.   I have a bachelor of science degree in biology

21  with a chemistry minor from Millikin University.

22  Q.   Have you received any specialized training in

23  the identification of controlled substances?

24  A.   I successfully completed a one-year training

25  program with the Illinois State Police in the area

1  of drug chemistry.

2  Q.   Do you belong to any professional

3  organizations?

4  A.   The Midwestern Association of Forensic

5  Scientists.

6  Q.   Have you received any honors or awards in your

7  field of expertise?

8  A.   A few.

9  Q.   Have you testified in court as an expert in the

10 identification of controlled substances?

11 A.   Yes, approximately 50 times.

12         MR. BROST:  Your Honor, I offer Ms. Little

13 as an expert in the identification of controlled

14 substances.

15         THE COURT:  Do you wish to voir dire?

16         MR. SLAUGHTER:  No, Your Honor.  We'll

17 accept Miss Little as an expert witness in her

18 chosen field.

19         THE COURT:  Thank you.  You may proceed,

20 Mr. Brost.

21         MR. BROST:  Your Honor, may I approach the

22 witness?

23         THE COURT:  You may.

24 BY MR. BROST:

25 Q.   Let me show you what's been previously marked

1  for identification as Government's Exhibits 5A

2  through 5F for right now.

3          Do you recognize those exhibits?

4  A.   Yes, I do.

5  Q.   And how do you recognize those exhibits?

6  A.   It bears my laboratory sticker which includes

7  my exhibit number, my case number, the day I

8  received it, as well as my initials.

9  Q.   And when did you first see those exhibits?

10  A.   September 5th of last year when I received them

11  from Officer Couve of the Peoria Police Department.

12  Q.   Why did you receive those exhibits?

13  A.   Peoria Police Department requested an analysis.

14  Q.   What type of condition were those exhibits in

15  when you received them?

16  A.   Sealed.

17  Q.   And what did you do with those materials

18  contained within these Exhibits 5A through 5F?

19  A.   The material within?

20  Q.   Yes.

21  A.   I performed an analysis.

22  Q.   Now, you opened -- they were in a sealed

23  condition, so you opened the bag; is that correct?

24  A.   That's correct.

25  Q.   Okay.  Then you tested the materials to

1  determine the nature of the substances?

2  A.   First I obtained a net weight which means the

3  weight of just the off-white chunky material, and

4  then I performed two standard scientific tests.

5  Q.   Okay.  And those are broken into -- really 5A

6  is separate from 5B through F; is that correct?

7  A.   Yes, that's correct.

8  Q.   Okay.  What -- did you weigh 5A?

9  A.   I did.

10 Q.   And what was the weight of that?

11 A.   248.8 grams of off-white chunks.

12 Q.   Okay.  What about 5B through F?  Did you weigh

13 those materials as well?

14 A.   Yes, I did.

15 Q.   And what was the weight of -- contained within

16 those exhibits?

17 A.   265.6 grams of off-white chunks from five

18 compartments.

19 Q.   And then you say you performed tests on that to

20 determine the nature of the substances in those

21 exhibits?

22 A.   Yes, that's correct.

23 Q.   What is the testing procedure that you use?

24 A.   First I performed a chemical color test.  The

25 second test is an instrument test called gas

1  chromatography mass spectrometry, and the third test

2  is an I.R. test.

3  Q.   Are those the standard tests used in your

4  field?

5  A.   Yes.

6  Q.   Okay.  And approximately how many times in the

7  past have you used -- performed those tests?

8  A.   Hundreds of thousands.

9  Q.   Based on your testing procedures, were you able

10  to identify the substances contained within

11  Government's Exhibits 5A and through 5F?

12  A.   Yes.  All are positive for the presence of

13  cocaine base.

14  Q.   What did you do with Exhibits 5A through 5F

15  when you were done with the testing?

16  A.   I resealed the bags with my blue evidence tape

17  and placed my initials and the date across the seal

18  and placed them back into my vault at the Morton

19  lab.

20  Q.   And do you know what happened with them after

21  they went into the vault?

22  A.   They stayed into the vault until Officer Couve

23  came to retrieve them.

24  Q.   Let me now turn your attention to Government's

25  Exhibits 6A and 6B.  Do you recognize those

1  exhibits?

2  A.    I do.

3  Q.    And how do you recognize them?

4  A.    These also bear my laboratory case number, the

5  exhibit number, my initials, as well as the date

6  that I received it.

7  Q.    Okay.  When did you receive it?

8  A.    The same day, September 5th of '06.

9  Q.    And what type of condition were those exhibits

10 in when you received them?

11 A.    Sealed.

12 Q.    And what was the purpose that you obtained

13 those exhibits?

14 A.    Peoria Police Department requested analysis.

15 Q.    And what did you do with them when you received

16 it?

17 A.    I filled out the appropriate paperwork and

18 placed them into my vault at the Morton lab.

19 Q.    Did you then go back to the vault to test the

20 materials?

21 A.    Yes, I did.  I did have an occasion to analyze

22 them.

23 Q.    Approximately when was that?

24 A.    Approximately November the 2nd of '06.

25 Q.    And what -- when you say that you tested them,

1  what is it that you did?

2  A.    I performed two standard scientific tests.

3  First I obtained the net weight, and then I

4  performed my two standard scientific tests.

5  Q.    What was the net weight of Exhibits 6A and 6B?

6  A.    6A was 18.5 grams of plant material, and 6B was

7  54.4 grams of plant material from two compartments.

8  Q.    And then you did a test on those?

9  A.    That's correct.

10  Q.    Was it the same tests that you did to determine

11  the cocaine base?

12  A.    No.  The first is a microscopic examination,

13  and the second is a chemical color test.

14  Q.    Are these the standard tests performed by

15  experts in your field?

16  A.    Yes.

17  Q.    And were you able to come to a conclusion as to

18  the nature of the materials contained within 6A and

19  6B?

20  A.    Yes.  All were positive for the presence of

21  marijuana.

22  Q.    What did you do with the exhibits when you were

23  done with the testing?

24  A.    Again, I resealed the plastic bags with my blue

25  evidence tape and placed it back in the vault at my

1  lab.

2  Q.    And do you know where they went from the vault?

3  A.    I returned them to Officer Couve on November

4  the 8th of '06.

5        MR. BROST:  Your Honor, if I might have a

6  moment?

7        THE COURT:  Yes.

8  BY MR. BROST:

9  Q.    How many grams are in a kilogram?

10  A.    1,000.

11  Q.    And were all of these Exhibits 5A through 5F

12  and 6A through 6B returned to Officer John Couve?

13  A.    Oh, yes.

14        MR. BROST:  Your Honor, I have no further

15  questions.

16        THE COURT:  You may cross, Mr. Slaughter.

17        MR. SLAUGHTER:  Yes, Your Honor.

18                    **CROSS-EXAMINATION**

19  **BY MR. SLAUGHTER:**

20  Q.    Miss Little, when you received the packages,

21  could you tell whether or not the outside of that

22  package had been subject to any type of examination?

23  A.    The outside of the evidence bag?

24  Q.    Yes, the plastic part of the bag.

25  A.    No.

1   Q.   You could not make a determination as to

2   whether or not they had gone to laboratory for

3   fingerprinting or anything of that nature, could

4   you?

5   A.   The evidence bag?

6   Q.   Yes.

7   A.   No.

8   Q.   Well, when you got the materials, they were

9   contained in a plastic bag, right?

10  A.   The -- yes, the evidence, the lab -- the

11  evidence bag, yes.

12  Q.   The original packaging is what I'm talking

13  about, the original packaging for the cocaine.

14        Were you able to make any determination as

15  to whether or not the original materials that

16  contained the cocaine had been subject to any type

17  of examination?

18  A.   I received it just like this; so, if there was

19  packaging previous, it could have been separated.

20  Q.   Oh, okay.

21        MR. SLAUGHTER:  Thank you, Miss Little.

22        MR. BROST:  No further questions, Your

23  Honor.

24        THE COURT:  All right.  Thank you, ma'am.

25  You may step down.

1        MR. MURPHY:  Call Linda Yborra.

2        THE CLERK:  Please raise your right hand.

3            (Witness sworn by the Clerk.)

4        THE CLERK:  Thank you.  Please have a seat.

5                    **LINDA YBORRA,**

6  **called as a witness, after being first duly sworn,**

7  **was examined and testified upon her oath as follows:**

8                    **DIRECT EXAMINATION**

9  **BY MR. BROST:**

10  Q.   Good afternoon.

11  A.   Good afternoon.

12  Q.   Would you state your name and spell your last

13  name, please?

14  A.   My name is Linda Yborra, Y-b-o-r-r-a.

15  Q.   And are you employed?

16  A.   I am.

17  Q.   And where is that?

18  A.   The Illinois State Police Morton Forensic

19  Science Laboratory.

20  Q.   And what are your duties there?

21  A.   My duties are to receive and examine evidence,

22  form a conclusion based on my examination, issue a

23  report on my conclusion and testify in court when

24  asked to do so.

25  Q.   How long have you been employed by the Illinois

1  State Police?

2  A.    Since June of 1997.

3  Q.    What's your educational background?

4  A.    I have a bachelor's degree in biology from

5  Sangamon State University.

6  Q.    And what is your current position with the

7  Illinois State Police?

8  A.    I am a forensic scientist specializing in the

9  area of firearm and tool mark identification.

10  Q.    What are your primary duties in that regard?

11  A.    My duties are to receive and examine evidence,

12  form a conclusion based on my examination and issue

13  a report on my conclusion.

14  Q.    Have you had specialized training in the field

15  of firearm identification and operation?

16  A.    Yes.  I completed a two-year formalized program

17  with Illinois State Police in firearm and tool mark

18  identification.  That training consisted of

19  formalized lectures, written, verbal and practical

20  examinations, along with supervised case work.

21  Q.    Do you belong to any professional

22  organizations?

23  A.    Yes, I do.

24  Q.    And what are those?

25  A.    I belong to the Association of Firearm and Tool

1  Mark Examiners, the Illinois Division of the

2  International Association for Identification, and

3  the Midwestern Association for Scientists.

4  Q.   As part of your duties, have you testified as

5  to firearms to determine whether those weapons were

6  in an operable condition?

7  A.   Yes, sir.

8  Q.   How many times have you done that?

9  A.   Testified to firearms?

10  Q.   Yes.

11  A.   Thousands.

12  Q.   Have you been qualified before as an expert to

13  testify in court regarding firearm identification

14  and operation?

15  A.   I have.

16  Q.   How many times?

17  A.   I believe this will be number 55.

18       MR. BROST:  Your Honor, I offer Miss Linda

19  Yborra as an expert in the field of firearms

20  identification and operation.

21       THE COURT:  Do you wish to voir dire?

22       MR. SLAUGHTER:  No, Your Honor.  We will

23  accept her as an expert.

24       THE COURT:  You may proceed, Mr. Brost.

25       MR. BROST:  Your Honor, may I approach?

1          THE COURT:  Yes, you may.

2   BY MR. BROST:

3   Q.   Ms. Yborra, let me show you what's been marked

4   as Government's Exhibits 3A and 3B and ask you to

5   look at those exhibits.

6          Have you seen those exhibits before?

7   A.   Yes, I have.

8   Q.   Okay.  How do you recognize them?

9   A.   By my seal that I have placed on the packaging.

10  Q.   And where did you get these exhibits from?

11  A.   They were brought into the Morton laboratory by

12  Officer Eric Ellis.

13  Q.   And were these -- what are these?  Can you

14  identify what the exhibits contain?

15  A.   People's Exhibit 3A is one Kel-Tec 9-millimeter

16  Luger caliber semiautomatic pistol, one magazine,

17  nine 9-millimeter Luger unfired cartridges and test

18  shots.

19          People's Exhibit 3B is a Ruger .45

20  autocaliber semiautomatic pistol, one magazine,

21  eight .45 autocaliber unfired cartridges, one black

22  cloth holster and test shots.

23  Q.   Can you state what the serial number is on

24  Government's Exhibit 3A?

25  A.   Yes, the serial number for People's Exhibit 3A

1  is A1E57.

2  Q.   And what about the serial number for Exhibit

3  3B?

4  A.   People's Exhibit 3B is 66348667.

5  Q.   And were these weapons test-fired at the Morton

6  crime lab?

7  A.   They were.

8  Q.   And how is the test-firing done?

9  A.   In a water recovery tank.

10  Q.   The gun is shot into the water recovery tank?

11  A.   We use laboratory ammunition, and we'll put

12  that in the magazine.  We insert the magazine in the

13  magazine well.  We'll put the muzzle of the firearm

14  into the port of the water recovery tank, fire two

15  shots into the water recovery tank, collect the

16  bullets, collect the cartridge cases.

17  Q.   And were these guns test-fired under your

18  direction and supervision in that manner?

19  A.   They were.

20  Q.   And is -- do you have an opinion as to whether

21  Government's Exhibits 3A and 3B were in an operable

22  condition?

23  A.   Yes, they were examined, found to be in

24  operating condition, and test-fired.

25           MR. BROST:  Your Honor, if I might have a

1    moment?

2        THE COURT:  Yes.

3    BY MR. BROST:

4    Q.   Did Government's Exhibits 3A and 3B operate as

5    designed?

6    A.   Yes, they did.

7        MR. BROST:  No further questions.

8        THE COURT:  You may cross, Mr. Slaughter.

9        MR. SLAUGHTER:  No, Your Honor.

10       THE COURT:  Thank you, ma'am.  You are

11   excused.

12       THE WITNESS:  Thank you very much.

13          (Witness sworn by the Clerk.)

14       THE CLERK:  Thank you.

15                    **JOHN COUVE,**

16   **called as a witness, after being first duly sworn,**

17   **was examined and testified upon his oath as follows:**

18                 **DIRECT EXAMINATION**

19   **BY MR. MURPHY:**

20   Q.   Would you please state your name and spell your

21   last name?

22   A.   John Couve, C-o-u-v-e.

23   Q.   And what is your business or occupation, sir?

24   A.   Peoria police officer.

25   Q.   How long have you been a Peoria police officer?

1  A.    Almost 20 years.

2  Q.    And the current nature of your duties is what,

3  please?

4  A.    I am assigned to the special investigations

5  division, vice and narcotics unit.

6  Q.    And how long have you been with vice and

7  narcotics?

8  A.    A little over 11 years.

9  Q.    Can you give us some idea of what you're doing

10  on a day-by-day basis, please, Officer Couve?

11  A.    Our unit is in charge of investigating

12  narcotics, whether it be search warrants, long-term

13  investigations, and search warrants and

14  surveillances of that nature.

15  Q.    Okay.  Are you also a sworn federal officer as

16  well?

17  A.    Yes, I am.

18  Q.    And what is that, please?

19  A.    I've been sworn in as a DEA task force officer

20  since October of 2004.

21  Q.    And does that really have -- give you any other

22  duties other than writing reports for the DEA?

23  A.    That, and preparing cases that are brought over

24  here to the federal system.

25  Q.    Directing your attention, please, back to the

1  date of July 27th of 2006, do you recall being on

2  duty that day?

3  A.   Yes, I was.

4  Q.   And do you recall long about 4:00 in the

5  afternoon, Mr. Couve, where you were and what you

6  were doing?

7  A.   We were conducting surveillance at 2401 North

8  Gale in Peoria, Illinois, specifically Apartment

9  Y10.

10 Q.   Were you familiar with the specific individual

11 that you were surveilling?

12 A.   Yes, I was.

13 Q.   And what was the name of that individual?

14 A.   Mr. Cory Mosby.

15 Q.   And is that person that you were surveilling on

16 that day, and others, present here in court today?

17 A.   Yes, he is.

18 Q.   Please point directly at Mr. Mosby.

19 A.   (Witness complies.)

20 Q.   Thank you.

21       MR. MURPHY:  Would the record reflect he's

22 identified the defendant, please, Judge?

23       THE COURT:  The record will reflect the

24 identification of the defendant.

25 BY MR. MURPHY:

Q.   Can you give us an idea of -- as we know,
you're on surveillance.  Are you in a marked squad
car or not?

A.   No, an unmarked city vehicle.

Q.   And I take it you're not in uniform?

A.   That's correct.

Q.   To conduct your surveillance activities, you
actually want to stay what's called incognito?

A.   Yes, trying to blend in.

Q.   Okay.  Give us an idea, if you recall, where
are you stationed, where and what view of this area
that you have?

A.   I believe at the beginning I was -- there's a
mortuary building at University, just south of Gale,
and on the back side of that is a parking lot.  And
I was parked there with an observation of the back
door of 2401 West Gale -- North Gale, Apartment Y10.

Q.   And was Apartment Y10 the one that was
specifically under surveillance?

A.   That's correct.

Q.   Along about 4:00 that afternoon, did you see
Mr. Mosby?

A.   Yes, I did.

Q.   Tell us what you saw.

A.   Mr. Mosby, another female that was later

1  identified as, I believe, Ashley Hunter and a small

2  child exited Apartment Y10, got into a vehicle that

3  was at the back side of that apartment building.

4  Q.   Was this vehicle a black Chrysler minivan?

5  A.   Yes, it was.

6  Q.   And what did you observe about that vehicle?

7  What did you see; what did you do?

8  A.   Miss Hunter got into the driver's side of the

9  vehicle.  Mr. Mosby got into the front passenger

10 seat vehicle.  And the child was also placed in the

11 vehicle.  And then the vehicle left from that

12 location.  Surveillance was continued, and they went

13 to Pioneer Auto Sales, which is on Pioneer Park in

14 Peoria, Illinois.

15 Q.   Would that be up in the far north reaches of

16 Peoria?

17 A.   That's correct.

18 Q.   Okay.  And did you continue your surveillance

19 of that vehicle and go along with it?

20 A.   That's correct.

21 Q.   And tell us what you observed out there happen

22 at Pioneer Parkway.

23 A.   When the vehicle arrived at the auto

24 dealership --

25        MR. SLAUGHTER:  Excuse me, Your Honor.  May

1    I interject an objection at this point?

2          THE COURT:  What's your legal objection?

3          MR. SLAUGHTER:  Your Honor, this is

4    completely irrelevant to the charges contained in

5    the indictment.  The indictment talks about the

6    26th.  No allegations that any crime was committed

7    other than on the 26th.

8          THE COURT:  Objection overruled.

9          MR. MURPHY:  Thank you, Judge.

10   BY MR. MURPHY:

11   Q.   Again, please tell us what you observed happen

12   out there.

13   A.    When they arrived at the auto dealership,

14   Mr. Mosby exited the vehicle and went into the

15   business, and Miss Hunter drove off at that point in

16   the van.

17   Q.    Okay.  And did you, after a few short minutes,

18   see Mr. Mosby again?

19   A.    Yes, I did.

20   Q.    And what did you see?

21   A.    Mr. Mosby exited the business, went to a black

22   GMC Yukon Denali SUV, got in that vehicle and drove

23   off from the parking lot.

24   Q.    Did you follow it as it left the parking lot?

25   A.    Yes, myself and the other officers.

1  Q.    Now, you observed Miss Hunter drive off, as you

2  told us, correct?

3  A.    That's correct.

4  Q.    How many individuals are in this Denali at the

5  point in time that the defendant drives off in it?

6  A.    Just the defendant.

7  Q.    Please tell us what you observed the defendant

8  and this vehicle do.  Where did you go?

9  A.    After he left the auto dealership, surveillance

10 was continued.  Mr. Mosby arrived back at the

11 apartment at 2401 West -- or North Gale and exited

12 the vehicle, went back into the apartment.

13 Q.    Did you continue with your surveillance?

14 A.    Yes, we did.

15 Q.    And a few minutes after that, did you have

16 occasion to see Mr. Mosby again?

17 A.    I believe at that point, a few minutes later

18 Mr. Mosby came back out, went to the black Denali,

19 was at the vehicle for a few minutes and then went

20 back into the apartment.

21       Then a short time later, came back out, went

22 to the Denali again and then was at the vehicle for

23 a few minutes and then went back into the apartment.

24 Q.    At some point in time that afternoon, did you

25 see Mr. Mosby leave in this black Denali?

1  A.    Yes, I did.

2  Q.    And where did it go?

3  A.    Surveillance was continued on the vehicle as it

4  left, and it went to the 700 block of East Nebraska

5  in Peoria, Illinois, and parked along the curb in

6  front of the residences.

7  Q.    This is a residential neighborhood?

8  A.    That's correct.

9  Q.    Who was in the vehicle with Mr. Mosby at this

10 point in time?

11 A.    No one at that point.

12 Q.    A short time after he pulls up, parks there at

13 the 700 block of East Nebraska, what did you see

14 happen?

15 A.    White female came from a residence, from one of

16 the houses; I was not able to tell exactly which

17 house.  Got into the passenger side of the Denali.

18 Was in the Denali for approximately three to four

19 minutes, then exited and went directly back into one

20 of the residences.

21 Q.    What happened when the white female got out and

22 walked into one of those residences?

23 A.    Mr. Mosby then drove off from that location.

24 Q.    How many people are in the vehicle when

25 Mr. Mosby drives off?

```
 1  A.    Just himself.
 2  Q.    And shortly after 5 p.m. that afternoon, did
 3  you observe Mr. Mosby back at the Parkview Estates?
 4  A.    Yes, I did.
 5  Q.    And what was done -- what did you see or
 6  observe at that time?
 7  A.    I know at a later -- I don't remember exact
 8  time -- he left again in another vehicle.
 9  Q.    Well, before that, when he got back and drove
10  back, what happened?
11  A.    He went back into the apartment.
12  Q.    Now, did the surveillance continue on him that
13  evening?
14  A.    Yes, it did.
15  Q.    Were you part of that surveillance?
16  A.    Yes, I was.
17  Q.    And what do you recall of your surveillance of
18  Mr. Mosby later on that evening?
19  A.    Later on, Mr. Mosby exited -- left in a
20  different vehicle, a beige Pontiac minivan.  At one
21  point, I observed him go into the alley on the side
22  of the 700 block of East Nebraska, which would be
23  the same side of the street that I had seen him at
24  earlier.  And then approximately two minutes later,
25  he drove back out of the alley, away from the area.
```

1  Q.   And is this time period approximately 6:08 to

2  6:10 that you observed the vehicle in and out of the

3  alley?

4  A.   That's correct.

5  Q.   Then where does it go?

6  A.   Back to the apartment on 2401 North Gale.

7  Q.   And is it arriving there about 6:18, along

8  through there?

9  A.   I believe so.

10  Q.   And shortly after that, did the surveillance

11  discontinue?

12  A.   That's correct.

13  Q.   Officer Couve, I want to move on to a different

14  date, the date of August 23rd of 2006.  Were you on

15  duty that day?

16  A.   Yes, I was.

17  Q.   And were you part of, again, a surveillance

18  team watching the comings and goings of the

19  defendant, Cory Mosby?

20  A.   That's correct.

21  Q.   And do you recall at approximately what point

22  in time you were part of the surveillance team?

23  A.   I believe it was shortly before noon, sometime

24  between 11 and 12.

25  Q.   Okay.  And did you have observations of

1  Mr. Mosby, either that morning or during the early

2  afternoon hours?

3  A.    Yes, I did.

4  Q.    And do you recall about what approximate time

5  it was that you observed Mr. Mosby and what he was

6  doing?

7  A.    At the beginning of the surveillance, I was

8  just on the outskirts, but at one point he left the

9  apartment in a gray Dodge Intrepid.  I observed him

10  go into a business in the 700 block of Western,

11  being the Western Meat Market, I believe is the name

12  of it.  He went into the residence, then came back

13  out and left.  A short while later, he was at the

14  south end of Peoria, where he pulled to the curb on

15  Idaho at Seibold.  A white male came from the

16  residence right there at the corner and lifted up

17  the hood on the vehicle.  Mr. Mosby exited the

18  vehicle and seemed to converse with the white male

19  that had been looking under the hood of the vehicle.

20          Another white female came from the residence

21  and then, after a few minutes later, Mr. Mosby got

22  into the vehicle and drove off.  And I believe he

23  ended up back at the apartment at 2401 North Gale.

24  Q.    Did you have -- did you observe him stopping at

25  this Midas muffler shop in between?

A.    I recall that he did stop there.  I don't
recall whether I was the one on the observation,
that I actually observed that part of it.

Q.    I want to move on to the afternoon hours of
that same day, of August 23rd.  Along about 3:45 or
so in the afternoon, did you have a surveillance
position that allowed you to see coming and going
from that Apartment Y10 on 2401 North Gale on that
afternoon at that time?

A.    No, I was not on the eyes of surveillance at
that point, no.

Q.    Okay.  Were you aware that other officers were
surveilling that?

A.    That's correct.

Q.    When you say you were on the eye, tell us what
you mean.

A.    When we do a surveillance, there's anywhere
from six to eight other officers that are involved
in the surveillance.  We are communicating via
Nextel we have, where all of us can communicate at
the same time.  So, one person will be watching the
specific area or person that we are watching, and
that person is considered the eye.  The other
officers are just in the immediate area or outskirts
of the direct area of the surveillance.

Q.   When you finally saw him that afternoon, do you

recall, please, where he was and what was going on?

A.   He was walking, and he arrived at the corner of

North Gale and North University on what would be the

northwest corner.   There's a little gas station at

the corner there.   He was standing at the corner.

He was carrying a white garbage bag.   And

Miss Hunter was -- had walked up with him at that

location.

Q.   Now, where were you that you could see this?

A.   I was on the, the east side of University,

parked -- I believe Brons is the name of the street.

But it comes there right at Gale and University,

across University.

Q.   Could you see what was going on, what the

interaction was at that point between the female and

Mr. Mosby?

A.   At one point Mr. Mosby was on his cellular

phone.   They -- Mr. Mosby and Miss Hunter appeared

to be conversing, but that was about it at that

point.

Q.   And did you maintain your position?

A.   Yes, I did.

Q.   And what happened after seeing them come to

that location?

1  A.    Short time later, I would say about four or

2  five minutes later, a black Chrysler Town & Country

3  minivan arrived, pulled into the gas station parking

4  lot where they were standing.

5           At that point, Miss Hunter got -- a black

6  female was driving the vehicle.  Miss Hunter got

7  into the front passenger seat of the Town & Country

8  minivan, and Mr. Mosby got into the back passenger

9  seat directly behind the front passenger seat of the

10 van.  And then the van drove off.

11 Q.   Now, you had actually seen this minivan before,

12 hadn't you?

13 A.    Yes.  It was the same minivan that we had

14 observed him in during the previous surveillance.

15 Q.   What further did you observe?  Tell us what

16 your surveillance observations were the rest of that

17 afternoon, please.

18 A.    After they had drove off, surveillance

19 continued with the other officers.  The van arrived

20 at the Lexington Hill apartment complex.  It parked

21 in front of one of the apartment buildings.

22          I observed the driver of the minivan exit

23 and go into the apartment building.  At that point,

24 Miss Hunter got out of the vehicle, got into the

25 driver's seat.  Mr. Mosby stayed in the back

1 passenger seat, and they drove off from that

2 location and drove to Methodist emergency room

3 parking lot.

4          A short time later, I observed Mr. Mosby

5 walking south on Hamilton, which is the street where

6 the emergency room is on.  I observed him walking

7 south, still carrying the white garbage bag that I

8 had seen him carrying, and get into the black

9 minivan.

10 Q.   Now, which direction again is he walking after

11 you see him on the street there by the hospital?

12 A.   He would be walking southbound towards the

13 river.

14 Q.   Is he alone?

15 A.   Yes.  At that point, yes.

16 Q.   From your vantage point, could you tell where

17 the van was, what had become of the van?

18 A.   It -- I could not see it.  The last -- I had

19 been reported from other surveillance officers that

20 it was in the emergency room parking lot, so I

21 assumed that it was still there.

22 Q.   What did -- did you continue then to keep the

23 eye on Mr. Mosby?

24 A.   At that point, yes.

25 Q.   Tell us where he went, what he did.

1  A.    Short time later, the minivan -- black Town &

2  Country minivan pulled back out of the emergency

3  room, pulled up on the street next to where

4  Mr. Mosby was at.  Mr. Mosby then got into the

5  passenger side front seat of the vehicle, and the

6  vehicle drove off from that -- from -- after

7  Mr. Mosby was picked up.

8  Q.    And did you continue to follow it at that point

9  or not?

10  A.    Yes.

11  Q.    Okay.  And do you recall where the vehicle

12  went?

13  A.    The vehicle went back to the emergency room

14  parking lot, was there only for a couple minutes and

15  then left again, driving back out onto Hamilton.

16  Q.    And what happened then?

17  A.    The vehicle continued down Hamilton, turned

18  onto Glendale and went westbound.  West Glendale

19  turns into Kumpf Street.  The vehicle went from

20  Kumpf Street to Jefferson Street, then took a right,

21  which is going south on Jefferson Street.  At that

22  point, I know that Officer Marion --

23          MR. SLAUGHTER:  I'm going to object, Your

24  Honor.  There is no question pending at this point.

25          THE COURT:  I'm sorry.  Say that again.

1      MR. SLAUGHTER:  I said -- I was objecting to

2  his narrative.  I said there's no question pending,

3  Judge, and he's just going on and on.

4      MR. MURPHY:  I will be happy to ask another

5  question.  That's fine.

6  BY MR. MURPHY:

7  Q.   Officer Couve, about ten minutes or so after

8  the vehicle left the hospital for the second time,

9  was a stop of the vehicle caused to be made?

10 A.   Yes, it was.

11 Q.   Now, were you present at the time that

12 happened?

13 A.   I was not directly present.  I was in the area,

14 but I was not directly -- I was about a block and a

15 half away.  I could see that the unit was being

16 stopped by a semi-marked police unit.  But I was not

17 directly at the time of the stop.

18 Q.   All right.  You were able to see the scene of

19 the stop from about a block and a half away?

20 A.   Approximately, yes.

21 Q.   Okay.  And you indicate that you had been

22 talking on your Nextel radios.  Were you aware of

23 what vehicle had been asked to stop the vehicle?

24 A.   Sergeant Mushinsky and Officer Joe Gray.

25 Q.   Now, at some point in time after the vehicle

1  was stopped, did you go up to the scene of the stop?

2  A.   Yes.  Myself -- I went back to the police

3  station.  I was advised that there was evidence in

4  the van that needed to be collected.  So, we went

5  back to the police station to get a video camera and

6  then responded back to the scene of the car stop.

7  Q.   And tell us, if you can identify more

8  specifically, where the scene of the car stop was.

9  A.   It was in the 1000 block of West Lincoln,

10  almost in front of, I believe, 1034 West Lincoln, if

11  I remember correctly.

12  Q.   And when you got back to the vehicle -- you

13  indicated you had gone to the station, got the video

14  equipment and came back.  Who's there at the

15  vehicle?

16  A.   Sergeant Theobald.

17  Q.   And is he one of your police sergeants there at

18  Peoria PD?

19  A.   Yes, one of our special investigation division

20  sergeants.

21  Q.   Did you have duties or were you assigned duties

22  that afternoon with regard to the collection of

23  evidence from the minivan?

24  A.   Yes, I was assigned duties as evidence officer.

25  Q.   And, in fact, as evidence was removed from the

1  vehicle, did you take it into your custody?

2  A.    Yes.

3  Q.    And did you take a number of items into your

4  custody that afternoon from the vehicle?

5  A.    Yes, I did.

6  Q.    Were you present when the videotaping was done?

7  A.    Yes, I was.

8  Q.    Do you recall who was doing the videotaping?

9  A.    Officer Marion.

10  Q.    Is that the fellow sitting over here?

11  A.    That's correct.

12       MR. MURPHY:  May I approach, please, Judge?

13       THE COURT:  Yes.

14  BY MR. MURPHY:

15  Q.    Officer Couve, did you bring to court today

16  with you all the exhibits that we have now lined up

17  there?  I think there's guns, and there's some

18  drugs, and there's a great big box you brought in.

19  A.    That's correct.

20  Q.    Where did you obtain those exhibits to bring

21  them to court?

22  A.    From the Peoria Police property room.

23  Q.    And is that property room set up and provided

24  to provide security for items of evidence that are

25  seized in your investigations?

1   A.    That's correct.

2   Q.    And let me start with the two weapons to your

3   left.  I believe they're marked as Exhibits 3A and

4   3B.

5   A.    That's correct.

6   Q.    And did you bring those two to court today with

7   you?

8   A.    Yes, I did.

9   Q.    Now, am I correct you didn't have previous

10  contact with those exhibits prior to today?

11  A.    3A I did.  3B I did not.

12  Q.    Okay.  We'll talk about 3A in a few moments.

13  The drug exhibits that are lying in front of you, we

14  have marked them as Exhibits 5A and then 5B through

15  F and 6A and 6B.  Do you see those four exhibits?

16  A.    Yes, I do.

17  Q.    Tell us where you first saw those four

18  exhibits.

19  A.    Do you want to do them individually or as a

20  whole where they were located at?

21  Q.    As a whole.

22  A.    They were in the Town & Country minivan, in

23  between the front two seats in a white garbage bag.

24  Q.    And was that the only garbage bag that was

25  visible there in the van?

1  A.    Yes, it was.

2  Q.    And more specifically, where was the white bag

3  located?

4  A.    Directly between the front driver and passenger

5  seat, on the floor in between the two.

6  Q.    Now, directing your attention to 6A, that would

7  be the -- that bag with marijuana, was that bag of

8  marijuana located actually outside the white bag?

9  A.    Yes, it was.

10  Q.    And describe how you first saw that.

11  A.    When I saw this, it was inside a clear plastic

12  sandwich bag, and it was laying on the front

13  passenger seat of the vehicle.

14  Q.    And 6B, please.  Do you recognize what that

15  stuff is?

16  A.    Yes, I do.

17  Q.    Is that marijuana?

18  A.    That's correct.

19  Q.    Where was that marijuana located?

20  A.    The two separate sealed compartments they have,

21  both were in two separate clear plastic sandwich

22  bags that were located inside of a medium size black

23  plastic bag that was inside the white garbage bag.

24  Q.    And 5A?

25  A.    5A was inside of a gallon -- clear plastic

gallon Ziploc bag.  That clear plastic gallon Ziploc
bag was inside another clear plastic gallon Ziploc
bag, and then that was inside the white garbage bag
that was between the front seats of the minivan.

Q.   And then Exhibits 5B through 5F?

A.   Each of these exhibits, I sealed them into five
separate compartments in this sleeve.  Each one was
individually in a clear plastic sandwich bag, and
then all five of those were inside of a clear gallon
Ziploc bag.  And then that -- that was all inside of
the white garbage bag that was between the seats of
the Town & Country minivan.

Q.   Do you recognize what that is, the contents?

A.   Yes.

Q.   What is that?

A.   Crack cocaine.

Q.   Now, the -- particularly with regard to those
drug exhibits, what did you do with those after you
retrieved those, as the evidence officer, from the
van?

A.   They were taken back to our office at the
Peoria Police Department.  After a weight was
obtained from them, the clear plastic bags that they
were contained in, they were removed from those and
placed in these sleeves.  And the clear plastic

1  containers that they were -- the clear plastic bags

2  they were contained in were turned over to lab

3  officer Eric Ellis for processing for possible

4  latent prints.

5  Q.   And is that the same for -- would that be true

6  for all four of those drug exhibits?

7  A.   That's correct.

8  Q.   You removed the controlled substance from the

9  original packaging, right?

10  A.   Correct.

11  Q.   And sent the original packaging to the crime

12  lab for fingerprint analysis?

13  A.   That's correct.

14  Q.   You placed the controlled substances in those

15  bags that we see them in now?

16  A.   That's correct.

17  Q.   Which would be aptly described as evidence

18  bags?

19  A.   Correct.

20  Q.   And at some point after they were seized and

21  after you sealed them up, did you put them in your

22  evidence locker at the Peoria PD?

23  A.   Yeah, placed into the property room at the

24  Peoria Police Department.

25  Q.   John, did you place your name and identifying

1  features on an evidence tag that's attached to each

2  one of those four drug exhibits?

3  A.    Yes, I did.

4  Q.    Just hold one of them up and show us what that

5  tag looks like.

6  A.    The tag is here, with my signature, badge

7  number, the case number and the date.  And on the

8  seals at either end of all of them are my initials,

9  the case number, my badge number and the date.

10  Q.    Where specifically does your name appear on the

11  white evidence tag itself?

12  A.    At the bottom of the property tag.

13  Q.    Is that true for each of the four exhibits?

14  A.    Yes, it is.

15        THE COURT:  Did you wish to publish the

16  exhibits at this time?

17        MR. MURPHY:  I think I want to wait for just

18  a little bit.  Thanks, Judge.

19  BY MR. MURPHY:

20  Q.    Officer Couve, with regard to those four

21  exhibits -- let me finish up the questioning I have

22  of you with regard to those so that we can go ahead

23  and publish those.  All right?

24        At some time after you put them in the

25  secure locker that you have there, did you remove

1  them on or about September 5th of 2006?

2  A.    Yes, I did.

3  Q.    Why?

4  A.    At that point, they were taken from the

5  property evidence room and transported over to the

6  Illinois state crime lab in Morton, at which time

7  they were turned over to the chemist over there,

8  Joni Little.

9  Q.    Did you personally do that?

10  A.    Yes, I did.

11  Q.    When you got them out of your evidence locker,

12  were they sealed up as you had left them back on

13  August 23rd?

14  A.    Yes, they were.

15  Q.    And when you gave them to her, were they in the

16  sealed condition?

17  A.    Yes, they were.

18  Q.    When you got them back, what was their

19  condition?

20  A.    They were still in a sealed condition.  I

21  believe that was November 8th that I retrieved them

22  from the chemist, Joni Little.

23  Q.    Okay.  You received them back personally from

24  her?

25  A.    Yes, I did.

1  Q.    What did you do with them on that day?

2  A.    They were then taken back to the Peoria Police

3  Department and placed into the property room.

4  Q.    And were they at all times in a sealed

5  condition at that time?

6  A.    Yes, they were.

7  Q.    Had the blue evidence tape or seal thereon been

8  placed on there at the crime lab after you had left

9  it there?

10  A.    That's correct.

11        MR. MURPHY:  Judge, now that I think the

12  chain of evidence is complete, I would ask

13  permission to admit those exhibits and publish them

14  to the jury.

15        THE COURT:  The Court will admit them, and

16  you may publish.  Rhonda can help you.

17        THE CLERK:  Is it just the drugs?

18        MR. MURPHY:  Just the drugs for now.

19  BY MR. MURPHY:

20  Q.    John, let's go back and talk about Exhibit 3A,

21  that one gun.  Did you have occasion to see that

22  particular weapon later on during the evening hours

23  of August 23rd?

24  A.    Yes, I did.

25  Q.    Would you explain what the circumstances were

1  under which you saw that weapon?

2  A.    Officer Cory Miller, who is also one of the

3  special investigation division officers, brought the

4  gun to me and then described where he located it

5  inside the minivan after it was brought down to the

6  station for a more thorough search.

7  Q.    And did you basically process that as evidence

8  like you did several other exhibits?

9  A.    After the -- I got the information off the gun,

10 it was then taken also to the lab, Officer Eric

11 Ellis, for possible latent print processing.

12 Q.    Okay.  Did you package the gun in any way

13 specific before doing that, before giving it to

14 Officer Ellis?

15 A.    No, I did not.

16 Q.    Okay.  Now I want to go to the exhibits that

17 you brought with you in the box today.

18        And would you remove from the box those

19 exhibits that were removed from the white plastic

20 bag from the black minivan.

21        Okay.  And have those -- the bags been

22 marked or have the contents on the inside been

23 marked?

24 A.    On these -- these were marked by myself after

25 -- they were placed in this bag and then marked.

1  The items that are in this bag were items that were

2  turned over to Lab Officer Ellis also for processing

3  for possible latent prints.

4  Q.    Okay.  Let's start with the bag on your right.

5  A.    Okay.

6  Q.    And what is -- first of all, what's in that

7  particular sack?

8  A.    They're a size 42 bluejean shorts, Marithe

9  Francois Girbaud, a pair of size 2X boxers, and

10  several pairs of socks.

11         THE COURT:  What's the exhibit number on

12  that bag?

13         THE WITNESS:  Exhibit 11, Your Honor.

14  BY MR. MURPHY:

15  Q.    Now, were those items, when you first saw them,

16  where were they?

17  A.    They were inside the white garbage bag that was

18  between the front seats of the Town & Country

19  minivan.

20  Q.    Out there on Lincoln Street?

21  A.    Correct.

22  Q.    And when you retrieved them, you took them down

23  to the station?

24  A.    Correct.

25  Q.    And did what with them?

1  A.    They were placed in this bag, evidence sticker

2  was placed on it, along with my signature and badge

3  number.

4  Q.    Does your signature appear on that white tag?

5  A.    Yes, it does.

6  Q.    Similar to the earlier ones?

7  A.    Correct.

8  Q.    Okay.  Then you placed that bag where?

9  A.    Inside the property room at the Peoria Police

10  Department.

11  Q.    Okay.  Now, as I asked you earlier, all of

12  these coming from the box now that you brought in

13  you got directly from the property room, brought

14  them straight here?

15  A.    Correct.

16  Q.    Now, the other exhibit, does it have -- the

17  other sack, does it have a sticker on the outside,

18  or are they marked on the inside?

19  A.    It has a sticker on the outside.

20  Q.    It's your exhibit sticker, though, right, your

21  property tag?

22  A.    It's a Peoria Police Department property tag,

23  but it was signed by Officer Ellis.

24  Q.    Okay.  Now, what's the difference between

25  what's in that bag and the other bag?

1    A.    In this bag are the items that were turned over

2    to Officer Ellis for processing for possible latent

3    prints.

4    Q.    Okay.   Are they marked with exhibit stickers on

5    the inside of the --

6    A.    Yes.

7    Q.    Would you go ahead and open up that sack,

8    please?

9            There are a number of items in there,

10   correct?

11   A.    That's correct.

12   Q.    I would like for you to pull them out either in

13   groups or one by one.   Tell us, first of all, John,

14   what is the government exhibit sticker, the yellow

15   sticker number on the exhibit?

16   A.    The first one is Government Exhibit Number 1,

17   and it is the white plastic garbage bag that was

18   retrieved from the front two seats of the Town &

19   Country minivan.

20   Q.    And it was between the seats the very first

21   time you saw it?

22   A.    Correct.   Well, the very first time I -- well,

23   yes.

24   Q.    Okay.   You saw a white plastic bag similar to

25   that one earlier, before the van, didn't you?

1  A.    Correct.

2  Q.    Where was it?

3  A.    Mr. Mosby was carrying one.

4  Q.    The time you observed Mr. Mosby with it, could

5  you tell what any of the contents were?

6  A.    You could tell there were contents in it, but,

7  no, you could not tell exactly what was in the bag.

8  Q.    Now, when -- when you retrieved the white bag

9  from the minivan, what did you do with it?

10  A.    It was taken up to our office in the Peoria

11  Police Department.  After the contents were taken

12  out of it, it was then taken, turned over to Officer

13  Ellis for processing for possible latent prints.

14  Q.    What's the next one?

15  A.    This has been marked Exhibit -- Government

16  Exhibit 10B1 and 10B2.  That's how I found them.

17  10B2 was inside of 10B1.  And then the contents of

18  the crack cocaine -- I don't remember the exact

19  exhibit -- approximately 263 grams -- yes, that one

20  there -- was inside of this Ziploc.  And this one

21  was inside this Ziploc.  Then they were both inside

22  of the white garbage bag.

23  Q.    Okay.  You're saying the contents of Exhibit

24  5A, as we see those contents now, were inside of --

25  A.    Inside of --

1  Q.    -- both of those bags?

2  A.    Correct.

3  Q.    Okay.  Actually, it was inside of one of the

4  bags which was inside the other bag?

5  A.    Correct.

6  Q.    Okay.  The next one?

7  A.    This is Exhibit 10B3.  10B3 contained five

8  individual clear sandwich bags that contained the

9  other crack cocaine exhibit.  And those five were

10 inside of this gallon Ziploc bag, and then this was

11 inside of the white garbage bag.

12 Q.    Okay.  So, you're saying that the contents of

13 the crack cocaine here, 5B, C, D, E and 5F, were

14 inside of five separate bags that were inside of

15 that bag?

16 A.    That's correct.

17 Q.    Okay.

18 A.    Exhibits 10C1, 10C2, 10C3, 10C4, and 10C5,

19 these were the clear plastic sandwich bags that

20 contained the five individual packages of crack

21 cocaine.  Each of those were inside of one of these

22 clear plastic sandwich bags that were inside of this

23 Ziploc, inside the tall kitchen bag.

24 Q.    Now, you have placed the sandwich bag that

25 contained the crack cocaine in an evidence bag; is

1  that correct?

2  A.    Yeah.  I did not seal them.  They were left

3  unsealed when they were transported to Officer Ellis

4  for processing for latent prints.  After that,

5  Officer Ellis secured them in the individual

6  sleeves, packages here.

7  Q.    Okay.  And the next group?

8  A.    Exhibit 10D1 was a clear plastic sandwich bag

9  that contained the approximately 20 grams of

10  marijuana that were located on the passenger --

11  front passenger seat of the minivan.

12  Q.    And again, you've placed that clear plastic bag

13  in the evidence sleeve?

14  A.    Correct.

15  Q.    Correct?  All right.  Go ahead.

16  A.    Government Exhibit 10D2 and 10D3, these were

17  two clear plastic sandwich bags that contained the

18  other two packages of marijuana.  The marijuana were

19  in these two individual clear plastic sandwich bags.

20  And then these two clear plastic sandwich bags were

21  in this black medium-sized plastic bag which is

22  marked Government Exhibit Number 9, and then this

23  was inside the white plastic garbage bag.

24  Q.    Okay.

25  A.    Government's Exhibit 7 is a silver digital

1  scale that was located inside the white plastic
2  garbage bags.  And then Government Exhibit 8 is a
3  medium-sized clear plastic Ziploc bag that contains
4  numerous small, clear plastic Ziploc bags, and they
5  were located inside the white garbage bag as well.
6  Exhibits 10A1 and 10A2, they are two Kroger plastic
7  grocery bags, and they were located inside the white
8  garbage bag as well.
9         That's all the ones you have exhibits on.
10 Q.   Okay.  Are there other items that you took out
11 of the white bag that we have not marked as an
12 exhibit?
13 A.   Yes, there are.
14 Q.   Can you hold them up, just describe what they
15 are?
16 A.   This sleeve here has two license plates, the
17 front and back license plates, and then also a
18 temporary license plate that were located inside the
19 clear -- I'm sorry, in the white garbage bag.
20        And then the other item are numerous
21 articles of paperwork that were located inside the
22 white garbage bag.
23 Q.   Now, let me ask a question now about all those
24 exhibits that just now you talked about coming out
25 of that second paper bag there.  To whom did you

1  give all of those exhibits?

2  A.    Those were all -- all those items were turned

3  over to Lab Officer Eric Ellis for processing for

4  possible latent prints.

5  Q.    You did not put them into the evidence vault?

6  A.    That's correct.

7  Q.    And you have seen them, I take it, since

8  August 23rd, just today when they were removed from

9  that, or did you see them some other time?

10  A.    I had seen them previously.

11  Q.    All right.  Was that a circumstance over at the

12  Peoria Police Department where they were marked?

13  A.    Correct.

14  Q.    When I say "marked," I mean marked with the

15  government exhibit tags.

16  A.    Correct.

17        THE COURT:  Mr. Murphy, is there an exhibit

18  number for this second bag that --

19        MR. MURPHY:  Judge, there's not, but we can

20  make one.

21        THE COURT:  I think we should distinguish it

22  from Group Government Exhibit 11.

23        MR. MURPHY:  John, what was the number on

24  the first bag?

25        THE WITNESS:  Exhibit Number 11.

1          MR. MURPHY:  It was 11.

2          THE WITNESS:  Correct.

3          MR. MURPHY:  Judge, for the record, I'm

4   going to mark that second larger bag as 11A at this

5   point.

6          THE COURT:  Very good.  All right.

7          MR. MURPHY:  Just so we can distinguish it.

8   For the record, I'm placing that exhibit sticker on

9   that bag at this point.

10         John, you can go ahead and put all that

11  stuff back in there.

12  BY MR. MURPHY:

13  Q.   Now, there were other exhibits in the box that

14  you brought over today?

15  A.   Yes.

16  Q.   And would you grab those, too, please?

17         Am I correct you also retrieved them from

18  your property room over at the Peoria PD?

19  A.   That's correct.

20  Q.   You brought them along?

21  A.   Correct.

22  Q.   Let's start with whichever one you want to.

23  Tell us what the number on it is.

24  A.   This has Government Exhibit 20.

25  Q.   Okay.

1          MR. MURPHY:  Judge, subject to that exhibit

2  being connected up with further witnesses, I would

3  like for him simply to describe what he knows that

4  to be.

5  BY MR. MURPHY:

6  Q.   What is Exhibit 20?

7  A.   It's an envelope with one of our evidence tags

8  on it that is signed by Officer Marion at the bottom

9  of the property tag.

10  Q.   And what does it contain?

11  A.   According to the tag, it contains a Consent to

12  Search form signed by Miss Hunter and a Consent to

13  Search form signed by Mr. Mosby.

14  Q.   Okay.  And what's the next one?

15  A.   The second one as well is a white envelope

16  bearing one of our evidence stickers that's also

17  signed by Officer Marion.

18  Q.   What's the exhibit number on it?

19  A.   Exhibit 4.

20  Q.   Okay.  And what does that purport to be?

21  A.   According to the sticker, it's -- yeah, the

22  property evidence sticker, it states Miranda Waiver

23  signed by Mr. Mosby.

24  Q.   Okay.  And the next one?

25  A.   Government Exhibit 17 is a clear plastic sleeve

1  with two separate compartments with initials and

2  Badge 845 and the date of August 23rd on it.

3  Q.   Okay.  And what does that purport to contain?

4  A.   Mail from the apartment for Mr. Mosby and

5  Miss Hunter.

6  Q.   What's the next one?

7  A.   Government Exhibit 18, property tag with

8  Officer Jordan's name.  It's a clear plastic sleeve

9  with his name and badge number and it states, Dry

10  Cleaning Receipt, is what the item is in the bag.

11  Q.   Okay.  Does it purport to come from a

12  particular location?

13  A.   Not on the tag.

14  Q.   Okay.  Thanks.  Is that the end of them?

15  A.   I have one other item that doesn't have a

16  government exhibit.

17  Q.   Now, as the evidence officer with regard to

18  this vehicle stop, were there certain quantities of

19  United States currency that were turned over to you?

20  A.   That's correct.

21  Q.   Did Officer Gray turn over money to you?

22  A.   Yes, he found, I believe, $1227 from the person

23  of Mr. Mosby at the time of the incident.

24  Q.   Okay.  And you took that, and you put that

25  money into safekeeping?

1    A.    Correct.

2    Q.    And did you also have occasion to receive and

3    put into evidence other sums of money recovered from

4    the van that afternoon?

5    A.    Yes, I did.

6    Q.    And do you recall where these other sums of

7    money came from?

8    A.    They were located in the pockets of the

9    bluejean shorts that are in this bag here.  There

10   were four separate pockets that contained money.

11   Q.    And do you know the total of -- amount of those

12   four pockets?

13   A.    I believe it was 14,636, I believe.

14   Q.    Is this all in cash, in U.S. currency?

15   A.    That's correct.

16   Q.    So, if I'm correct, more than $15,000 was

17   turned over to you?

18   A.    That's correct.

19   Q.    Was this money eventually taken to a bank?

20   A.    Yes.  It was placed in our safe in our office.

21   And then on August 25th, I retrieved the money from

22   the safe, and it was taken to a bank where it was

23   counted by the people at the bank for specific

24   count.

25   Q.    Okay.  And then was it placed into an account

1  there at the bank?

2  A.    Yes.

3  Q.    Is this in accordance with the DEA procedures

4  for handling money?

5  A.    That's correct.

6  Q.    All right.  John, have I talked about all the

7  evidence you brought over here today?

8  A.    I believe so.

9         MR. MURPHY:  Thank you, Judge.  Those are my

10  questions.

11         THE COURT:  You may cross, Mr. Slaughter.

12         MR. SLAUGHTER:  Yes, Your Honor, if I may.

13                  **CROSS-EXAMINATION**

14  **BY MR. SLAUGHTER:**

15  Q.    Investigator, you were telling us about part of

16  your surveillance wherein you saw the defendant,

17  Cory Mosby, go to 725 North Western and that's the

18  Western Food Market?

19  A.    That's correct.

20  Q.    Was that on the 23rd, or was that on -- before

21  then?

22  A.    I believe that was the July 27th surveillance.

23  Q.    Okay.  And was that the day that you also saw

24  him go and get this black GMC Denali?

25  A.    Yes, sir.

1  Q.   Okay.  Now, when he went to get the GMC Denali,

2  he was merely dropped off by Miss Hunter; is that

3  right?

4  A.   It appeared so, yes.

5  Q.   Okay.  Did he have to go into the office, or

6  did he just walk up to the car and get in?

7  A.   No, he went into the building itself for four

8  to five minutes, I believe, and then came out and

9  got into the vehicle.

10 Q.   Were you able to ascertain what, if anything,

11 he was doing in that building?  Did he pay any money

12 for repairs or what?

13 A.   I -- that I do not know.

14 Q.   Does your investigation tell you whether or not

15 he was there for the purpose of purchasing that

16 automobile?

17 A.   I don't know.

18 Q.   Okay.  Was that a new car?

19 A.   No.

20 Q.   Okay.  Do you --

21 A.   1990, 2000 if I recall.  I don't remember the

22 exact year of the vehicle.

23 Q.   Do you know if that vehicle was registered to

24 the defendant or to someone else?

25 A.   If I'm not -- I don't remember exact -- I

1  believe it might have been registered to either

2  Mr. Mosby or Miss Hunter; I don't remember or recall

3  which one, but it did have a temporary Illinois

4  registration affixed to the back of it.

5  Q.   Does the name Brenda Boyd refresh your memory

6  as to who that vehicle may have been registered to?

7  A.   That's a possibility.  I -- without looking at

8  the notes, I couldn't recall for sure.

9  Q.   Now, you have just spent a great deal of time

10  telling us about the contents of -- that is the

11  second brown bag, and we are calling that 11A; is

12  that correct?

13  A.   Yes, sir.

14  Q.   The contents of that bag were removed by you

15  and sent to Officer Ellis?

16  A.   Correct.

17  Q.   And he's the person that does your latent

18  fingerprint examinations; is that correct?

19  A.   One of them, yes.

20  Q.   Okay.  And you sent to him, I believe, Exhibit

21  Number 1 which we call a white plastic bag?

22  A.   Should I look to see?

23  Q.   Sure.  Go right ahead.

24  A.   Yes, Exhibit 1.

25  Q.   And that's the large, white plastic bag that

1  we've been talking about; is that correct?

2  A.    Yes.

3  Q.    Can you open it so the jury can see how big

4  that bag is?

5  A.    (Witness complies.)

6  Q.    Okay.  That's the bag that had all the contents

7  inside it that you have just been describing for us,

8  correct?

9  A.    Yes, sir.

10  Q.    That bag then, that was all -- that was sent to

11  Officer Ellis?

12  A.    Correct.

13  Q.    In addition to that particular plastic bag,

14  there was a digital scale that was sent?

15  A.    Yes, sir.

16  Q.    There was also I guess what we could call some

17  small baggies; they were also sent?

18  A.    Correct.

19  Q.    Now, what about a black plastic bag --

20  A.    Yes, sir.

21  Q.    -- that was sent?

22       And the two large Kroger -- I'm sorry, the

23  two Kroger bags, were those bags folded up inside

24  this white bag, or were they open?

25  A.    They were -- they were in there.  I don't know

1  that they were open or folded.  They were just

2  basically laying in the white plastic garbage bag.

3  Q.   Can you tell us whether or not there was mail

4  with Cory Mosby's name on it inside that white

5  plastic bag?

6  A.   No, sir.

7  Q.   Okay.  From someplace you recovered a dry

8  cleaner's receipt with Mosby's name on it; is that

9  right?

10 A.   I did not personally, no, sir.  That was

11 retrieved from the apartment, and I was not at the

12 apartment.

13 Q.   Okay.  All right.  You just have knowledge that

14 that was retrieved.  But again, it was not retrieved

15 from out of that plastic bag; is that right?

16 A.   That's correct.

17 Q.   Can you tell us whether there was any type of

18 identification inside the white plastic bag?

19 A.   As far as what kind of identification?

20 Q.   Any cards or anything that bore the defendant's

21 name, any mail or anything that we haven't talked

22 about that had his name on it that was inside that

23 bag?

24 A.   No, sir.

25 Q.   Now, when the automobile that Hunter was

1  driving was stopped, you were about, I think, a

2  block and a half away?

3  A.    Approximately, yes.

4  Q.    Did you get an opportunity to walk up to that

5  stopped automobile?

6  A.    Not at that time, no, sir.

7  Q.    Some time later?

8  A.    When we came back with the video camera, yes.

9  Q.    When you came back with the video camera, was

10  the weapon still in the car?

11         I believe we're referring to 3A at this

12  point.

13  A.    It had not been located at that time.  The

14  vehicle was transported down to Peoria Police

15  Department where it could -- a more thorough search

16  of the vehicle could be done and that's where it was

17  located at.

18  Q.    That's what I want to talk to you about.  When

19  you say it wasn't located -- based on your

20  examination from outside of the car, you couldn't

21  detect if there was a gun in there; is that right?

22  A.    That's correct.

23  Q.    Okay.  Then the whole automobile was

24  subsequently transported to Peoria police station,

25  right?

1  A.    That's correct.

2  Q.    All right.  Now, did you make an examination at

3  the police station that revealed the gun?

4  A.    I did not, no.

5  Q.    All right.  Do you know who did do that?

6  A.    Officer Miller is the officer who located the

7  handgun.

8  Q.    And the location of where the gun was recovered

9  from, that was videotaped, right?

10  A.    Yes, sir.

11  Q.    Okay.  Have you seen the videotape?

12  A.    I have.

13  Q.    Was the gun in plain view?

14  A.    No, sir.

15  Q.    And that would have been -- that's the Kel-Tec

16  9-millimeter?

17  A.    That's correct.

18        MR. SLAUGHTER:  May I have one minute, Your

19  Honor?

20        THE COURT:  Yes.

21  BY MR. SLAUGHTER:

22  Q.    Investigator, by the time you actually got to

23  look inside the -- I guess this is the black

24  Chrysler Town & Country, had there been other

25  officers there before you arrived on the scene?

1  A.    Yes, sir.

2  Q.    And you said something about there was

3  marijuana on the front seat?

4  A.    The front passenger seat, when I arrived there,

5  yes.

6  Q.    Do you know whether or not that marijuana was

7  on that front seat when the automobile was stopped?

8  A.    After talking to Sergeant Mushinsky who was the

9  officer that advised me of it, he stated that that

10  plastic bag had been on top of the white -- the

11  white garbage bag when he first arrived at the

12  vehicle.

13  Q.    Okay.  So, it wasn't on the seat at first.

14  Later it was placed on the seat?

15  A.    Correct.

16  Q.    Okay.

17          MR. SLAUGHTER:  Thank you very much,

18  Investigator.  I have no other questions.

19          THE COURT:  Redirect, Mr. Murphy?

20          MR. MURPHY:  Just briefly, please, Judge.

21                    **REDIRECT EXAMINATION**

22  **BY MR. MURPHY:**

23  Q.    Officer Couve, to clarify, the paper bags 11

24  and 11A, those two paper bags did not come out of

25  the white plastic bag in Exhibit Number 1, did they?

1  A.    No, they did not.

2  Q.    Those are what we refer to as evidence bags

3  that you had down at the police station that you

4  packaged things in, correct?

5  A.    That's correct.

6  Q.    All right.

7          MR. MURPHY:  No further questions, Judge.

8          THE COURT:  Thank you.

9          We might have time for one more witness.

10          MR. MURPHY:  Yes.  Actually, Judge, I have

11  about a 15-minute witness and a 5-minute witness.

12          MR. SLAUGHTER:  Your Honor, may I approach

13  the bench for just a minute?

14          (The following proceedings were had at the

15  bench, out of the hearing of the jury.)

16          MR. MURPHY:  Mr. Slaughter needs a potty

17  break.

18          MR. SLAUGHTER:  Just a minute, Judge.

19          THE COURT:  Okay.

20          MR. MURPHY:  We'll wait here for you.

21          (The bench conference was concluded, and a

22  pause was had in the record, after which the

23  following proceedings were had in the hearing of the

24  jury.)

25          MR. MURPHY:  We call Sergeant Mike

1  Mushinsky.

2              (Witness sworn by the Clerk.)

3         THE COURT:  You may proceed.

4         MR. MURPHY:  Thank you, Your Honor.

5                    **MICHAEL MUSHINSKY,**

6  **called as a witness, after being first duly sworn,**

7  **was examined and testified upon his oath as follows:**

8                    **DIRECT EXAMINATION**

9  **BY MR. MURPHY:**

10  Q.   Sir, would you please state your name and spell

11  your last name?

12  A.   Michael Mushinsky, M-u-s-h-i-n-s-k-y.

13  Q.   What's your business occupation, sir?

14  A.   I'm a sergeant with the Peoria Police

15  Department.

16  Q.   How long have you been with the Peoria PD, sir?

17  A.   Nine years.

18  Q.   And the current nature of your duties is what

19  with the Peoria PD?

20  A.   I'm the sergeant of the street crimes unit.

21  Q.   And would you give us a brief description of

22  what the street crimes unit is and how that's

23  different, for instance, from the patrol division or

24  the detective division?

25  A.   We mainly focus on gang crimes and open-air

1  drug trafficking.

2  Q.    And do you drive marked squad cars?

3  A.    We drive semi-marked squad cars.

4  Q.    And what do you mean by "semi-marked"?

5  A.    We either have white -- white squad cars, but

6  they don't have the emblems on the sides, and they

7  don't have the lights on top.  They have the lights

8  in the interior of the vehicles.  I drive a blue

9  Crown Vic that has all the lights on the interior of

10  the vehicle.

11  Q.    Is yours a patrol duty, however?

12  A.    Yes.

13  Q.    And do you have the city kind of divided up

14  into areas in which you patrol?

15  A.    We, for the most part, are city-wide in the

16  street crimes unit.

17  Q.    Which is different than the normal patrol

18  division?

19  A.    That's correct.

20  Q.    And you are interacting with individuals, both

21  private citizens and offenders, on the streets of

22  Peoria?

23  A.    Yes, we are.

24  Q.    Sergeant Mushinsky, I want to direct your

25  attention, please, to the afternoon hours of

1  August 23, 2006, ask if you were on duty that

2  afternoon?

3  A.    Yes, I was.

4  Q.    Do you recall what your shift or duty hours

5  were that day, sir?

6  A.    That day I would have been working 16:00 to

7  24:00 which is 4 to midnight.

8  Q.    Did you have a fellow officer with you at that

9  time?

10  A.    Yes, Officer Gray was with me.

11  Q.    What's his first name?

12  A.    Joe.

13  Q.    So, you're in this two-man squad, and --

14  actually, semi-marked squad?

15  A.    Correct.

16  Q.    And I want to ask you if you recall sometime

17  right around 5 p.m. that afternoon, were you in

18  communications with Officer Loren Marion and/or

19  other officers that afternoon?

20  A.    Yes, I was.

21  Q.    As a result of communications that you had with

22  Officer Marion, were you requested to make a stop of

23  a particular motor vehicle?

24  A.    Yes, I was.

25  Q.    And where were you when you saw or came upon

1  that motor vehicle?

2  A.    I was in the 1000 block of West Lincoln.

3  Q.    Would you describe for us, please, briefly what

4  the nature of the information was that you received

5  about that particular vehicle?

6  A.    Yes.  I was contacted by Officer Marion who

7  asked me to stop a black minivan.  Himself and the

8  vice unit had been doing a surveillance.  They

9  advised me that during the surveillance they

10 observed the driver -- female driver of this minivan

11 slash three tires on a vehicle.  They also advised

12 me that they believed that she had cut her finger

13 because she had gone in someplace to seek medical

14 attention but then had left prior to getting that

15 medical attention.

16 Q.    Now, did you have any problems stopping the

17 vehicle on -- in the 1000 block of Lincoln?

18 A.    No, I did not.

19 Q.    Did you have to use lights or sirens or both?

20 A.    Yes, I used lights and siren to stop the

21 vehicle.

22 Q.    Did the vehicle pull over quite quickly?

23 A.    Yes.  Immediately pulled over.

24 Q.    Now, were you able to observe how many people

25 were in the vehicle even before you pulled it over?

1  A.    Yes.

2  Q.    And how many did you observe?

3  A.    Two.

4  Q.    And could you tell from your observation if the

5  driver did appear to be a female?

6  A.    Yes, the driver appeared to be a female.

7  Q.    And there were two occupants; then there was

8  only one other occupant in the vehicle besides the

9  driver?

10  A.    Correct.

11  Q.    Where was that person seated?

12  A.    He was in the passenger seat of the vehicle.

13  Q.    Do you see in court here now the person who was

14  in the passenger seat of the vehicle?

15  A.    Yes, I do.

16  Q.    Would you please point at that individual?

17  A.    Sitting right here.

18  Q.    You know that individual by name now?

19  A.    Yes, Mr. Mosby.

20  Q.    At the time that the vehicle is pulling over,

21  are you able to observe any interaction between the

22  two occupants of the vehicle?

23  A.    Yes.

24  Q.    Describe what you saw.

25  A.    They appeared to be having an argument when I

1  pulled in behind them just prior to pulling the

2  vehicle over.  They appeared to be having an

3  argument.

4  Q.   Can you be more descriptive of what -- why did

5  you --

6  A.   It seemed like they were yelling at one

7  another.

8  Q.   Okay.  After the vehicle pulled over and as

9  you're walking up towards the vehicle, what, if

10  anything, did you see happen within the vehicle?

11  A.   As soon as I exited my vehicle, I observed

12  Mr. Mosby reach in -- reach to the center of the

13  vehicle.  He was in the passenger seat, so he

14  reached to his left.  It appeared that he was

15  reaching into a bag, a plastic bag of some sort.

16        I hollered to Officer Gray who was going --

17  Officer Gray was on my passenger side so he was

18  going to the passenger side of the minivan.  I

19  hollered to Officer Gray and said, "He just reached

20  in the bag in the center of the vehicle," just to

21  warn Officer Gray that I had seen him put his hand

22  in this bag.

23  Q.   What, if anything else, did you observe about

24  the passenger of the vehicle?

25  A.   Mr. Mosby then exited the vehicle as Officer

1 Gray was walking up to the vehicle.

2 Q.   What happened with regard to that?

3 A.   I positioned myself behind the minivan so I

4 could watch Miss Hunter, who was the driver of the

5 minivan, and I could watch the interaction between

6 Officer Gray and Mr. Mosby.

7 Q.   What happened on the other side of the vehicle

8 there then?

9 A.   Officer Gray took control of Mr. Mosby.

10 Q.   Okay.  When you say he left the van, did he get

11 back in the van, did he stay outside the van or

12 what?

13 A.   He stayed right outside the van.  He, he at

14 first started to exit the van.  Myself and Officer

15 Gray yelled at him to get back in the van.  He then

16 walked back over to the passenger side of the van

17 but stayed standing right at the passenger side of

18 the van, and Officer Gray approached him and took

19 custody of him.

20 Q.   Then did you have direct contact with the

21 driver?

22 A.   Yes.

23 Q.   And did you make any requests of her?

24 A.   Yes, I asked for the -- Miss Hunter's driver's

25 license which she produced.

1  Q.    Was Mr. Mosby out of the vehicle already at

2  this point?

3  A.    Yes, he was.

4  Q.    Did you see where she produced it from?

5  A.    No.

6  Q.    Did -- were you satisfied with what she

7  produced?  She had a valid driver's license?

8  A.    She gave me a driver's license.  I hadn't

9  confirmed whether it was valid or not, but she did

10 give me a driver's license.

11 Q.    Okay.  Were you able to observe any injuries to

12 her hands at that point?

13 A.    Yes, she had a -- either a piece of gauze that

14 was white, a piece of gauze or a white napkin of

15 some sort that she had on her finger.  I could see

16 that there was blood on the napkin.

17 Q.    Did you converse with her?  Did you ask her

18 further questions about why you had stopped her?

19 A.    Yes.  I asked her how she injured her hand, and

20 she told me that she had cut her finger.  And she

21 started to laugh and said that she was -- had

22 slashed three of her boyfriend's tires on his car.

23 Q.    What further did you say or do?

24 A.    I asked her -- I said, "You don't still have

25 the knife on you, do you?"

1        And at that point she said, no, that she

2   didn't have the knife and I was welcome to search

3   the vehicle.

4   Q.   What happened then?

5   A.   I waited for -- since Officer Gray was -- had

6   Mr. Mosby, I waited for Officer Curry to come so --

7   before I got her out of the van, just in case she

8   did have a weapon.  I waited for Officer Curry to

9   get there.  Once he got there, I again asked her if

10  she had the knife or any weapons in the van.  She

11  again stated she didn't.  I asked her if I could

12  check the van.  She stated yes, that I could.

13  Q.   And what happened then?

14  A.   I had her exit the van.  Officer Curry

15  handcuffed her, took her back to his car.  I then

16  opened the door of the van, and I went right to the

17  plastic -- the white plastic bag that I had seen

18  Mr. Mosby put his hand in when we were walking up.

19       In the bag I saw a bag of marijuana that was

20  sitting right on top, and then there was some

21  clothes, a pair of -- it looked like a pair of black

22  shorts, black shorts or black jeans.  I picked up

23  the jeans, and I looked in, and what appeared to be

24  a large amount of crack cocaine which was in --

25  looked like wafers, kind of wafer form was in the

1  bottom of the bag.

2  Q.    And what did you do with that bag of marijuana

3  that was on top?

4  A.    When I -- when I lifted the, the shorts up, it

5  rolled onto the passenger seat of the car.  And then

6  I put the -- I put the shorts back into the bag the

7  way that I had found them and called Sergeant

8  Theobald.

9  Q.    Okay.  When you say you called Sergeant

10  Theobald, is he one of the S.I.D. officers that were

11  there?

12  A.    Yeah, he's the S.I.D. sergeant so he's in

13  charge of the S.I.D. unit at that time.

14  Q.    You knew that he was watching you already,

15  didn't you?

16  A.    Correct.

17  Q.    And where had he been?

18  A.    Sergeant Theobald was right across the street

19  watching me when I made the traffic stop.

20  Q.    And you made a communication with your

21  sergeant, Theobald?

22  A.    Yes.

23  Q.    And do you remember what you said to him?

24  A.    Yes.  I advised him that I thought I had what

25  was a large amount of crack cocaine in the vehicle.

1  At that point, he advised me to take Miss Hunter and

2  Mr. Mosby down to the station, and he took custody

3  of the vehicle.

4          MR. MURPHY:  May I approach, please, Judge?

5          THE COURT:  Yes.

6  BY MR. MURPHY:

7  Q.   Sergeant Mushinsky, I have shown you Government

8  Exhibit Number 1.  Let me ask you, first of all,

9  when you left the van, did you take this white bag

10 with you?

11 A.   No, I did not.

12 Q.   You left it where?

13 A.   I left it right where it was in between the two

14 seats on the van.

15 Q.   Okay.  In two front bucket seats, type?

16 A.   Yes.

17 Q.   Okay.  And show you what's marked there as

18 Government Exhibit Number 1.  Does that appear to be

19 similar --

20 A.   Yes.

21 Q.   -- to the white plastic bag you have referred

22 to in your testimony, sir?

23 A.   Yes.

24 Q.   Okay.  Is that the same white plastic bag that

25 you observed Mr. Mosby reaching into?

1 A.    Yes.

2 Q.    And is that the same white plastic bag that

3 this package of marijuana came out of and went onto

4 the seat?

5 A.    Yes.

6 Q.    I want to show you 6A.  That's lying right

7 there in front of you.  Do you see that exhibit?

8 A.    Yes.

9 Q.    Does that appear to contain approximately the

10 same amount of cannabis that was in that plastic

11 baggy that was on the front seat?

12 A.    Yes.

13 Q.    It's in a different package at this moment, is

14 it not?

15 A.    Yes.

16 Q.    Okay.

17        MR. MURPHY:  Judge, those are my questions

18 for Sergeant Mushinsky.

19        THE COURT:  You may cross.

20        MR. SLAUGHTER:  Your Honor, may I approach

21 the witness stand?

22        THE COURT:  Yes.

23                    **CROSS-EXAMINATION**

24 **BY MR. SLAUGHTER:**

25 Q.    Sergeant, do you have the white plastic bag?

1  A.   Yes, sir.

2  Q.   May I have it, please?

3  A.   Yes, sir.

4  Q.   Now, Sergeant, you notice that this bag has red

5  plastic at the top; is that correct?

6  A.   Yes.

7  Q.   And that's there for the purpose of doing it

8  like that?

9  A.   Yes.

10  Q.   When it's in this form, you cannot see what was

11  inside the bag; is that right?

12  A.   Correct.

13  Q.   But you're telling us that this bag was sitting

14  like this, like that (indicating), right?

15  A.   Yes.

16  Q.   In an upright position, and it was open?

17  A.   It, it was -- it wasn't sitting

18  full-length-wise upright.  It was squished down, but

19  it -- the bag was open.

20  Q.   The bag was squished down, like this position

21  (indicating)?

22  A.   Uh-huh.  Uh-huh.

23       THE COURT:  You might position yourself so

24  the jury can see you.  You have your back to them.

25       MR. SLAUGHTER:  I'm sorry.

1  BY MR. SLAUGHTER:

2  Q.   Sergeant, the bag was, as you say, squished

3  down in the position I have it in now?

4  A.   Yes.

5  Q.   But so that I don't distort your testimony,

6  even though it was squished down, it was not pulled

7  like that?

8  A.   No, it wasn't pulled tight like that.

9  Q.   It wasn't turned like that in any manner to

10 form a handle when you saw it?

11 A.   No, sir.  No, sir.

12 Q.   Let me ask you this, Sergeant.  You're the

13 person that stopped the black Town & Country, right?

14 A.   Yes, sir.

15 Q.   And you had to activate your emergency

16 equipment to stop it, right?

17 A.   Yes, sir.

18 Q.   How far did the black minivan travel before it

19 came to a stop?

20 A.   I'd say I watched it for probably about a

21 block.

22 Q.   In that amount of time, that's when you

23 activated your equipment, right?

24 A.   No, sir, that's before I activated my

25 equipment.

1  Q.    I want to know how far it traveled from the

2  time you activated your equipment.

3  A.    It, it immediately pulled over.  I would

4  estimate probably 20, 30 feet.  She pulled right

5  over.

6  Q.    Okay.  Now, during the time that the vehicle

7  was in the process of pulling over, you didn't see

8  the defendant put anything into a plastic bag, did

9  you?

10  A.    No.

11  Q.    It was after you stopped your automobile, after

12  Miss Hunter stopped the automobile, you get out of

13  your car, you -- by the way, were you in full

14  uniform?

15  A.    Yes.

16  Q.    You start walking up on the driver's side of

17  the minivan, right?

18  A.    Actually, I saw him reach in the bag from the

19  back window of -- I wasn't -- I was just -- I had

20  just stepped out of my car, stood up --

21  Q.    Let me put a question to you, Sergeant.

22  A.    Yes, sir.

23  Q.    We're going to get there.

24  A.    Yes, sir.

25  Q.    You got out of your car.  You are walking up on

1  the passenger side -- driver's side?

2  A.   I, I wasn't walking up yet when I saw him reach

3  in the bag.

4  Q.   All right.  When you say you saw the defendant

5  reach into a bag, at that position that you were in,

6  were you adjacent to the black minivan?

7  A.   No, I was still behind the black minivan.  I

8  was in the back window.

9  Q.   Okay.  Were the windows on this black minivan

10 tinted in any way?

11 A.   They were slightly tinted, yes.

12 Q.   Okay.  And you were able to look through the

13 slightly tinted windows, and you say you saw the

14 defendant who was sitting in the front put something

15 into the smushed-down white plastic bag, right?

16 A.   I saw him put his hand in the bag.  As I

17 testified, I can't say if he took something -- put

18 something in or took something out.  I just saw him

19 put his hand in the bag.

20 Q.   So, is it your testimony that you couldn't see

21 what was in his hand?

22 A.   That's correct.

23 Q.   So, you didn't -- you didn't know at that point

24 what it was?

25 A.   No.

1  Q.    Okay.  And you say then that the defendant got

2  out of the car.  You and your partner said, "Get

3  back in the car."  Then your partner approached him

4  and put handcuffs on him?

5  A.    Yes.

6  Q.    Okay.  Now, you got a -- not a telephone call

7  but got a call from your fellow officers, and they

8  told you to stop the minivan, right?

9  A.    Yes.

10  Q.    The information they gave you was that the lady

11  was injured?

12  A.    Correct.

13  Q.    Did they tell you that the lady had a knife?

14  A.    Yes, they said that they had observed her

15  slashing the tires on a vehicle while they were

16  doing surveillance.

17  Q.    Okay.  My question, though, is did -- did they

18  tell you that they believed this lady was in

19  possession of any kind of a weapon?

20  A.    I believe I just inferred that she used a

21  weapon of some sort to slash the tires on the car.

22  I don't know that they said knife.  It could have

23  been a screwdriver.  I don't know.

24  Q.    Well, they didn't tell you when the incident

25  occurred -- that is, the tire-slashing incident?

1  A.    No, sir.

2  Q.    They didn't tell you where the tire-slashing

3  incident occurred?

4  A.    No, sir.

5  Q.    All they said was they saw her slash some

6  tires?

7  A.    Correct.

8  Q.    Okay.  And you made the assumption that she

9  might have had a knife so you asked her about a

10 knife?

11 A.    Correct.

12 Q.    She said, "I don't have one"?

13 A.    Correct.

14 Q.    And she gave you a driver's license?

15 A.    Correct.

16 Q.    Now, at this point, Mr. Mosby is already in

17 handcuffs, right?

18 A.    Correct.

19 Q.    Now, did you have any information that

20 Mr. Mosby had a weapon on him?

21 A.    No, sir.

22 Q.    Did you have any information that Mr. Mosby was

23 the person responsible for the injury that the lady

24 had?

25 A.    No, sir.

1  Q.   But Mr. Mosby is off to the side, under arrest,

2  right?

3  A.   Yes, because Mr. Mosby tried to leave the

4  traffic stop, is why Mr. Mosby got handcuffed.

5  Q.   Oh, okay.  He got out of the car and tried to

6  walk away from you.  Is that what you're saying?

7  A.   Yes.

8  Q.   He didn't run; he tried to walk away?

9  A.   Excuse me?

10  Q.   I said he didn't run; he tried to walk away?

11  A.   Yes.

12  Q.   That's why you apprehended him?

13  A.   Correct.

14  Q.   Did you fill out a report that says that

15  Mr. Mosby tried to walk away from the traffic stop?

16  A.   Yes.

17  Q.   You did?

18  A.   Yes.

19  Q.   Do you have that report with you?

20  A.   I do not have it with me, no.

21  Q.   But that's a report that can be produced, where

22  you authored a report that said Mosby tried to walk

23  away from the traffic stop?

24  A.   Yes, it says that Mr. Mosby exited the vehicle

25  and was instructed to go back to the vehicle.

1  Q.   Did he go back?

2  A.   Yes, he walked back to the passenger area of

3  the vehicle.

4  Q.   So, he tried to walk away, but on your command

5  he followed what you asked him to do?

6  A.   He was told to get back in the vehicle, and he

7  just stood.  He walked back to the passenger side,

8  and he just stood at the passenger side, so he did

9  not get back in the vehicle as he was instructed.

10  Q.   Now, you've also told us that some kind of way

11  the marijuana fell from out of this plastic bag onto

12  the seat?

13  A.   Yes, sir.

14  Q.   Which seat did it fall on?

15  A.   The passenger seat.

16  Q.   Although the bag was, as you say, smushed down?

17  A.   The bag was smushed down.  The bag of marijuana

18  was sitting right on top of the jeans.  I picked the

19  jeans up to see what else was in the bag.  And at

20  that point, as I picked the jeans up out of the bag,

21  the marijuana rolled over onto the passenger seat.

22  And I set the jeans back down on the bag.

23  Q.   Did Miss Hunter tell you, when you asked her

24  for a driver's license, that she was trying to get

25  to the hospital to get her hand repaired?

1  A.    She stated that she had cut her hand, yes.

2  Q.    But she told you, "I'm trying to get to the

3  hospital right now," right?

4  A.    I don't recall her saying that.  All she told

5  me was -- she laughed about cutting her hand

6  slashing the tires.

7  Q.    And she was laughing when she said that?

8  A.    Yes.

9  Q.    Did you actually see the wound in her hand?

10  A.    No, I just -- I could see the finger.  She had

11  -- she was holding it with the napkin, but I didn't

12  actually see the cut.

13  Q.    She asked you, "Can I close the windows to my

14  car and go on about my business?"  Did she say that

15  to you?

16  A.    No, I don't recall that at all.

17  Q.    She just said, "Okay, I'll stand here while my

18  hand is bleeding, and you can question me"?

19  A.    I was speaking to her, and she was very -- she

20  was answering my questions.  Like I said, she was

21  laughing about slashing the tires on the car.

22  Q.    Let me make sure I got this straight.  You were

23  stopping her for the purpose of placing her under

24  arrest for slashing of the tires, right?

25  A.    I was stopping her at the request of Officer

1  Marion.

2  Q.    I see.

3  A.    And that's what he had told me he had seen her

4  do.

5  Q.    And she gave you permission to search that

6  vehicle; is that right?

7  A.    Twice.

8  Q.    How long was it from the time that you stopped

9  her until you say the lady gave you permission to

10 search the car?

11 A.    As I walked up, I asked her for her driver's

12 license.  She gave me her driver's license.  I then

13 made a comment about her finger, about the napkin

14 that had blood on it with her finger.  And she --

15 she immediately said to me -- she laughed and said,

16 "I cut my finger slashing my boyfriend's tires."

17          And then at that point I said to her,

18 "Ma'am, you don't still have the knife with you that

19 you slashed the tires with?"

20          And she, she laughed and she said, "No, I

21 don't have the knife.  You're welcome to look in the

22 van."

23 Q.    She told you twice that she did not have a

24 knife?

25 A.    Correct.  Then when Officer Curry then got

1    there -- because I didn't want to get her out of the

2    van until Officer Curry got there, I said to her

3    again, "Ma'am, you don't have any knives or guns on

4    you, do you?"

5          And she stated, "No, I don't have any knives

6    or any guns."

7          And I then said, "Do you mind if I search

8    your van?"

9          She said, "No, go ahead and search my van."

10   Q.   Now, you didn't ask her anything about this

11   marijuana that you saw laying on the front seat,

12   right?

13   A.   No.

14   Q.   You didn't say, "Is that yours, Miss?"

15   A.   No.

16   Q.   "Where did it come from?"

17   A.   No.

18   Q.   It was apparent to you that it was contraband,

19   right?

20   A.   I actually -- she was already handcuffed and

21   taken back to Officer Curry's car before I observed

22   the marijuana.

23   Q.   Oh, so you didn't see the marijuana at first

24   when you were going through the series of questions

25   with her about her injury and that sort of thing?

1  A.   No, I didn't see the marijuana until I entered

2  the car and started looking.

3       MR. SLAUGHTER:  Thank you, sir.  I have no

4  other questions.

5       THE WITNESS:  Thank you.

6                **REDIRECT EXAMINATION**

7  **BY MR. MURPHY:**

8  Q.   When you looked in the vehicle, how many white

9  plastic bags did you see?

10  A.   Just one.

11  Q.   When you looked in the vehicle, did you find

12  any knives?

13  A.   No, I did not.

14  Q.   When you first approached that driver's side

15  window to talk to her, was there a concern in the

16  back of your mind that she might be armed?

17       MR. SLAUGHTER:  I'm going to -- never mind.

18  I will withdraw.

19  A.   Yes, that was my -- the first -- my first worry

20  was that she still had the knife.

21  Q.   Were you able to detect the presence of

22  marijuana even prior to seeing it for the first

23  time?

24  A.   Yes, I could smell it in the vehicle.

25  Q.   Is that something you're trained to smell?

1  A.    Yes.

2  Q.    And so you -- did you suspect that there was

3  marijuana in this vehicle when you were at the

4  window talking to her?

5  A.    Yes.

6  Q.    And did both you and Officer Gray direct the

7  defendant to get back in the vehicle?

8  A.    Yes.

9  Q.    And he did not do so?

10 A.    He did not do so.

11 Q.    So, he disobeyed both of you officers?

12 A.    Yes.

13         MR. MURPHY:  Thank you.  That's all.

14         MR. SLAUGHTER:  May I, Your Honor?

15         THE COURT:  Yes.

16                **RECROSS-EXAMINATION**

17 **BY MR. SLAUGHTER:**

18 Q.    When he was trying to get away from you, he had

19 the white plastic bag, right?

20 A.    No, sir.

21 Q.    And you said you smelled the odor of marijuana,

22 but you never questioned the lady about whether or

23 not there was marijuana in that car?

24 A.    Correct.

25         MR. SLAUGHTER:  Thank you.  I have no other

1 questions.

2          MR. MURPHY:  Nothing further, Your Honor.

3 Can we do one more short witness?

4          THE COURT:  How short?  6 feet?

5          MR. MURPHY:  It's Officer Gray, Judge, who

6 will talk about them searching the defendant.

7          THE COURT:  All right.

8          MR. MURPHY:  Thank you.

9          THE COURT:  I'm glad somebody caught my bit

10 of judicial humor there.  One of my favorite lines.

11          (Witness sworn by the Clerk.)

12          THE CLERK:  Thank you.

13                    **JOSEPH GRAY,**

14 **called as a witness, after being first duly sworn,**

15 **was examined and testified upon his oath as follows:**

16                    **DIRECT EXAMINATION**

17 **BY MR. MURPHY:**

18 Q.   Sir, would you please state your name?

19 A.   Joseph Gray.

20 Q.   And your occupation?

21 A.   I'm a Peoria police officer.

22 Q.   And are you with the street crimes unit?

23 A.   Yes, I am.

24 Q.   And going back to August 23rd of 2006, were you

25 on the patrol status with Sergeant Mushinsky about

1  5:00 or so that evening?

2  A.    Yes.

3  Q.    And was he driving or you?

4  A.    He was.

5  Q.    And did you overhear radio traffic requesting a

6  stop of a particular motor vehicle?

7  A.    I was made aware of it by Sergeant Mushinsky.

8  Q.    Okay.  And when -- was this vehicle stopped in

9  the 1000 block of Lincoln?

10  A.    Yes, it was.

11  Q.    And please describe what you observed at the

12  time this vehicle was pulled over.

13  A.    I exited our squad and approached the vehicle

14  with Sergeant Mushinsky.  I noticed the passenger

15  lean over in towards the middle, between the seats

16  -- front two seats.  And Sergeant Mushinsky said,

17  "He's reaching into a bag."

18  Q.    What happened then?

19  A.    As I approached the passenger side of the car,

20  just as I was to the rear of the bumper, I noticed

21  the passenger come back up and then exit the

22  vehicle.  And I ordered him back into the vehicle.

23        He walked back up to the front, just between

24  the open door but didn't get in the vehicle.  As I

25  came up to the door, I could smell cannabis -- the

1  odor of cannabis coming from the vehicle and

2  immediately placed the passenger into cuffs.

3  Q.    Okay.  And is that passenger known to you now

4  by name?

5  A.    Yes, sir.

6  Q.    Is that Mr. Mosby?

7  A.    Yes, it is.

8  Q.    Is Mr. Mosby present here in court today?

9  A.    Yes, he is.

10  Q.    Would you please point at that individual?

11  Thank you.

12        MR. MURPHY:  Judge, would the record reflect

13  the identification of the defendant, Cory Mosby?

14        THE COURT:  Yes.

15        MR. MURPHY:  Thank you.

16  BY MR. MURPHY:

17  Q.    Officer Gray, after handcuffing the defendant,

18  did you perform a quick search or patdown of his

19  person?

20  A.    I asked him to step away from the vehicle just

21  up on the sidewalk and patted him down for weapons.

22  Q.    And did you discover any weapons?

23  A.    No, sir.

24  Q.    Did you discover something else, however?

25  A.    He had some money in one of his pockets.  I

1 believe that I gave that to Officer Couve.

2 Q.   And do you recall about how much money that

3 was?

4 A.   I know it was over $1,000.  I don't think it

5 was over 2,000.  About 1,200, I believe.

6 Q.   Okay.  And was it all in one pocket, or was it

7 in multiple, if you recall?

8 A.   I don't recall.

9 Q.   Okay.  Can you be specific today about which

10 pocket it came out of?

11 A.   No, sir.

12 Q.   You just know that you took over $1200 off of

13 his person?

14 A.   Yes, sir.

15 Q.   This was all in U.S. currency -- cash as we

16 call it?

17 A.   Yes, sir.

18 Q.   Okay.

19        MR. MURPHY:  Judge, those are my questions.

20 Thank you.

21        THE COURT:  You may cross, Mr. Slaughter.

22        MR. SLAUGHTER:  Yes, Your Honor.

23                    **CROSS-EXAMINATION**

24 **BY MR. SLAUGHTER:**

25 Q.   Officer Gray, you say that the defendant got

1  out of the car, and he started walking; is that

2  right?

3  A.   Yes, sir.

4  Q.   Was he walking towards you?

5  A.   He appeared to be walking just south, away from

6  the car, towards the sidewalk.

7  Q.   And how many feet did he take before you told

8  him to go back to the car?

9  A.   Approximately five to seven feet.

10 Q.   Okay.  And you say there was a sidewalk, and he

11 was walking in the direction of the sidewalk?

12 A.   Yes, sir.

13 Q.   Are you on the passenger side or driver's side?

14 A.   I was on the passenger side.

15 Q.   And on the passenger side, you're outside of

16 the vehicle.  Are you towards the rear or in the

17 center of the vehicle?

18 A.   Towards the rear more.

19 Q.   Okay.  And from your position towards the rear

20 of the vehicle, you were able to smell the odor of

21 marijuana, right?

22 A.   Yes, I was.

23 Q.   Was it -- that marijuana, was it encased in

24 plastic?

25 A.   I don't know.

1    Q.    You never saw the marijuana?

2    A.    There was -- after I had gotten him out and

3    walked back up to the vehicle, when Sergeant

4    Mushinsky was up there and another officer had

5    arrived, there was a large bag of cannabis on the

6    passenger seat.

7    Q.    That was the first time you noticed it?

8    A.    Yes, sir.

9    Q.    When you saw it, was it encased in plastic?

10   A.    Yes, sir.

11   Q.    And you say you put the handcuffs on the

12   defendant, did a patdown search, and the only thing

13   you removed from him was United States currency?

14   A.    Yes, sir.

15        MR. SLAUGHTER:   Thank you.   I have no other

16   questions.

17        MR. MURPHY:   Thank you very much, Judge.   We

18   have no other questions.

19        THE COURT:   Thank you very much, sir.

20        We will break for the day, start back at

21   9:00 in the morning.

22        THE CLERK:   Court's adjourned.

23        (Proceedings adjourned at 4:51 p.m.)

24

25