1            IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS

2  UNITED STATES OF AMERICA,        )

3                  Plaintiff,       )   VOLUME II

4          vs.                      )   Case No. 06-10072
                                    )   Peoria, Illinois
5  CORY MOSBY,                      )

6                  Defendant.       )

7

8     EXCERPTED TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                    MAY 1, 2007

9

10                   BEFORE:

11        THE HONORABLE JOE BILLY McDADE,
            United States District Judge
12                 And a Jury

13

                  APPEARANCES:
14

          BRADLEY W. MURPHY, ESQUIRE
15          JERRY BROST, ESQUIRE
            United States Attorneys
16          One Technology Plaza
        211 Fulton Street, Fourth Floor
17          Peoria, Illinois  61602
        (Appeared on Behalf of the Plaintiff)

18

19        CHESTER SLAUGHTER, ESQUIRE
            Lyle & Slaughter
20      900 West Jackson Street, Suite 6-W
            Chicago, Illinois  60607
21      (Appeared on Behalf of the Defendant)

22

23

24      Jennifer E. Johnson, CSR, RMR, CRR, CBC
    Proceedings recorded by mechanical stenography,
25  transcript produced by computer

99

1                          <u>**INDEX**</u>

                                                    **PAGE**
2
   **GOVERNMENT WITNESSES:**
3
        **JAMES  HENSON**
4
             Direct Examination by Mr. Murphy    102
5            Cross-Examination by Mr. Slaughter  107

6       **ERIC  ELLIS**

7            Direct Examination by Mr. Murphy    108
             Cross-Examination by Mr. Slaughter  126
8
        **DOUGLAS  THEOBALD**
9
             Direct Examination by Mr. Murphy    128
10           Cross-Examination by Mr. Slaughter  141
             Redirect Examination by Mr. Murphy  146
11
        **CORY  MILLER**
12
             Direct Examination by Mr. Murphy    149
13
        **JOHN  DIERKER**
14
             Direct Examination by Mr. Brost     158
15           Cross-Examination by Mr. Slaughter  170
             Redirect Examination by Mr. Brost   172
16
        **SCOTT  JORDAN**
17
             Direct Examination by Mr. Murphy    173
18           Cross-Examination by Mr. Slaughter  182
             Redirect Examination by Mr. Murphy  184
19           Recross-Exam by Mr. Slaughter       185

20      **MARK  GEEVER**

21           Direct Examination by Mr. Brost     189

22

23

24

25

**INDEX**

**PAGE**

**GOVERNMENT'S EXHIBITS:**

|  |  |
|---|---|
| 2A | 136 |
| 2B | 175 |
| 11A | 118 |
| 21A | 125 |
| 21B | 122 |
| 21C | 122 |
| 22 | 106 |

```
 1                    (Jury Not Present.)

 2           THE COURT:  Good morning.

 3           MR. MURPHY:  Good morning, Judge.

 4           MR. SLAUGHTER:  Good morning.

 5           THE COURT:  What's your lineup for today,

 6  Mr. Murphy?  We have to stop about noontime.

 7           MR. MURPHY:  Oh, okay.  And then you're not

 8  going to be available this afternoon?

 9           THE COURT:  No.

10           MR. MURPHY:  Okay.  Yes, that changes --

11           THE COURT:  Maybe we can go until 1:00.

12           MR. MURPHY:  Okay.  Let me see what I need

13  to do to change the lineup.  We have four witnesses

14  here, and we've got two more on tap.  We've got one

15  coming from the crime lab.

16           Boy, if I could get those seven witnesses

17  done by 1:00 I'd really like to do that, Judge.

18           THE COURT:  Well, I'm here.  Just I have to

19  do something.

20           MR. MURPHY:  That changes Mr. Slaughter's

21  program, though.

22           MR. SLAUGHTER:  Not a problem, though.

23  Whenever we get ready for my thing, they'll be here.

24  I just have to tell them when to come.

25           MR. MURPHY:  I presume 9:00 tomorrow morning
```

1  then.

2       THE COURT:  Yes.  We have all day tomorrow.

3       MR. MURPHY:  Very good.  If we get these

4  seven done, I'm anticipating that we would have only

5  a couple more witnesses to close our case in chief.

6       THE COURT:  All right.  Have the jury come

7  in, please.

8          (The jury was brought in.)

9       THE COURT:  You may call your next witness.

10      MR. MURPHY:  Thank you, Your Honor.  We

11  would like to start today by calling Officer James

12  Henson.

13          (Witness sworn by the Clerk.)

14      THE CLERK:  Thank you.  Please have a seat

15  over there.

16                    **JAMES HENSON,**

17  **called as a witness, after being first duly sworn,**

18  **was examined and testified upon his oath as follows:**

19               **DIRECT EXAMINATION**

20  **BY MR. MURPHY:**

21  Q.   Sir, would you please state your name and spell

22  your last name for us?

23  A.   James R. Henson, H-e-n-s-o-n.

24  Q.   Sir, what's your business or occupation?

25  A.   I work at the Peoria County Sheriff's

1    Department.   I'm a correctional officer.

2    Q.    Okay.   Generally what are your duties as a

3    correctional officer?

4    A.    I receive inmates; I fingerprint inmates; I

5    overlook their activities.   I just look after their

6    well-being.

7    Q.    Okay.   And how long have you worked for the

8    Peoria County sheriff?

9    A.    Approximately 27 years.

10    Q.    Officer Henson, I want to direct your attention

11    back to the month of August, more specifically to

12    the early morning hours of August 24th of 2006.

13    Were you working that morning?

14    A.    Yes.

15    Q.    And when I say "early morning hours," do you

16    recall what time your shift began, sir?

17    A.    Our briefing starts at 9:30.

18    Q.    That's p.m.?

19    A.    Yes.

20    Q.    Okay.   And you -- your shift would then end

21    what time?

22    A.    At 6 a.m.

23    Q.    During the course of the early morning hours of

24    August 24th, did you come in contact with an inmate

25    that you now know is Cory Mosby?

1  A.    Yes.

2  Q.    What was the nature of your contact, please?

3  A.    I fingerprinted him.

4  Q.    Okay.  And where did that happen?

5  A.    In the intake area of the Peoria County Jail.

6  Q.    And did you fingerprint him in accordance with

7  your regular procedures?

8  A.    Yes.

9  Q.    And did you understand that Mr. Mosby had been

10 recently arrested by the Peoria Police Department?

11 A.    Yes.

12 Q.    Now, you were sharing with me just a little bit

13 earlier today that you have some automated equipment

14 that allows you to do the fingerprinting now?

15 A.    That's correct.

16 Q.    And would you explain the procedure that you

17 followed in fingerprinting Mr. Mosby?

18 A.    After the jail tech finishes with the booking,

19 she'll photograph him.  Then she'll have him have a

20 seat.  I'll run his name through the machine and

21 bring up the information to the screen where I need

22 to have it at.  And then I'll ask him to step up,

23 and I'll let him know that I'm taking his

24 fingerprints.  I start with his right forefingers,

25 go to his thumb, then his left forefingers, then his

1  thumb, and then I roll each finger.

2  Q.   Okay.  Is there a specific spot on the screen

3  or something that you have to roll the individual

4  print in?

5  A.   Yes, it's florescent red.

6  Q.   And then does the machine then put out or

7  manufacture a card of some sort?

8  A.   Yeah, it prints out two cards.

9  Q.   Okay.  And are they identical?

10 A.   Yes.

11 Q.   And is there anything you have to do with the

12 card at that point?

13 A.   I would ask, ask the person imprinting to have

14 a seat.  As soon as the prints come out, I'll have

15 him sign them.

16 Q.   Okay.  Did you do that on this occasion as far

17 as you know?

18 A.   Yes.

19 Q.   And you fingerprint a lot of people, right?

20 A.   Yes.

21 Q.   Do you believe you'd remember this Cory Mosby

22 if you saw him in court here today?

23 A.   Yes.

24 Q.   And do you see Cory here?

25 A.   Yes, I do.

1  Q.    Please point at him.

2  A.    I'm sorry.  Right there.

3  Q.    Thank you.

4         MR. MURPHY:  Would the record reflect he's

5  pointed at the defendant, Your Honor?

6         THE COURT:  The record will reflect.

7  BY MR. MURPHY:

8  Q.    Officer Henson, lying just in front of you up

9  on the ledge is an exhibit we marked as Government

10 Exhibit 22.  Would you look that over, please?

11        Do you recognize that, sir?

12 A.    Yes.

13 Q.    And what is it?

14 A.    It's a print card.

15 Q.    Okay.  And did you print the individual on that

16 card?

17 A.    Yes.

18 Q.    And whose card is it?

19 A.    Cory Mosby.

20 Q.    You're referring to the defendant here in

21 court?

22 A.    Yes.

23 Q.    And did you -- is that one of the cards that

24 you produced back on the early morning hours of

25 August 24?

1  A.   Yes, it is.

2  Q.   Now, you didn't put it in the plastic sleeve at

3  that time, did you?

4  A.   No.

5  Q.   That's been added since you produced the card?

6  A.   Correct.

7  Q.   And just one last thing.  To the best of your

8  knowledge, are those the accurate fingerprints of

9  the defendant, Cory Mosby?

10  A.   Yes.

11       MR. MURPHY:  We will move for the admission

12  of 22, please, Judge.

13       THE COURT:  Any objection?

14       MR. SLAUGHTER:  No objection, Your Honor.

15       THE COURT:  Be admitted.

16       MR. MURPHY:  Those are my questions.  Thank

17  you, Judge.

18       THE COURT:  You may cross.

19                    **CROSS-EXAMINATION**

20  **BY MR. SLAUGHTER:**

21  Q.   Officer Henson, the new procedure that you have

22  only means that the machine produces the card as

23  opposed to you producing it.  Is that how it works

24  now?

25  A.   Correct.

Q.    And once the machine produced the card, to

check the accuracy, you then went and got one of the

old fingerprint cards and compared them.  Is that

what you did?

A.    No.

Q.    Did you compare the prints that came through

the machine with anything else?

A.    No.

Q.    But it is your testimony and your belief that

that machine is pretty much accurate; is that

correct?

A.    Yes.

        MR. Slaughter:  All right.  Thank you, sir.

        MR. MURPHY:  That's all.  Thank you, Judge.

        THE COURT:  Thank you, sir.

            (Witness sworn by the Clerk.)

        THE CLERK:  Thank you.  Please have a seat.

                    **ERIC ELLIS,**

**called as a witness, after being first duly sworn,**

**was examined and testified upon his oath as follows:**

                **DIRECT EXAMINATION**

**BY MR. MURPHY:**

Q.    Sir, would you please state your name and spell

your last name for us?

A.    Eric Ellis, E-l-l-i-s.

Q.    And, Mr. Ellis, what is your business or
occupation?

A.    I'm a City of Peoria police officer.

Q.    How long have you been with the Peoria Police
Department?

A.    Since August of 1993.

Q.    Tell us, please, the current nature of your
duties there.

A.    I'm assigned to the crime scene unit.

Q.    And how long have you been with the crime scene
unit?

A.    Since January of 1996.

Q.    In those 10-plus years -- actually, 11 years or
so, tell us what your duties as part of the crime
scene unit have been.

A.    My duties include the recognition,
documentation and preservation of evidence for the
eventual presentation in court, which includes
things such as photography and the searching for
latent fingerprint evidence.

Q.    Have you had specialized training in the area
of the -- both the development and the
identification of fingerprints?

A.    Yes, I have.

Q.    And would you relate to us, please, what some

1  of that training has been?

2  A.    I have college education that includes things

3  such as criminal investigation.  I've also been sent

4  to training up at Northwestern University in crime

5  scene investigation.  I've been sent to a seminar on

6  fingerprint identification and comparison.  And then

7  through my time in the crime scene unit, I've also

8  fallen under the tutelage of other crime scene

9  officers.

10  Q.    Did you have specific training in the different

11  ways to try to develop a latent fingerprint on an

12  object?

13  A.    Yes.

14  Q.    And what are some of those different ways that

15  you both been trained in and have used over the

16  years?

17  A.    Well, the first is just visualization, when you

18  just examine items for latent fingerprint evidence.

19  And then with that, you take progressive steps to

20  further develop or digitalize, such as fingerprint

21  powder, which is the most common.

22        And then you can also use what is just

23  commonly referred to as fuming, which is the

24  vaporization of super glue.  Then from that, you get

25  into florescent dyes and other materials.

1   Q.   Have you used these techniques many times over

2   the course of the years as your part of the crime

3   scene unit?

4   A.   Yes, I have.

5   Q.   Have you been called a number of times to

6   appear in court and testify as an expert witness in

7   both the development and the identification of

8   latent fingerprints?

9   A.   Yes, I have.

10  Q.   Is that both in state and federal courts?

11  A.   Yes, it is.

12       MR. MURPHY:  Judge, at this time I would

13  tender Mr. Ellis as an expert in the -- actually

14  just the area of development of fingerprints.  I am

15  not going to be asking him about identification.

16       THE COURT:  Would you wish to voir dire?

17       MR. SLAUGHTER:  Your Honor, we'll accept

18  this witness as an expert in the area that he's

19  going to testify to.

20       THE COURT:  All right.  You may continue,

21  sir.

22  BY MR. MURPHY:

23  Q.   Mr. Ellis, I'd like to direct your attention,

24  please, back to the month of August of 2006.  And

25  I'll ask you if in the latter part of that month,

1  along about the 23rd or 24th of the month, if you

2  received a number of items from Officer John Couve?

3  A.    Yes, I did.

4  Q.    Do you recall those circumstances -- that is,

5  which date it was and how you received them?

6  A.    Yes.

7  Q.    Please tell us what that was.

8  A.    On August 23rd, at approximately 9:30 p.m.,

9  Vice Officer Couve brought down numerous articles,

10  including a firearm and items that are commonly used

11  for the packaging of contraband.

12  Q.    Lying just to your right, I think, on the floor

13  I placed a paper sack that had a large number of

14  items in it.  And were the items that you received

15  that evening, were they in that sack already, or did

16  you place them in the sack?

17  A.    They were brought down in this sack, and then I

18  just later sealed them back in the sack.

19  Q.    Okay.  And fair to say that there were a number

20  of items in the sack when you received it?

21  A.    Yes.

22  Q.    And did Officer Couve request you to process

23  all of those items in that particular sack to try to

24  determine the presence of any latent fingerprints?

25  A.    Yes, he did.

1  Q.   Did you set about doing that?

2  A.   Yes, I did.

3  Q.   Can you give us some idea, at least a

4  description of the items that you did search, that

5  you did try to find prints on?  What is it that you

6  were examining at that point?

7  A.   There were a number of plastic packaging items.

8  One of them was a kitchen-size drawstring garbage

9  bag.  There were also three one-gallon size Ziploc

10 bags and two Kroger grocery shopping bags, a black

11 shopping bag, and then eight sleeves with eight

12 foldover sandwich bags and then another bag with

13 small, tiny Ziploc bags inside of it.  There were

14 also other items such as license plates and some

15 documents inside the bag.

16 Q.   Did you make your best effort to try and

17 develop latent fingerprints on every item that you

18 received in that bag?

19 A.   Except for the documents, a Kroger receipt and

20 some insurance papers, yes, I did.

21 Q.   Okay.  Did that include the license plates?

22 A.   Yes.

23 Q.   Okay.  On how many, if any, of the items that

24 were submitted to you were you able through your

25 different processes that you used, on how many of

1  them were you able to discern what are called

2  suitable latent prints?

3  A.    On the two Kroger grocery bags, there were two

4  areas, one on each of the bags, that I cut away that

5  had potential latent evidence on it.

6  Q.    Okay.  And as well --

7            MR. MURPHY:  May I approach please, Judge?

8            THE COURT:  Yes.

9  BY MR. MURPHY:

10  Q.    I'm going to show you the -- another exhibit.

11  It's marked here for identification as Exhibit 3B.

12  Is that correct?

13  A.    Yes.

14  Q.    Is that the weapon that you received?

15  A.    This is the -- a weapon that Officer Jordan

16  brought down earlier in the evening.

17  Q.    Okay.  And show you one more weapon; it's been

18  marked as 3A.  And was 3A presented to you as well?

19  A.    Yes, 3A is the Kel-Tec that Officer Couve

20  brought down to me.

21  Q.    So, Officer Couve brought you the sack full of

22  many different things and 3A; is that correct?

23  A.    Yes, it is.

24  Q.    Were there any other items that he brought to

25  you at that time?

1  A.    No.

2  Q.    Okay.  And then also from another officer -- I

3  think you've indicated his name was Scott Jordan --

4  am I correct you received Exhibit 3B?

5  A.    That is correct.

6  Q.    Let's talk about Exhibit 3A, that particular

7  weapon that you received from Couve.  Did you

8  process it?

9  A.    Yes, I did.

10  Q.    And can you tell us specifically what process

11  you used to examine that weapon and any of the

12  magazines or bullets?

13  A.    On this one, I did what is commonly referred to

14  as super glue fuming for the process on this weapon

15  and the ammunition and magazine inside.

16  Q.    Do you remember how many bullets, how much

17  ammunition was included with the magazine?

18  A.    There were nine cartridges in the magazine.

19  Q.    Did you -- did you examine them separately?

20  A.    I processed them at the same time as I did the

21  handgun and the magazine.

22  Q.    Okay.  So, this is actually one super glue

23  process that you used for all of them?

24  A.    Yes.

25  Q.    And that involves what, briefly?

1  A.   All we do is we have vacuum chambers.  And we

2  will use just coffee cup warmers, and we will heat

3  up super glue.  And it will vaporize.  And the

4  vapors created from this heating process will adhere

5  to latent fingerprints that left on objects.

6  Q.   So, you put the super glue and the object in

7  the tank, and you wait for any latents that may

8  develop?

9  A.   Yes.

10 Q.   Did you find any suitable latents on any of the

11 items on 3A?

12 A.   No, I did not.

13 Q.   Let's talk about 3B, that firearm.  Did you

14 also process it?

15 A.   Yes, I did.

16 Q.   Did you use the same process that you earlier

17 described to us that you used with the 9-millimeter,

18 3A?

19 A.   Yes, I did, but in this case I also took one

20 step further by applying a florescent dye to the

21 firearm.

22 Q.   Did you do that before or after the super glue?

23 A.   It's done after the fuming.

24 Q.   And is there a particular reason you did use

25 the florescent dye process?

1  A.    There were -- there were two latent

2  fingerprints on the slide of the weapon, and the dye

3  is used to -- it's a staining dye which will allow

4  you to then use a forensic light to actually

5  visualize the fingerprint better.

6  Q.    Okay.  So, the weapon you received that we're

7  talking about now, 3B, that's the .45-caliber,

8  correct?

9  A.    Yes, it is.

10  Q.    And you've indicated there were a couple of

11  areas on the slide that you felt had suitable latent

12  prints to possibly be compared?

13  A.    Yes.

14  Q.    Did the magazine or the ammunition contain any

15  latent prints?

16  A.    No.

17  Q.    What further did you do with Exhibit 3B?

18  A.    After I was finished evaluating the prints to

19  the best of my ability, I then sealed them in the

20  plastic sleeve and submitted them to our property

21  room.  And then after that, delivered the items with

22  evidence to the Illinois State Police Division of

23  Forensic Services over in Morton, Illinois.

24  Q.    Now, did that occur on about August 31st?

25  A.    Yes.

1  Q.    What is it that you took over to the lab at

2  that time?

3  A.    I took over -- I took over both firearms, and

4  then I also took over the two cutout portions from

5  the Kroger shopping bags.

6  Q.    Okay.  We'll talk about those bags in just a

7  moment.

8          To whom did you give these items, if you

9  recall, at the Morton crime lab?

10 A.    I can't recall if I signed firearms in to

11 Dennis Hoyland or Linda Yborra.  I believe it was

12 Dennis Hoyland.

13 Q.    Okay.  And he's one of the technicians there?

14 A.    Yes.

15 Q.    Okay.  And the other evidence that you took

16 over, to whom did you give it?

17 A.    That was signed over to their latent

18 fingerprint section.

19 Q.    Okay.  Now, let's -- if you would, please, you

20 indicated you processed all of those different bags

21 that were in 11A, correct?

22 A.    Yes.

23 Q.    Would you pull out the one that -- I believe

24 it's marked as Government Exhibit Number 1, the

25 large white -- you've described it as a tall kitchen

1  garbage bag here.

2          Now, you processed the surface on that

3  particular bag?

4  A.   Yes, I did.

5  Q.   And what means did you use to do that?

6  A.   I first again used the super glue fuming

7  method.  And then afterwards I used what's called

8  black magnum powder to assist in the visualization

9  of any latent evidence on the bag.

10 Q.   Okay.  And as you have told us earlier, you

11 developed no latent prints on that bag; is that

12 correct?

13 A.   That's correct.

14 Q.   Well, does that mean that nobody touched the

15 bag?

16 A.   No.

17 Q.   Okay.  Simply means you couldn't develop

18 anything?

19 A.   That's correct.

20 Q.   Now, does -- is there still some residue or

21 some evidence of that black powder that's still on

22 that bag?

23 A.   Yes, there is.

24 Q.   So, the white bag, at the time you received it,

25 was pretty much white.  A little less than white

1  now.  Is that fair?

2  A.    Yes.

3  Q.    Okay.  Would you pull out of the bag, 11A,

4  those two Kroger bags that you indicate you did some

5  further processing on?

6         I believe we placed government exhibit

7  stickers on those two bags, correct?

8  A.    Yes.

9  Q.    What are those numbers, please?

10  A.    One is 10A1 and the other is 10A2.

11  Q.    What process did you use to examine those two

12  bags?

13  A.    Again, I used the super glue fuming technique.

14  And then on areas, after visualizing the -- or

15  examining the bags, I used florescent dye on the

16  areas where I observed ridge detail.

17  Q.    Okay.  And what, in fact -- that is what you're

18  looking for, correct, what are called the ridges on

19  the fingerprints that are left thereon?

20  A.    Yes.

21  Q.    Okay.  Did you find such area on each of those

22  two exhibits?

23  A.    Yes, I did.

24  Q.    And did you make some effort to preserve those?

25  A.    The super glue I actually preserved the

1  fingerprint, but, yes, I cut away the portions and

2  then placed them on what we call black backers.

3  Q.    Okay.  So, you actually pulled or actually cut

4  out a portion of each of those bags?

5  A.    Yes.

6  Q.    Would you hold each one of those bags up in

7  order, tell us what the number is on each one and

8  show us the hole that you made?

9  A.    This is 10A1.  Then here, here is the hole that

10  I cut the piece of plastic portion away from.

11  Q.    Okay.  It's up there at the top near your right

12  hand?

13  A.    Yes.

14  Q.    Okay.  Very good.  And on the other one?

15  A.    This is 10A2, and then on the back of the

16  bag --

17  Q.    That would be near the bottom right -- bottom

18  left of the bag, excuse me.  Correct?

19  A.    Yes.

20  Q.    Okay.  Now, I want to direct your attention to

21  a couple of exhibits lying up in front of you there,

22  Mr. Ellis.  Those two exhibits, do you recognize

23  those two?

24  A.    Yes, I do.

25  Q.    And what are the numbers on those two exhibits?

```
1   A.   One is 21B and the other is 21C.

2   Q.   And what are 21B and C?

3   A.   These are the actual lift card or the black

4   backers, as we call them, where I taped on the

5   excised portions of the Kroger bags.

6   Q.   They are actually part of the bag that you cut

7   out --

8   A.   Yes.

9   Q.   -- and put on that black card?

10  A.   Yes.

11  Q.   Correct?

12        And what did you do with those two portions

13  of the Kroger bags?

14  A.   Eventually, I then submitted them to the

15  Illinois State Police, Division of Forensic Services

16  in Morton, Illinois, for further comparison and

17  evaluation.

18  Q.   Okay.  And was that done on or about

19  August 31st, as you've already told us?

20  A.   Yes.

21  Q.   Okay.  And as you indicated, you turned that

22  over to the latent fingerprint section --

23  A.   Yes, I did.

24  Q.   -- at the Morton crime lab?

25  A.   Yes.
```

1  Q.    Now, did, did you recently take over or pick up

2  the evidence over at the crime lab?

3  A.    Yeah.  Yes.

4  Q.    I believe, what, some of the items you picked

5  up last week that were still at the crime lab; is

6  that correct?

7  A.    Yes.

8  Q.    What did you pick up and bring back to the

9  Peoria Police Department?

10 A.    The two lift cards with the plastic bag

11 portions, the fingerprint card and then also a

12 photograph of a latent fingerprint.

13 Q.    Okay.  I want to direct your attention to

14 Number 22, the fingerprint card that's been admitted

15 in evidence here.  Do you recognize that, sir?

16 A.    Yes, I do.

17 Q.    What is it?

18 A.    This is a fingerprint card from our files that

19 was used in the comparison work to further develop

20 latent fingerprint evidence.

21 Q.    And do you know where that was obtained?

22 A.    It was obtained out of our files.

23 Q.    Okay.  And do you know how it got into your

24 files?

25 A.    Yes.  Every time someone is arrested in Fulton

1  -- or Peoria County, Peoria County supplies us with

2  a fingerprint card.

3  Q.    Okay.  And did you do something with that

4  fingerprint card when you obtained it?

5  A.    I sealed it in a plastic sleeve for submission

6  to the Illinois State Police, Division of Forensic

7  Services.

8  Q.    And did you take that card also over to the

9  crime lab?

10  A.    Yes, I did.

11  Q.    And is that the card you recently picked up at

12  the crime lab as well?

13  A.    Yes, it is.

14  Q.    At the time you sealed that card up in that

15  sleeve, did it have the blue evidence tape that

16  appears thereon now?

17  A.    No, it did not.

18  Q.    Did it have that blue tape on it when you

19  picked it up at the crime lab?

20  A.    Yes, it did.

21        MR. MURPHY:  May I approach one last time,

22  please, Judge?

23        THE COURT:  Yes.

24  BY MR. MURPHY:

25  Q.   One last exhibit, Mr. Ellis.  I believe it's

1  been marked for identification as 21A; is that

2  correct?

3  A.   Yes.

4  Q.   Did you pick that up over at the crime lab last

5  week when you picked up the other exhibits?

6  A.   Yes, I did.

7  Q.   And did you produce that particular exhibit?

8  A.   No, I did not.

9  Q.   Who gave you that exhibit?

10 A.   It was inside with the envelope from the latent

11 fingerprint section.

12 Q.   Okay.  So, that was simply provided to you

13 along with those two sections of the bag that you

14 brought back?

15 A.   Yes.

16 Q.   Okay.  If I can now, in summary form, to

17 conclude your testimony, two weapons were submitted

18 to you with regard to this case, right?

19 A.   Yes.

20 Q.   You were able to develop latents on only one of

21 the two?

22 A.   That is correct.

23 Q.   More than 20 items were submitted to you in

24 Exhibit 11A, individual items when you count all the

25 bags?

1  A.   Yes.

2  Q.   Correct?

3        And you were able to develop latent prints

4  on only two of those?

5  A.   Yes.

6  Q.   Is that unusual at all in your business?

7  A.   No.

8        MR. MURPHY:  Thank you.  That's all, Judge.

9        THE COURT:  You may cross.

10                  **CROSS-EXAMINATION**

11  **BY MR. SLAUGHTER:**

12  Q.   Officer Ellis, did you process a set of license

13  plates?

14  A.   Yes, I did.

15  Q.   Now, did those license plates come out of the

16  large white plastic bag, or do you know?

17  A.   I can't recall if they came out of -- exactly

18  out of that white bag or if they were just in the

19  paper sack that came down with the bag.

20  Q.   Okay.  So, the things that came in the brown --

21  is that the brown paper sack we're talking about,

22  the evidence bag?

23  A.   Yes.

24  Q.   Okay.  You are not sure of the origin of some

25  of those things that came; is that right?

1    A.    As, as far as where they were at?

2    Q.    Yes, sir.

3    A.    No.

4    Q.    Okay.  I think you just got done telling

5    Mr. Murphy that you sent two pieces of plastic that

6    came off the Kroger bags, you sent those to the

7    Illinois State crime lab?

8    A.    Yes.

9    Q.    They had what you call suitable prints?

10   A.    Yes.

11   Q.    And then you also lifted a print off the slide

12   of one of the weapons, right?

13   A.    I developed it on the slide, but I didn't lift

14   it.  It remains on the slide.

15   Q.    I see.  So, the people at the Illinois State

16   crime lab examined those prints right on the weapon

17   -- I'm sorry, on the magazine?

18   A.    It's on the slide to the weapon.

19   Q.    I'm sorry.  Still on the slide?

20   A.    Yes.

21   Q.    Now, is that the .44?

22   A.    That is the .45.

23   Q.    Do you know what the origin of -- where was the

24   .45 collected from?

25   A.    No, I don't know where it was collected from.

```
 1              MR. SLAUGHTER:  Excuse me just one minute.
 2   Thank you, Officer.  I have no other questions.
 3              THE COURT:  Redirect?
 4              MR. MURPHY:  I don't think so.  Thank you,
 5   Judge.
 6              THE COURT:  Thank you, Officer.
 7              (Witness sworn by the Clerk.)
 8              THE CLERK:  Thank you.
 9              THE WITNESS:  Good morning.
10                        DOUGLAS THEOBALD,
11   called as a witness, after being first duly sworn,
12   was examined and testified upon his oath as follows:
13                        DIRECT EXAMINATION
14   BY MR. MURPHY:
15   Q.   Sir, would you please state your name and spell
16   your last name?
17   A.   Douglas Theobald, T-h-e-o-b-a-l-d.
18   Q.   And, sir, what is your occupation?
19   A.   Peoria police officer, 14 years.
20   Q.   And the current nature of your duties with the
21   Peoria PD is what, Sergeant?
22   A.   Special investigations division, vice and
23   narcotics.
24   Q.   On a regular basis, what do you do as a
25   sergeant?
```

1  A.    Regular basis, I supervise the night shift.

2  Q.    Does that also cause you, from time to time, to

3  be on the street assisting in investigations and/or

4  surveillance?

5  A.    Yes.

6  Q.    Were you on duty, sir, during the day of

7  August 23, 2006?

8  A.    Yes, I was.

9  Q.    And were you part of a surveillance team, if I

10  may call it that, that was surveilling the comings

11  and goings of an individual that you now know as

12  Cory Mosby?

13  A.    That's correct.

14  Q.    Were you part of the surveillance team out at

15  the -- in the area of the Parkview Estates?

16  A.    Yes, I was.

17  Q.    And did you, from time to time, as part of the

18  surveillance duties that you had out there, did you

19  see Mr. Mosby at one point in time or another?

20  A.    At Parkview Estates?

21  Q.    Yes.

22  A.    No, I did not.

23  Q.    Okay.  Did you see him later on after he had

24  left Parkview Estates?

25  A.    Yes.

Q.    Where did you first set eyes on Mr. Mosby?

A.    Outside of the vehicle that he was in when I

first saw him, he was on Hamilton Street, near

Methodist Hospital.

Q.    Okay.  And was he alone on the street when you

first observed him?

A.    Yes.

Q.    What did you see him doing at that point?

Describe it to us, what you saw.

A.    He was walking along the sidewalk area, across

the street from the hospital.  Hamilton is a -- kind

of a busy road there.  It would be the southwest

side across from the hospital.  He was walking down

the hill, towards downtown here, walking alone, and

he had a fairly good size bag in his hand.

Q.    Could you tell what color the bag was?

A.    It was white.

Q.    Could you see anything else that you could make

out in his hands at any time besides that white bag?

A.    No.

Q.    Did you ever see him using a cell phone?

A.    No, I did not.

Q.    Okay.  And tell us what you observed of him as

he was walking down the street.  What happened?

A.    Well, after I went by him initially, I, I did

1  not go back around because I didn't want him seeing

2  me again, being on the surveillance team.  So, I

3  ended up taking another position and then was

4  contacted -- we were back and forth in contact with

5  the other surveillance members who had picked him up

6  or got an eye on him.

7  Q.   Okay.  So, the one time that you did see him

8  was there on Hamilton near the hospital?

9  A.   Correct.

10  Q.   And he was walking in essence kind of away from

11  the hospital?

12  A.   Yes.

13  Q.   Okay.  Did you see anybody else in his vicinity

14  at the time that he was walking there on the street?

15  A.   No.

16  Q.   Did you have occasion to see him again after

17  that?

18  A.   Yes.  The next time I saw him was after the

19  uniformed officers had stopped the car on Lincoln

20  Street.

21  Q.   Now, you actually were near -- very near that

22  stop, were you not?

23  A.   Yes, I was.

24  Q.   Tell us what your vantage point was there at

25  the time of the stop.

1  A.   I was behind the van and the unmarked car with

2  the uniformed officers going down Lincoln Street

3  which is a -- it's a one-way street going eastbound.

4  And after they got the van stopped, I pulled into an

5  alley that's just off of a side street so I had a --

6  about a 45-degree view of the stop.  So, I just

7  parked my surveillance vehicle there and watched the

8  stop take place.

9  Q.   After the stop is made, do you receive a

10 communication from Sergeant Mushinsky?

11 A.   Yes.

12 Q.   And after that communication is made to you,

13 does Sergeant Mushinsky and Officer Gray and Officer

14 Curry then clear the area of the van?

15 A.   Yes, they do.

16 Q.   And did you actually direct them to take

17 Mr. Mosby and Miss Hunter down to the station?

18 A.   Yes, I informed them that Ser-- Sergeant

19 Mushinsky that --

20        MR. SLAUGHTER:  I'm going to object to the

21 hearsay at this point, Your Honor.

22        THE COURT:  Overruled.

23 BY MR. MURPHY:

24 Q.   Proceed.

25 A.   Sergeant Mushinsky and I were back and forth on

1  the Nextel phone, and I informed him that we would

2  like those two separated in transport to the

3  station, which one of them went in Sergeant

4  Mushinsky's and Officer Gray's car, and the other

5  one went in Officer Curry's car which is a marked

6  unit.  And they were transported down Lincoln Street

7  toward the station.

8  Q.   As they left the scene, what did you do?

9  A.   As they were driving down Lincoln Street or the

10  one-way street away, I simply pulled in behind the

11  van from across the street.

12  Q.   Was there anybody else there in the vicinity of

13  the van at that time?

14  A.   No.  They had just pulled away.  I pulled in

15  behind, and then I was joined by other officers.

16  Q.   Okay.  And when you pulled in behind the van,

17  tell us what you did at that point.

18  A.   As I pulled in behind the van, I think the next

19  officer there was Officer Miller, who was also a

20  narcotics investigator.  I got into the van.

21  Officers -- I'm sorry, Sergeant Mushinsky had

22  relayed some other information to me that there was

23  a bag inside the -- inside the van.  And I opened up

24  the door, looked inside, could tell what it was.

25  Q.   Did -- which door did you open?

1  A.   It was the passenger -- front passenger door.

2  Q.   Were you able to see a bag at that point?

3  A.   Yes.

4  Q.   Can you describe the bag that you could see?

5  A.   It was a white plastic garbage type bag.

6  Q.   And where specifically was it?

7  A.   It was in between the two seats in the van,

8  towards the front.

9  Q.   Okay.  The front two seats --

10  A.   Right.

11  Q.   -- you are talking about?

12  A.   Correct.

13  Q.   Lying just to your right up there is what's

14  marked for identification here as Government Exhibit

15  Number 1.  How does Number 1 appear in comparison to

16  the bag you've told us you saw on the front seat of

17  the van?

18  A.   Appears to be the same.  Well, minus the --

19  it's got fingerprint dust on it from getting

20  processed.  But other than that, the same.

21  Q.   And the time you saw it there, did it have

22  contents?

23  A.   Yes, it did.

24  Q.   Now, did you take a quick look at the contents,

25  or did you have someone come and video it?

1  A.   I took a quick look at the top.  I could see

2  into the top of it.  And then before I removed

3  anything, I had to have video.

4  Q.   Okay.  Now, did you also observe what appeared

5  to be a bag of marijuana on one of the front seats?

6  A.   Yeah, there was a smaller bag of cannabis,

7  marijuana, right towards the passenger seat there.

8  Q.   Okay.  Did you have one of the officers get the

9  video and bring it back?

10  A.   Yes.

11  Q.   And did you then -- what did you then proceed

12  to do with the video on?

13  A.   Once we got the video there to document what

14  was -- we documented what was inside the bag.  I had

15  put rubber gloves on and then simply removed each

16  item in the bag on, on video, showing what it was.

17  And then eventually, that -- all those pieces of

18  evidence got transported to the station.

19  Q.   And the evidence there in the van, you didn't

20  take it out of the van, correct?

21  A.   Correct.

22  Q.   You left it there in the van.  And the van was

23  turned over to an evidence officer that day?

24  A.   Correct.

25  Q.   And who was that?

1   A.   Officer John Couve.

2   Q.   Now, have you viewed the video that was taken

3   from your actions there in the van that day of

4   August 23rd?

5   A.   Yes.

6   Q.   And does it accurately portray what you did

7   inside the van that afternoon?

8   A.   Yes.

9          MR. MURPHY:  Judge, at this point in time I

10  would like to admit Government Exhibit 2A and play a

11  portion thereof.

12         THE COURT:  Any objections?

13         MR. SLAUGHTER:  No.

14         THE COURT:  Be admitted, and you may.

15         MR. MURPHY:  Thank you.

16         Rhonda, do I need to do anything or --

17         THE CLERK:  I can't mute it, but I'm going

18  to turn it all the way down so hopefully we won't be

19  able to pick up any audio.

20         MR. MURPHY:  Okay.

21         THE CLERK:  Take just a second.

22             (Video commenced.)

23  BY MR. MURPHY:

24  Q.   For the record, Officer Theobald, we are now --

25  excuse me, Sergeant Theobald, we are now going to

1  play a portion of the video 2A, and I would like for

2  you, in response to my questions, to kind of narrate

3  this.  Okay?

4  A.   Okay.

5  Q.   Is this the van, Sergeant Theobald?

6  A.   Yes, it is.

7  Q.   The back, I take it, of the van?

8  A.   That's correct.

9  Q.   Who's shooting this video?

10  A.   Officer Loren Marion.

11  Q.   Is that showing the street number of 1046?

12  A.   Yes, that's -- we were showing that it's in the

13  1000 block of Lincoln, and 1046 happened to be the

14  house that was closest there.

15  Q.   Okay.  Is that you and Miller and Couve there

16  also?

17  A.   Yes.

18  Q.   Does that show the white bag between the seats

19  there?

20  A.   Correct.

21  Q.   And what's that show?

22  A.   That's the -- about an ounce of marijuana that

23  was there on the seat when I arrived.

24  Q.   That's the passenger seat?

25  A.   Correct.

1   Q.   Is that you getting in the front seat there?

2   A.   Yes, that's me.  And I will be retrieving stuff

3   from the bag.

4   Q.   Would you tell us now, as the video plays, what

5   it is you're pulling out as you are pulling things

6   out, please?

7   A.   Okay.  Right there, I was just telling him,

8   when I pulled the evidence out, I'm going to put it

9   on the back seat there.

10  Q.   Okay.  What is this?

11  A.   That is crack cocaine.  It's approximately --

12  about 9 ounces, and there's, there's several

13  individual packages of -- it appears to be about

14  2 1/4 ounces each so there's four of those inside

15  that clear plastic there.

16  Q.   Then there was a fifth one as well, right?

17  A.   Yeah.

18  Q.   What's this now?

19  A.   This is the -- this is also crack cocaine, but

20  it's not packaged individually.  It's all in one

21  chunk, but it's about the same weight as the other

22  one.  They're both towards the top there of the bag.

23  Q.   What's this?

24  A.   That's a digital scale, common for weighing

25  smaller amounts of cocaine, crack or any kind of

1  drug, really.  Temporary license plates checked to a

2  different vehicle than the van.  Regular license

3  plates checked to a different vehicle than either of

4  our --

5  Q.   What were these?

6  A.   That was -- it was some sort of paperwork, but

7  I don't -- I think it had a female's name on it.  I

8  don't recall the name offhand.

9        Pulled those out showing that they appeared

10  to be large boxer shorts, perhaps male.  I think

11  they were 2X, if I recall.

12  Q.   More paperwork?

13  A.   More paperwork with some names.  Just some

14  other amounts of cannabis here, similar package to

15  the one that was on the seat there when I arrived.

16  A couple ounce packages of marijuana or cannabis,

17  whatever you want to call it.  But that was all in

18  the black bag there.

19  Q.   What was that?

20  A.   That I could not tell.  That was a receipt, I

21  think.  I think a grocery store receipt there.

22        Tube socks.  I was pulling them each apart

23  to make sure that -- that's the cannabis that was on

24  the seat to begin with.  But there's several pairs

25  of tube socks I just searched real quick.  Those are

1  jeans that -- I don't recall the exact men's size of

2  them, but they were large men's jeans.  I pulled the

3  tag.  They were just -- narrated on the video, but I

4  don't recall exact size.  I pulled out the pockets,

5  searched each one of the pockets.  There's large

6  amounts of cash in several of the pockets.

7         What I ended up doing on this was the --

8  initially I pulled that out of the pocket and put it

9  on the seat, but then I ended up putting each amount

10 back into the pocket it came from.

11        Three of the four main pockets had large

12 amounts of cash in them, and then a cargo pocket

13 also had a large amount of cash.  Ended up being

14 about $15,000 in cash between all of the four

15 pockets.

16 Q.   There you were re-storing the cash?

17 A.   Yeah, that's the first one I took out.  We just

18 put it all back in each pocket so we know where it

19 was at for the evidence officer.  That's the last

20 cargo pocket with the side pocket on them.

21 Q.   More socks?

22 A.   Uh-huh.

23 Q.   Did that conclude the search of the van as far

24 as you were concerned?

25 A.   That concluded the search of the van on the

1  scene there, on Lincoln Street.

2  Q.    And did you direct that the van be brought down

3  to the police department for further and more

4  thorough search of the entire van?

5  A.    Yes.

6  Q.    Okay.

7        MR. MURPHY:  Judge, those are my questions

8  of Sergeant Theobald.

9        THE COURT:  You may cross-examine,

10  Mr. Slaughter.

11                 **CROSS-EXAMINATION**

12  **BY MR. SLAUGHTER:**

13  Q.    Sergeant Theobald, you removed a set of license

14  plates from inside the white plastic bag?

15  A.    That's correct.

16  Q.    Was there a registration card with those

17  license plates?

18  A.    With the reg-- with the license plates?

19  Q.    Yes.  You know the card that has the State

20  sticker on it, was that inside the little plastic

21  sleeve that surrounds the license plate?

22  A.    I don't recall, but I can check on the

23  evidence.

24  Q.    Well, let me ask you this:  You also removed,

25  was that mail or some envelopes?

```
 1  A.   Right.
 2  Q.   And it had someone's name on it, right?
 3  A.   Correct.  A female's name.
 4  Q.   All right.  Did you ever go and ask that female
 5  how it is that mail belonging to her was found
 6  inside that bag?
 7  A.   Did I personally?
 8  Q.   Well, any of the investigators under your
 9  control.
10  A.   I do not know.
11  Q.   Okay.  The license plate then, did either you
12  or any of your investigators check with the
13  Secretary of State to see who those plates were
14  registered to?
15  A.   That's correct.  Both, both the temporary
16  license plate and the regular license plate were run
17  and checked.
18  Q.   Okay.  And did you get a name back from the
19  Secretary of State?
20  A.   Yes, they were both females' names and two --
21  two separate vehicles.
22  Q.   And did either you or anybody under your
23  command go and interview the names of the people
24  that came back from the Secretary of State?
25  A.   I did not.  I can speak for myself.  I did not.
```

1  Q.   Okay.  You haven't seen any of the reports

2  where any of the investigators working on this case

3  went and interviewed the people's names that were on

4  that mail that you found; is that right?

5  A.   Without looking at each individual piece of

6  evidence to remember what names were on there, I

7  can't answer that.  But to my knowledge, no.

8  Q.   Okay.  You have been working in narcotics for

9  how long?

10 A.   About half my career.

11 Q.   Okay.  And one of the things that you do when

12 you go out on raids, when you are executing search

13 warrants -- and you have executed search warrants;

14 is that correct?

15 A.   That's correct.

16 Q.   You pick up mail inside various places that you

17 go to to show what we call proof of residency; isn't

18 that correct?

19 A.   Yes.  For search warrants at residences, yes,

20 we do that.

21 Q.   So, in this instance when you discover mail and

22 you discover license plates, you are saying that you

23 did not check to see who these people were or how it

24 is that their belongings got in that bag.  Am I

25 correct?

1  A.    Correct.

2  Q.    Now, you also told us about seeing Mr. Mosby on

3  the -- I guess on the sidewalk of Hamilton; is that

4  right?

5  A.    Yes.

6  Q.    And you say that you saw him carrying a plastic

7  bag similar to the one that's in front of you?

8  A.    Correct.

9  Q.    The bag that you say you saw him carrying, did

10  it have a red drawstring attached to it?

11  A.    Well, I can't -- from viewing him on Hamilton

12  Street, I can't say that I saw the red drawstring on

13  Hamilton Street.  I can only -- as I testified to, I

14  saw him with a white bag.

15  Q.    Was he carrying that white bag out in front of

16  him, or did he have it over his shoulder or what?

17  A.    No, he just had it down.

18  Q.    Had it hanging down?

19  A.    Yes.

20  Q.    And while it was hanging down, you couldn't

21  tell whether or not it was being held by those red

22  -- by the red straps?

23  A.    No, not -- no, I couldn't.

24  Q.    When you say it was hanging down, did he have

25  -- was the bag all pushed together in his hand --

1  that is, a portion of the bag?

2  A.    It didn't appear to be -- if -- I guess if I

3  pull this out all the way full-length, it appeared

4  that he had the top portion of it in his hand.

5  Q.    Well, can we do it like this?  Would you stand

6  up and show the ladies and gentlemen of the jury how

7  he was holding that bag when you saw him on Hamilton

8  Street?

9  A.    Okay.  As I was driving by in my car, I recall

10 he was walking down Hamilton Street.  He had the top

11 of the bag.  I can't tell whether or not he had it

12 like this or -- but he had the top of the bag he was

13 holding.

14 Q.    Thank you.

15 A.    It was down.  But I was driving by in my car,

16 so --

17 Q.    But as you said, you can't tell whether or not

18 the bag that you saw him with had a red drawstring?

19 A.    When I saw him on Hamilton Street?

20 Q.    Yes, sir.

21 A.    No, on Hamilton I can't.

22 Q.    Excuse me one second.

23        Sergeant Theobald, do you recall how

24 Mr. Mosby was dressed that day when you passed him

25 on Hamilton Street?

1 | A.   No, I do not.

2 | Q.   Was he wearing -- do you remember whether or

3 | not he was wearing a hat or a cap or anything of

4 | that nature?

5 | A.   No, I do not.

6 | Q.   As shown in the video, were you able to tell

7 | whether or not the back window to the van was

8 | tinted?

9 | A.   It looked -- it did look tinted, yes.

10 | Q.   What about the side windows; were they also

11 | tinted?

12 | A.   I think the ones in the back were, were darker.

13 | I don't know what level tint or anything, but --

14 | Q.   And you showed -- well, in the video it shows a

15 | bag of marijuana.  Would you say in the middle of

16 | the passenger -- in the middle of the front

17 | passenger seat?

18 | A.   Yes, it was on the passenger seat.

19 | Q.   And the white bag was actually on the floor

20 | between the two seats; is that correct?

21 | A.   Correct.

22 |        MR. SLAUGHTER:  Thank you, sir.  I have no

23 | other questions.

24 |                **REDIRECT EXAMINATION**

25 | **BY MR. MURPHY:**

1  Q.   At the time you observed Mr. Mosby on Hamilton

2  Street carrying a white bag, could you see or did it

3  appear to you that there were contents in the bag?

4  A.   It appeared that it had some weight to it.  It

5  wasn't flying in the breeze, you know, I mean like a

6  regular garbage bag.

7  Q.   If you would hold it up now, would you describe

8  that as kind of waving in the breeze?

9  A.   I would say that, you know, no consistency to

10  it.  You could kind of tell there's nothing in it.

11  Q.   Okay.  So, there did appear to be something in

12  the bag, as you say, some weight to it?

13  A.   Yes.

14  Q.   Now, I take it you weren't able to see what any

15  of the contents were at that point?

16  A.   No.

17  Q.   And tell us how many white bags you saw there

18  in the van when you got into the van.

19  A.   I only saw one.

20  Q.   And is the one shown on the video, is that the

21  only one?

22  A.   Yes.

23       MR. MURPHY:  Okay.  Thank you.  That's all.

24       THE COURT:  Mr. Slaughter, anything else?

25       MR. SLAUGHTER:  No, sir, Your Honor.

```
 1          THE COURT:  Thank you.

 2          MR. MURPHY:  Judge, we're going to need to

 3   take a short recess before the next witness, if you

 4   would, five minutes.

 5          THE COURT:  Let's take a recess.

 6          THE CLERK:  Court's in recess.

 7          (Whereupon, the jury departed the courtroom

 8          for a recess.)

 9          (The jury was brought in.)

10          THE COURT:  Members of the Jury, because of

11   a conflict that I have, we will stop the day at

12   1:00.  So, we won't have a lunch break, which is --

13   we are going to go right through until 1:00 with

14   short recesses and then be done for the rest of the

15   day, then come back tomorrow at 9.  Sorry about

16   that, but I have something else this afternoon I

17   have to do.

18          Next witness.

19          MR. MURPHY:  Thank you, Judge.  We call

20   Officer Cory Miller.

21          (Witness sworn by the Clerk.)

22          THE CLERK:  Thank you.

23                    CORY MILLER,

24   called as a witness, after being first duly sworn,

25   was examined and testified upon his oath as follows:
```

**DIRECT EXAMINATION**

BY MR. MURPHY:

Q.   Sir, would you please state your name and occupation?

A.   My name is Cory Miller.  I'm a police officer.

Q.   And that's with the Peoria Police Department?

A.   Yes.

Q.   And how long have you been with Peoria PD?

A.   Seven years.

Q.   And your current duties are what?

A.   I'm assigned to the vice and narcotics unit.

Q.   And you have been with that unit how long now?

A.   Two years.  Going on two years.

Q.   Were you on duty during the morning and afternoon hours of August 23, 2006?

A.   Yes, I was.

Q.   Were you part of both an investigation and surveillance team that, shortly after 5 p.m. that evening, took Cory Mosby into custody?

A.   Yes, I was.

Q.   The actual stop of the vehicle Mr. Mosby was in was made by a street crimes unit, correct?

A.   Yes.

Q.   Were you somewhere in that vicinity at the time that happened?

A.    Yes, I was.

Q.    Did you actually have a vantage point where you could see the squad that stopped the black van?

A.    Yes.

Q.    Where was the van stopped?

A.    The van was stopped on Lincoln Street in the 1000 block.  And I was approximately three blocks, two blocks -- two or three blocks back of the vehicle looking at what they were doing through a pair of binoculars.

Q.    Didn't have any direct contact with Mr. Mosby at the time of the stop?

A.    No, sir.

Q.    And was Mr. Mosby actually taken down to the station before you went up to the scene of the stop?

A.    Yes.

Q.    Were you present when at least a portion of the front seat of the van area was searched there on Lincoln Street?

A.    Yes, I was.

Q.    You were not directly involved in that, however?

A.    No, I was not.

Q.    Later, after that was done, what happened to the van?

1    A.    It was taken to the Peoria Police Department.

2    Q.    How did it get taken to the police department?

3    A.    It was drove by one of the vice officers.

4    Q.    Do you remember who it was?

5    A.    I believe it was Loren.

6    Q.    Okay.  It wasn't you?

7    A.    No, it was not me.

8    Q.    Okay.  Now, did you see the van once again

9    after it was down at the station?

10   A.    Yes, I did.

11   Q.    Was this placed in some secure area?

12   A.    It was placed, yes, in the area of -- we have a

13   garage -- two garages down there, and it was in

14   between the two garages there.  But I was there

15   during the whole time.

16   Q.    Okay.  And were you assigned certain duties

17   with regard to a further search of the van?

18   A.    Yeah, more tedious search to make sure, you

19   know, we didn't miss any hidden compartments or

20   things like that, plus it was in a safer

21   environment.  It wasn't right there on the side of

22   the road where maybe somebody could get struck.  So,

23   that's why it was taken down there and secured, and

24   that's --

25   Q.    Did Officer Couve remove certain items out of

1  the van before you did your search?

2  A.    Yes.

3  Q.    Tell us what areas of the van you then searched

4  down at the police department.

5  A.    I started in the front area.  The front seat,

6  driver's seat, front passenger seat I went to.  Then

7  I went to the passenger side of the vehicle, opened

8  up the sliding door to the van, and I started to

9  search the back of the front seat.  There's usually

10  like a pocket, holds maps and things like that,

11  started searching that area.

12        At that time, I lifted the back portion of

13  the seat, the cover of it, and I lifted it up.  And

14  you can -- when you do that, you see like Styrofoam

15  and sometimes bracing of the seat, metal bracing.

16  And at that time, I noticed what appeared to be a

17  black handgun in between the metal bracket of the

18  back seat and the Styrofoam.

19  Q.    Now, after finding that, did you call that to

20  someone's attention?

21  A.    I got ahold of Officer Marion and told him I

22  found some more evidence, and he came down with the

23  video camera.

24  Q.    Before you removed it from the position in

25  which you found it, you had it videotaped?

153

1  A.   Yes, I did.

2  Q.   Did you thereafter finish a search of the van,

3  your detailed search?

4  A.   Yes.

5  Q.   Did you find any other weapons or anything of

6  evidentiary value after finding the gun?

7  A.   No, I just found the gun.

8  Q.   Now, let's be more specific about the area that

9  you found the gun.  This would be on the back of the

10  front passenger seat; is that correct?

11  A.   That's correct.

12  Q.   And you had to lift up the seat cover?

13  A.   Yes.

14  Q.   Covering the back of the seat.  And it was

15  placed in there somehow?

16  A.   Yes.

17  Q.   Okay.  Now, you have, at my request, looked

18  over the video that was taken that day?

19  A.   Yes, I did.

20  Q.   And does the video truly and accurately show

21  the position in which you not only found the gun but

22  you recovered the gun from?

23  A.   Yes, it does.

24       MR. MURPHY:  This video has previously been

25  admitted, Your Honor, as Exhibit 2A, and I would

1   like permission in a few moments to show that

2   portion of 2A to the jury.

3            THE COURT:  You may.

4            MR. MURPHY:  Thank you.

5   BY MR. MURPHY:

6   Q.    A couple quick questions with regard to the gun

7   itself.  Lying up in front of you there is an

8   exhibit we have marked as, I believe, 3A.

9   A.    Yes.

10  Q.    And do you recognize that, sir?

11  A.    Yes, I do.

12  Q.    What is it?

13  A.    It's the gun that was located in the seat.

14  Q.    Can you give me a brief description of the gun?

15  Please don't point it at anybody.  I know it's

16  unloaded, but --

17  A.    It's a small black handgun.

18  Q.    Is it a 9-millimeter?

19  A.    A 9-millimeter, yes.

20  Q.    And is it a pistol as opposed to a revolver?

21  A.    It's a pistol, correct.

22  Q.    Did you find it loaded?

23  A.    Yes.

24  Q.    And do you recall how many rounds?

25  A.    Not off -- I could count, but I don't recall.

1  Q.   Go ahead and count.

2  A.   There's one, two, three, four, five, six,

3  seven, eight, nine -- nine in this bag right here.

4  And there's also some rounds -- looks like some

5  spent rounds.

6  Q.   Were those the test shots from the crime lab?

7  A.   Yes.

8  Q.   Okay.  But the nine rounds, live rounds you see

9  there, tell us where they were in the gun at the

10 time you found the gun.

11 A.   They were in the magazine, in the chamber, one

12 chamber.

13 Q.   There was one in the chamber?

14 A.   I believe so.

15       MR. MURPHY:  Okay.  Next I would like to

16 play, Judge, at this time, Exhibit 2A.

17       THE COURT:  Yes.

18       (Videotaped commenced and stopped.)

19       MR. MURPHY:  I'm sorry.  This is not the

20 correct portion.

21       THE CLERK:  Do you want me to stop it?

22       MR. MURPHY:  Yes, stop it, run it forward.

23 Okay.  Now you're there.

24       THE CLERK:  No?  Stop it again?

25       MR. MURPHY:  Yes, can you go forward?

1          THE CLERK:  Fast forward?

2          MR. MURPHY:  Yes, please.

3          THE CLERK:  About how far?

4          MR. MURPHY:  About right there.

5          THE CLERK:  Go back?

6          MR. MURPHY:  You did a rewind, I'm sorry.

7          THE CLERK:  No.

8          MR. MURPHY:  I'm sorry.

9          (Videotape commenced.)

10  BY MR. MURPHY:

11  Q.    Is this the van down at the police department?

12  A.    Yes.

13  Q.    What are you doing to the front seat now?

14  A.    We are moving it forward, lifting up the back

15  of the seat.

16  Q.    Okay.  Had you put it down so you could search?

17  A.    Yes.

18  Q.    What are you doing now?

19  A.    I lifted up the back cover of the seat.  And as

20  you can see, the gun is in between the steel bar and

21  the Styrofoam.

22  Q.    Okay.  Are you, with some difficulty, removing

23  it now?

24  A.    It was tucked in there pretty tight.  We're

25  lifting it up -- I'm lifting it up over the metal

1  bar and just brought it out.

2  Q.   And this is Exhibit 3A, correct?

3  A.   Yes.

4  Q.   What are you doing now?

5  A.   Checking to see if the gun -- securing the gun,

6  make sure it's safe for handling.

7  Q.   Does that show the magazine with the live ammo

8  in it?

9  A.   Yes, it did.

10 Q.   And what are you doing now to the gun?

11 A.   Making sure there's not one in the chamber.

12 Q.   And is there one in the chamber?

13 A.   You know, I, I don't think there was.

14 Q.   Okay.  A picture is worth a thousand words

15 here.  Okay.  Now that seat that it's on, that's --

16 A.   That sits right behind the front passenger

17 seat.  So, that's the middle passenger seat on the

18 passenger side of the vehicle.

19 Q.   Okay.  Thank you.

20       MR. MURPHY:  That concludes that, Judge.

21 Judge, at this time I believe I want to offer

22 Government Exhibit 3A, that particular firearm.  I

23 think the chain of evidence is now concluded there.

24       THE COURT:  Any objection?

25       MR. SLAUGHTER:  No objection, Your Honor.

1           THE COURT:  Be admitted.

2           MR. MURPHY:  Thank you.  Those are my

3    questions for Officer Miller.

4           THE COURT:  You may cross.

5           MR. SLAUGHTER:  Your Honor, we have no

6    questions for Officer Miller.

7           THE COURT:  Thank you, Officer.

8           THE WITNESS:  Thank you, Your Honor.

9           MR. BROST:  Your Honor, the government calls

10   John Dierker.

11          (Witness sworn by the Clerk.)

12          THE CLERK:  Thank you.

13                      **JOHN DIERKER,**

14   **called as a witness, after being first duly sworn,**

15   **was examined and testified upon his oath as follows:**

16                   **DIRECT EXAMINATION**

17   **BY MR. BROST:**

18   Q.   Would you please state your name and spell your

19   last name for the court reporter?

20   A.   My name is John Dierker, D-i-e-r-k-e-r.

21   Q.   Mr. Dierker, where are you employed?

22   A.   I'm employed with the Illinois State Police at

23   the crime laboratory in Morton, Illinois.

24   Q.   What -- how long have you been employed there?

25   A.   Approximately 22 1/2 years.

1  Q.    What's your job title?

2  A.    I am a forensic scientist in the latent

3  fingerprint section.

4  Q.    What are your duties as a forensic scientist in

5  the latent fingerprint section?

6  A.    As a latent print examiner, I examine evidence

7  for the presence of latent fingerprints, which may

8  either be visible on an item or need to be developed

9  by some physical, chemical or electronic fingerprint

10 processing technique.  I will then preserve any of

11 these latent impressions that I find on an item and

12 then compare these latent impressions to known

13 prints of certain individuals.  Will then issue a

14 report on my findings and then testify in court on

15 fingerprint-related matters as requested.

16 Q.    What is your educational background?

17 A.    I have a bachelor of science degree in biology

18 from the University of Illinois.

19 Q.    Have you received any specialized training in

20 the area of latent fingerprints?

21 A.    Yes, I've completed a 2-1/2-year training

22 program offered by the Illinois State Police in

23 which I received instruction on various areas of

24 fingerprint identification, as well as doing

25 approximately one year of supervised case work

1  during that time.  I've also attended conferences,

2  in-service training programs and things like that

3  for the last 22 1/2 years.

4  Q.   Do you belong to any professional associations?

5  A.   Yes.  I'm a member of both the parent body and

6  the Illinois division of the International

7  Association for Identification.

8  Q.   Do you hold any offices within any

9  organizations?

10 A.   I hold no current offices.  However, I've been

11 past president, first and second vice presidents and

12 -- as a member of the board of directors as well as

13 chairman of the board of the Illinois division of

14 the International Association for Identification.

15 Q.   Have you testified in court before regarding

16 fingerprint identification?

17 A.   Yes.

18 Q.   Okay.  Approximately how many times have you

19 testified?

20 A.   37 times.

21       MR. BROST:  Your Honor, I offer witness John

22 Dierker as an expert in the field of fingerprint

23 identification.

24       THE COURT:  You wish to voir dire,

25 Mr. Slaughter?

1           MR. SLAUGHTER:  No, Your Honor, we will

2    accept him as an expert.

3           THE COURT:  You may proceed, Mr. Brost.

4    BY MR. BROST:

5    Q.   Can you explain to the jury why we use

6    fingerprints as a form of identification?

7    A.   Yes.  There are two main reasons we use

8    fingerprints as a positive form of identification.

9    The first is that fingerprints are permanent.

10   They're formed on the fetus before birth and remain

11   unchanged throughout the lifetime of an individual

12   until decomposition of the skin will destroy them.

13          The second is that fingerprints are unique.

14   No two individuals have ever been found with the

15   same arrangement of the individual ridge

16   characteristics present in the latent print.

17   Q.   What is a latent print?

18   A.   A latent print is a chance or an unintentional

19   impression which is left upon an object by contact

20   with an area of friction ridge skin.  A friction

21   ridge skin is the skin that's found on the inside of

22   your fingers, palms and the bottom of your feet.

23   It's characterized by the raised portions, or what

24   we call ridges, and lower portions which are called

25   the furrows which lie between the ridges.  And it

1  takes a transfer of residue from an area of friction

2  ridge skin to an object in order for us to find a

3  latent impression.

4  Q.   What do you mean by a print standard?  What is

5  a print standard?

6  A.   A print standard is an actual recording of a

7  specific area of friction ridge skin that can be

8  taken by applying a thin film of ink to an area of

9  friction ridge skin and applying to a card of

10 contrasting background.

11         We then have a set of known prints from

12 certain individuals which we can compare to any

13 latent prints which may be present in the case.

14 Q.   And what's the methodology that you use to do

15 the comparison with the latent prints and the known

16 prints?

17 A.   The fingerprints are compared by studying the

18 latent print and a known print standard side by

19 side, and we compare those using a fingerprint

20 magnifier approximately four and a half times

21 magnification.  The acronym we use for the

22 scientific methodology is called ACE-V, which is

23 A-C-E, dash, V.  It stands for analysis, comparison,

24 evaluation and verification.

25         And we -- first of all, when we are looking

1 at a latent print, we do an analysis of it where

2 we're looking at the pattern or the flow of the

3 ridges to try to determine anything we can regarding

4 that latent impression.

5        We then move into the comparison phase where

6 I look for a plus area or series of these individual

7 ridge characteristics that I can remember and look

8 for in my ink impression or my known impression.

9 And that is a comparison phase where I'm going back

10 and forth between the latent print and ink print,

11 trying to determine if the same arrangement of these

12 characteristics is apparent.

13        We then evaluate the prints based on the

14 levels of detail that's there.

15        And then during the evaluation phase, we

16 would make our determination that that print was or

17 was not made by the particular individual.  And then

18 most importantly, at the end, we would do a

19 verification.  Every fingerprint that's examined and

20 is identified at Illinois State Police forensic

21 laboratory is verified by one other examiner.

22 Q.   And what conclusions do you come to when you --

23 when you make this comparison?

24 A.   We can come to three conclusions.  One was that

25 the latent print was made by the person whose prints

1  appeared on the card that we're looking at.  One is

2  that print was not made by that person.  Then the

3  third would be that we would need additional detail

4  in order for us to tell.  For instance, many times

5  we're not given palm print cards; the latent print

6  itself may be from a palm.  Therefore, we would need

7  to request additional ink standards to determine

8  whether or not that print was made by a certain

9  individual.

10         MR. BROST:  May I approach the witness, Your

11 Honor?

12         THE COURT:  Yes, you may.

13 BY MR. BROST:

14 Q.   Let me show you what's been marked as

15 Government's Exhibit 3B and ask if you recognize

16 this exhibit?

17 A.   Yes, I do.

18 Q.   And what is that?

19 A.   It is a gun and some cartridges in a holster.

20 Q.   Have you seen this exhibit before?

21 A.   Yes.

22 Q.   And when?

23 A.   I -- it was received at the Morton laboratory

24 in August -- August 31st, 2006.

25 Q.   Do you know who delivered it to the laboratory?

1    A.    Yes.

2    Q.    Who's that?

3    A.    Eric Ellis.

4    Q.    And what was the purpose that it was delivered

5    to the Morton lab?

6    A.    I was to examine two areas on the firearm for

7    latent impressions.

8    Q.    Okay.  And did you do an examination of the

9    weapon for latent prints?

10   A.    Yes.

11   Q.    Okay.  In Exhibit 3B, there's some pink or

12   reddish material on the -- on the gun itself, is

13   there not?

14   A.    Yes.

15   Q.    Okay.  Was that on the gun when you received

16   it?

17   A.    Yes.

18   Q.    And what was the purpose for that, that reddish

19   or pinkish material, if you know, and what is that

20   material?

21   A.    It appears to me to be a florescent dye which

22   we would use in the processing techniques.  There

23   are several types; I'm not familiar exactly with

24   what type it is.  However, it will cause florescence

25   of prints that have been super glued underneath

1  laser light or ultraviolet light.

2  Q.    And did you examine those areas on that weapon

3  for prints?

4  A.    Yes.

5  Q.    And were you able to find any prints?

6  A.    Yes, I was able to find one latent impression

7  suitable for a comparison on the gun.

8  Q.    And what did you do, and what did your

9  examination consist of once you made that

10  determination?

11  A.    I used the latent impression to compare to a

12  set of known standards.

13  Q.    Did you take a photo of that print?

14  A.    Correct.  As a method of preservation, I took a

15  photograph.

16  Q.    There's some exhibits on the counter there

17  before you to your left.  Do you see that photo?

18  A.    I do.

19  Q.    Is that Exhibit 21A?

20  A.    Yes.

21  Q.    Okay.  And that is the photo that you took; is

22  that correct?

23  A.    Yes.

24  Q.    Okay.  And you took it -- that's a -- well,

25  describe what it is, please.

1   A.   It's an actual enlargement of the specific

2   latent print that was compared, in this case, off

3   the gun.

4   Q.   And then did you then compare that to a known

5   print, the print that you found?

6   A.   Not the specific photograph, but I did compare

7   the latent impression, yes.

8   Q.   Okay.  Would you also look at the Exhibit 22

9   which is on the counter there?  Do you recognize

10  that exhibit?

11  A.   Yes.

12  Q.   Okay.  And how do you recognize it?

13  A.   By my markings that I placed on the item at the

14  time of exam.

15  Q.   And did you -- what is that Exhibit 22?

16  A.   Exhibit 22 is a fingerprint card marked Cory D.

17  Mosby.

18  Q.   And where did you receive that?

19  A.   At the Morton laboratory as well.

20  Q.   And was that delivered to you by -- to the lab

21  by Officer Ellis as well?

22  A.   Yes.

23  Q.   Okay.  Did you do a comparison between the

24  prints that you found on Exhibit 3B, the gun, with

25  the known fingerprints card found on Exhibit 22?

1  A.    Yes.

2  Q.    Okay.  Were you able to make any conclusions

3  regarding that comparison?

4  A.    Yes.

5  Q.    What was your conclusion?

6  A.    My conclusion was that the latent impression

7  that I found on the slide of the gun was made by the

8  person whose fingerprints appear on the card marked

9  Cory D. Mosby.

10 Q.    So, the fingerprints on the gun matched the

11 fingerprints on the known fingerprint card; is that

12 correct?

13 A.    Correct.

14 Q.    Let me now direct your attention to Exhibits

15 21B and C which are on the counter before you there.

16         Do you recognize those exhibits?

17 A.    Yes.

18 Q.    Okay.  What are they?

19 A.    They are pieces of a plastic bag.

20 Q.    And were those delivered to the Morton crime

21 lab?

22 A.    Yes.

23 Q.    By Officer Ellis?

24 A.    Correct.

25 Q.    And they -- were you to conduct a determination

1  whether you could find fingerprints on that -- on

2  those two exhibits?

3  A.    Yes, I was asked to look for a latent

4  impression which may be on the plastic bags

5  themselves.

6  Q.    Did you do an examination of Exhibits 21B and C

7  to determine if you can find suitable prints for

8  identification?

9  A.    Yes.

10  Q.    What did your examination consist of?

11  A.    My examination -- I took photographs of the

12  latent print ridge detail which was present on both

13  of the pieces of plastic bag and then was --

14  compared those to the suspect card.

15  Q.    Were you able to make any determinations

16  regarding the plastic bags and the known fingerprint

17  card?

18  A.    Yes, the -- there were three latent impressions

19  on the two pieces of plastic bag.  Those prints were

20  not made by the person whose prints appear on the

21  card, Cory D. Mosby.

22        MR. BROST:  Your Honor, if I might have a

23  moment?

24        THE COURT:  Yes.

25  BY MR. BROST:

1  Q.   Did you then return Exhibits 3B and 21B and C

2  to Officer Ellis?

3  A.   Those were returned to him, yes.

4  Q.   Okay.

5        MR. BROST:  Your Honor, I would offer into

6  evidence Government's Exhibit 3B and 21B and C as

7  well as Exhibit 22.

8        THE COURT:  Any objections?

9        MR. SLAUGHTER:  No objection.

10        MR. BROST:  Your Honor, I would also offer

11  in Exhibit 21A which is the photo of the print.

12        THE COURT:  All right.  Government's

13  Exhibits 3B, 21B and C, and Exhibit 21A would be

14  admitted.

15        MR. BROST:  Thank you.  No further

16  questions.

17        THE COURT:  And you may cross,

18  Mr. Slaughter.

19                    **CROSS-EXAMINATION**

20  **BY MR. SLAUGHTER:**

21  Q.   Mr. Dierker, on the two pieces of plastic that

22  you examined from the Kroger bags, there were

23  suitable prints for comparison on those pieces of

24  plastic, right?

25  A.   Correct.

1  Q.   Okay.  You didn't have a standard to compare

2  them?

3  A.   I compared those to the cards marked Cory

4  Mosby.

5  Q.   And you made a determination that those were

6  not his prints on the card -- on the plastic, right?

7  A.   The plastic bag, correct.

8  Q.   But did you have any way of identifying whose

9  prints those were?

10  A.   Those were the only cards or fingerprint cards

11  that I was given to compare.

12  Q.   Okay.  Now, you also found where there was a

13  print that was suitable for comparison off the .45

14  weapon; is that correct?

15  A.   Correct.

16  Q.   Do you know what the origin of that weapon was,

17  where it came from?

18  A.   I do not.

19  Q.   How many prints were there on this weapon that

20  was suitable for comparison?

21  A.   I evaluated one print which was suitable for

22  comparison.  However, I photographed an additional

23  area of friction ridge detail which I didn't

24  evaluate.

25  Q.   When you say you photographed an area, was that

1  of another suitable print?

2  A.   It could have been suitable.   However, there

3  was no evaluation to determine if it was suitable.

4  The state police, when we make an identification and

5  we only have the one suspect, we will stop our

6  examination at that point once the person is

7  identified.

8  Q.   Now, you also told us about a holster that you

9  received with that weapon?

10  A.   Yes.

11  Q.   Was the weapon inside the holster when you got

12  it, or were they separate?

13  A.   Those were separate.

14       MR. SLAUGHTER:   Thank you, sir.   I have no

15  more questions.

16                 **REDIRECT EXAMINATION**

17  **BY MR. BROST:**

18  Q.   Mr. Dierker, when you received Government's

19  Exhibit 3B, was the weapon in the sleeve as it is

20  now?

21  A.   Yes, it was.

22       MR. BROST:   No further questions.

23       THE COURT:   Anything else, Mr. Slaughter?

24       MR. SLAUGHTER:   No, Your Honor.

25       THE COURT:   Thank you, sir.

1          MR. MURPHY:  We call Officer Scott Jordan.

2          (Witness sworn by the Clerk.)

3          THE CLERK:  Thank you.

4                    **SCOTT JORDAN,**

5   **called as a witness, after being first duly sworn,**

6   **was examined and testified upon his oath as follows:**

7                  **DIRECT EXAMINATION**

8   **BY MR. MURPHY:**

9   Q.   Sir, would you please state your name and spell

10  your last name for us?

11  A.   Scott Jordan, J-o-r-d-a-n.

12  Q.   And, Scott, I think if you will lean back and

13  just relax there, it will pick you up just fine.

14          Your business or occupation is what?

15  A.   I'm a Peoria police officer.

16  Q.   And how many years on the force do you have?

17  A.   17.

18  Q.   Current duties are what, please?

19  A.   I'm assigned to the vice and narcotics unit.

20  Q.   And were you so employed back on August 23rd of

21  2006?

22  A.   Yes, I was.

23  Q.   On that particular date, did you take part in

24  an investigation of the defendant here, Cory Mosby?

25  A.   Yes, I did.

1  Q.   Now, were you part of the investigation even

2  before his arrest, or did you come into play after

3  his arrest?

4  A.   I was a part of the investigation before his

5  arrest.

6  Q.   Okay.  I want to direct your attention, though,

7  to events that happened later on during the evening

8  hours of that day after his arrest.

9        Did you have certain duties that were

10 assigned to you with regard to the search of an

11 apartment, I believe it was Y10 at 2401 North

12 Gale --

13 A.   Yes.

14 Q.   -- in Peoria?

15 A.   I'm sorry.  I was assigned duties as evidence

16 officer.

17 Q.   Okay.  That's located in Peoria County,

18 correct?

19 A.   That's correct.

20 Q.   And describe for us what the duties of the

21 evidence officer are.

22 A.   My duties would be to gather, log and place

23 into evidence any items that were taken from this

24 apartment of evidentiary value, seized for any other

25 reason.

1  Q.    Okay.  You were assisted by other officers, I

2  take it, that evening?

3  A.    Yes, there were other officers that helped

4  search the apartment.

5  Q.    In point of fact, was the area that was

6  searched and the items that were recovered, were

7  they videoed?

8  A.    Yes, they were.

9  Q.    Do you recall who did the video?

10  A.    No, I don't.

11  Q.    Okay.  You've taken a look, however, at a video

12  that I have marked as Government Exhibit 2B,

13  correct?

14  A.    Yes.

15  Q.    And do you recognize yourself in the video?

16  A.    Yes.

17  Q.    And are you recovering certain items of

18  physical evidence?

19  A.    Yes, I am.

20  Q.    I want to talk to you about just three of those

21  items at this moment.  They're all lying there in

22  front of you.  The first one is a weapon that's been

23  marked as Exhibit 3B.

24  A.    That's correct.

25  Q.    Do you recognize that?

1  A.   Yes, it was a handgun taken out of the bedroom

2  of the apartment.

3  Q.   And does the video accurately show exactly

4  where it was recovered from the bedroom area?

5  A.   Yes.

6  Q.   Was the gun loaded at the time you recovered

7  it?

8  A.   There was a loaded magazine in the gun, but

9  there was no round in the chamber.

10 Q.   A couple other items lying up there.  First is

11 Exhibit Number 17, please.  What is that?

12 A.   That's pieces of mail that were taken from the

13 apartment.

14 Q.   Do you recall more specifically where that mail

15 was located?

16 A.   Mail was in a blue bag that was in the bedroom,

17 that was located next to the gun that was found.

18 Q.   Okay.  And are you saying that the bedroom was

19 next to the bedroom or -- all in the same bedroom?

20 A.   It was all in the same bedroom, but it was next

21 to the gun in that bedroom.

22 Q.   And another exhibit, Number 18 also lying up

23 there, what is that, please?

24 A.   This is a receipt for dry cleaning that was

25 found in the apartment, in the living room.

1  Q.    You mean downstairs?

2  A.    Downstairs living room.

3  Q.    And what was the significance of the receipt,

4  and why did you take it?

5  A.    It has the name Mosby C. on it.  It's a dry

6  cleaning receipt in the defendant's name.

7  Q.    Okay.  Actually was it attached to some -- what

8  appeared to be dry cleaning?

9  A.    Yes.

10         MR. MURPHY:  We would move, Judge, now for

11  the admission of these three exhibits and the fourth

12  exhibit, the video, 2B.  And I want to publish 2B to

13  the jury at this time.

14         THE COURT:  Any objections, Mr. Slaughter?

15         MR. SLAUGHTER:  No, Your Honor.

16         THE COURT:  They will be admitted, and you

17  may publish.

18         MR. MURPHY:  We're going to play the video,

19  Officer Jordan, and I will be asking you a few

20  questions as we go through it.

21                  (Video commenced.)

22  BY MR. MURPHY:

23  Q.    Does this show the exterior of the apartment?

24  A.    That's correct.

25  Q.    Would this be the front or the back side?

1   A.    Looks like the front side.

2   Q.    Okay.   Does it show the apartment number there?

3   A.    Yes.

4   Q.    The parking lot area adjacent to it?

5   A.    Yes.

6   Q.    And the area that we're approaching now would

7   be what part of the apartment?

8   A.    That would be the back of the apartment, the

9   back door.

10  Q.    Okay.   Are those your fellow vice officers

11  there?

12  A.    That's correct.

13  Q.    Was this an individual that was present in the

14  apartment when you arrived?

15  A.    That's correct.

16  Q.    What's that show?

17  A.    A small amount of cannabis that was lying on

18  that glass table.

19  Q.    That appeared to be small enough to be called

20  personal use amount?

21  A.    Yes.

22  Q.    What are you doing here?

23  A.    That's the dry cleaning receipt we just

24  referred to.

25  Q.    Okay.   That's Exhibit 18.   Is that Exhibit 18

1  that you just showed us there?

2  A.    Yes, that's 18.

3  Q.    Okay.   Now we're going upstairs.

4  A.    That's a bedroom.   This is the shelf that the

5  handgun was found on in the bedroom.

6  Q.    Are you going to recover that here in a moment?

7  Was that weapon in a holster?

8  A.    That's correct.

9  Q.    And this is a .45-caliber weapon?

10  A.    That's correct.

11  Q.    What are you doing with the weapon now?

12  A.    I'm putting it over to the side and having it

13  videotaped.   Later I turn it over to Officer Ellis

14  to be processed for fingerprints.

15  Q.    Do you unload the weapon here?

16  A.    Yes.

17  Q.    Do you recall how many rounds?

18  A.    No, I didn't count the rounds in the magazine.

19  Pointing out the serial number on the weapon.

20  Q.    What are you checking for there?

21  A.    To see if there was a round in the chamber.

22  Q.    And was there?

23  A.    No.

24  Q.    Okay.   What are you looking into now?

25  A.    This is a blue bag that had pieces of mail in

1  it.  Would be Exhibit Number 17.

2  Q.  And those were taken as evidence for what

3  reason?

4  A.  To show that -- the names on them show who had

5  access to the apartment, had control of the bedroom.

6  Q.  What's this item?

7  A.  That's another piece of mail, a telephone bill

8  with the name Mosby on it.

9  Q.  What area of the apartment is this?

10  A.  This is still the same bedroom.

11  Q.  What are these?

12  A.  They're jeans, large jeans, men's clothing.

13  More clothing.  Men's clothing.  Size 14 shoe.

14  Q.  What area were you in now?

15  A.  This appears to be the living room.

16  Q.  Back downstairs now?

17  A.  Yes.

18  Q.  And what are we showing here?

19  A.  That's more clothing.

20  Q.  Are you in particular checking for the size of

21  the clothing?

22  A.  Yes, and any other items.

23  Q.  What did you note about most of the sizes

24  there?

25  A.  They were large sizes, men's clothing.

Q.   One more thing, Mr. Jordan.  I would ask you to take a look at Exhibit 3B one more time.  And you did remove the live rounds from the magazine; is that correct?

A.   That's correct.

Q.   How many were there?  Can you tell us by counting, or did you note it?

A.   Eight rounds.

Q.   Is that a fully-loaded magazine, if you know?

A.   I don't know.  I'm not sure on that, that magazine how many it will hold.

Q.   Okay.  You took 3B, the gun and the magazine and those live rounds back down to the station that night after the search, and you did what with it?

A.   I turned them over to Officer Ellis, who works for our lab, to have them fingerprinted.

Q.   Now, did you put them in the sleeve there, or did he do that?

A.   He did that.

Q.   Okay.  Now, with regard to Exhibit 17 and 18?

A.   Those I took to -- back to the station, and I placed them into the sleeve and then placed them into our property room.

Q.   Okay.  And did you place the evidence tag on both of those?

1  A.   Yes, I did.

2  Q.   Does your name appear prominently on that white

3  tag?

4  A.   Yes, it does.

5  Q.   Do those appear to be in the same sealed

6  condition as when you recovered them back on

7  August 23rd of 2006?

8  A.   Yes, they do.

9       MR. MURPHY:   Thank you, Judge.   Those are my

10 questions.

11      THE COURT:   You may cross.

12                **CROSS-EXAMINATION**

13 **BY MR. SLAUGHTER:**

14 Q.   Officer Jordan, the weapon that you recovered

15 was underneath some clothing?

16 A.   That's correct.

17 Q.   When you took the weapon out of the holster and

18 examined it, can you tell us whether or not there

19 was a bullet in the chamber?

20 A.   There was no round in the chamber, no, sir.

21 Q.   It was not chambered.   Now, you also recovered

22 several items of mail in the name of Cory Mosby,

23 right?

24 A.   That's correct.

25 Q.   And you -- did you inventory those items?

A.   I placed -- the items were taken in the

property room, that's correct.

Q.   That's part of your standard procedure when you

are working in narcotics and you go into an

apartment or house; you recover various pieces of

mail addressed to whoever it is that you're

investigating?  Is that right?

A.   That's correct.

Q.   Is that what you call proof of residency?

A.   That's correct.

Q.   Okay.  You do that to show that this person has

some connection with the unit that you're searching?

A.   Yes.

Q.   Okay.  Did you do the same thing with mail or

letters that were recovered inside the black bag?

A.   The black bag or the blue bag, sir?

Q.   The black bag.  Had a white plastic bag in it.

Are you familiar with that?

A.   Inside the apartment, no, sir.

Q.   No, inside the black van that was stopped on

the street.

A.   Oh, no, I didn't have any-- anything to do with

that.

Q.   The mail that you recovered at the apartment

that was addressed to Mr. Mosby, did it have that

1  address, that Gale Street address on it?

2  A.   The mail from the office of the Secretary of

3  State does not.  It has a Ketelle Street address on

4  it.

5  Q.   Is that a Peoria address?

6  A.   Yes, it is.

7  Q.   Okay.  But based on your investigation, there's

8  no question that Mr. Mosby was living at that

9  apartment?

10  A.   No, sir.

11  Q.   Okay.

12  A.   No question.

13        MR. SLAUGHTER:   Thank you.  I have no other

14  questions.

15                    **REDIRECT EXAMINATION**

16  **BY MR. MURPHY:**

17  Q.   I guess I need to follow that last question up

18  with a following question.  When you say there's no

19  question that he was living at the apartment, did

20  your investigation show that he did live at the

21  apartment or that he did not live at the apartment?

22  A.   My investigation, from what I see, he lived at

23  the apartment.

24  Q.   Okay.  Thank you.

25        Did the video that we saw here, we've marked

1  it as 2B, did that show accurately the condition of

2  the apartment at the time the officers got there and

3  began searching?

4  A.   Yes.

5  Q.   Obviously, you moved some things, did you not,

6  in order to -- you moved some clothing off the top

7  of the gun to recover the gun?

8  A.   Yes.

9  Q.   And you appeared to be moving the dry cleaning

10 to take the tag off of that as well?

11 A.   That's correct.

12 Q.   Okay.  And you pulled some items out of this

13 blue bag that you told us about up on the shelf?

14 A.   That's correct.

15 Q.   But there were other men's clothing laying both

16 upstairs and downstairs in the apartment, correct?

17 A.   Yes.

18       MR. MURPHY:  Thank you, Judge.  Those are my

19 questions.

20       THE COURT:  Mr. Slaughter?

21              **RECROSS-EXAMINATION**

22 **BY MR. SLAUGHTER:**

23 Q.   Officer, so that I'm clear, are you saying that

24 the only -- the only thing that you and your fellow

25 officers did when you went into that apartment was

1  take items out of the blue bag and then look

2  underneath some clothing and remove a gun?  Is that

3  all that was done?

4  A.    I'm not sure what the other officers did.  What

5  we did is we searched the apartment, and we took

6  some mail and took a gun and some cannabis.

7           I'm not real sure what your question is as

8  far as what else we would have done.

9  Q.   Well, you were asked if the apartment was in

10  the same condition when you came in as it is

11  depicted in the video, and that is not correct, is

12  it?

13  A.   No, the apartment was in disarray when we came

14  in.   There was -- there was clothes strewn all over

15  the apartment when we came in.

16  Q.   Then you conducted a search, and you started

17  with the kitchen; you removed food from out of the

18  cabinets and the refrigerator.  Is that correct?

19  A.   I didn't remove any food.  Normally in a search

20  there is food removed from cabinets, that's correct.

21  Q.   Well, you saw boxes and cans of food that had

22  been taken out of the cabinets?

23  A.    Yes.

24  Q.    Okay.  You saw food that had been removed from

25  the refrigerator?

1  A.   I remember food on the cabinets.   There

2  possibly could have been food removed from the

3  refrigerator; that's correct.

4  Q.   You went through all the drawers you could find

5  in that house, didn't you?

6  A.   I didn't go through them.   The drawers were

7  gone through by other officers.

8  Q.   When I say "you," I'm not talking about you

9  individually.

10  A.   You mean "you" as a whole?  Yes, when we search

11  a house, we go through the drawers, and we go

12  through the cabinets.

13  Q.   You remove things from those drawers so you can

14  see what's in there?

15  A.   Correct.

16  Q.   You did not put the items back in the drawer?

17  A.   No, they were not put back in.

18  Q.   So, when you left, the house was in complete

19  disarray?

20  A.   I don't know if I'd say it was disarray.   It

21  had been searched.

22  Q.   Thoroughly?

23  A.   Thoroughly.

24       MR. SLAUGHTER:   Thank you, Officer.

25       MR. MURPHY:   No further questions, Judge,

1  and we would ask to take a short recess before we

2  conclude with our final witness.

3        THE COURT:  All right.  Thank you, Officer.

4        We'll take a recess.  Just occurred to me,

5  members of the jury, that at 2:00 there are

6  naturalization ceremonies in the adjoining courtroom

7  which I should be presiding over, but I won't

8  because it's not my province.  But I would encourage

9  you to drop by and watch them if you have the time.

10 You would have been here, so you will be free at

11 2:00.  If you've never been to a naturalization

12 ceremony, this is where new citizens are maybe

13 people who have waited years to become American

14 citizens, and this is the formal ceremony which they

15 will administer the oath.  And I think you might be

16 very interested in seeing how happy these people are

17 to become American citizens.  It's a wonderful

18 experience.  So, if you have the time, I would

19 encourage you to attend at 2:00.

20       Be in recess.

21       (The jury was taken out, and a recess was

22       taken.)

23       MR. MURPHY:  Judge, we have one more witness

24 available today, will get us somewhat past noon, and

25 then we would like to read the stipulation and break

1  for the day if that's possible.  Probably won't go

2  all the way until 1:00, but we will then have only

3  two witnesses to finish up with tomorrow.

4          THE COURT:  Very good.

5          MR. MURPHY:  Okay.

6          THE COURT:  All right.  Ask the jury to come

7  in, please.

8          (The jury was brought in.)

9          THE COURT:  Next witness.

10         MR. BROST:  Your Honor, the United States

11  calls Special Agent Mark Geever to the stand.

12         (Witness sworn by the Clerk.)

13                    **MARK GEEVER,**

14  **called as a witness, after being first duly sworn,**

15  **was examined and testified upon his oath as follows:**

16                 **DIRECT EXAMINATION**

17  **BY MR. BROST:**

18  Q.   Would you state your name and spell your last

19  name, please?

20  A.   Mark Geever, G-e-e-v-e-r.

21  Q.   And where are you employed?

22  A.   I'm a special agent with the Bureau of Alcohol,

23  Tobacco, Firearms and Explosives in the Springfield,

24  Illinois, field office.

25  Q.   How long have you been employed with ATF?

1  A.    A little over 20 years.

2  Q.    And what are your duties as a special agent

3  with ATF?

4  A.    Mainly we investigate alleged violations of the

5  federal firearms, explosives and arson laws here in

6  the Central District of Illinois.

7  Q.    What is your educational background?

8  A.    I have a bachelor of science degree in

9  psychology from the University of Illinois,

10 Urbana-Champaign, and then I received much training

11 through ATF since I have been employed by them over

12 the last 20 years.

13 Q.    Have you received specialized training

14 regarding the interstate nexus of firearms?

15 A.    Yes, I have.  Starting in November of 1998, I

16 began receiving advanced training in this area

17 through ATF.  In 1998, the training consisted of a

18 one-week school at our headquarters in Washington,

19 D.C., where we were required to pass written

20 examinations both before and after the training

21 which involved interstate nexus determination of

22 firearms, which was advanced firearms training as

23 far as familiarization with how firearms are

24 manufactured, how they are marked, how they move

25 through interstate commerce, how they move from

1  foreign commerce into the United States and then

2  enter in the U.S. commerce.

3      And since that time, I've also attended

4  advanced training schools in this -- on the subject

5  matter.  In 2001, a group of us toured several of

6  the major U.S. firearms manufacturing facilities in

7  the northeast part of the United States,

8  Massachusetts, New Hampshire, Connecticut.  Toured

9  some of the major firearms manufacturers where they

10 took us through, beginning and end of their

11 manufacturing process and how they start from raw

12 materials and manufacture the firearms, how they

13 mark them, how they're entered into -- into commerce

14 from the manufacturing facilities.

15     I've also been to Europe for a two-week

16 school where we toured many of the major European

17 firearms manufacturing facilities; and that was in

18 2004, I went through that training.  And it was the

19 same type of deal where we took guided tours through

20 Glock and Walther and some of the other big

21 manufacturing facilities in Europe and showed how

22 they manufacture and mark their firearms, how they

23 proof them, and proof houses in Europe and how they

24 are shipped to the U.S. through interstate commerce

25 here.

Q.   Have you conducted any investigations regarding
the interstate nexus of firearms?

A.   Yes, I have.  During the course of my career,
I've been the case agent in approximately 250 to 300
firearms investigations, where most of those cases I
was involved in tracing the firearms to try and find
out how they were recovered from, from the suspect
of the investigation.  I conducted firearms traces
for other agencies that request them through ATF.

      And the firearms trace basically involves,
you know, the history of a firearm from where it's
manufactured, either domestically here in the U.S.
or by a foreign company, and then how that firearm
goes from its manufacturing location to a wholesaler
to a retailer and then into, into the general
public.

Q.   Have you testified in court before regarding
the -- as an expert on the interstate nexus of
firearms?

A.   Yes, I have.  Prior to today, I've testified in
U.S. District Court here in the Central District of
Illinois 21 times as an expert in interstate
commerce of firearms.  And I've testified in grand
jury proceedings approximately 80 to 100 times.

          MR. BROST:  Your Honor, I offer Special

1   Agent Mark Geever as an expert in the interstate

2   nexus of firearms.

3           THE COURT:  Do you wish to voir dire,

4   Mr. Slaughter?

5           MR. SLAUGHTER:  No, Your Honor, we will

6   accept his testimony.

7           THE COURT:  You may continue, Mr. Brost.

8   BY MR. BROST:

9   Q.   Would you explain to the jury what is meant by

10  interstate nexus regarding firearms?

11  A.   It's really a simple term.  It involves

12  commerce between one state and another.  And in this

13  case, it involves the commerce of a firearm from one

14  state to another.  Moving across state lines in

15  commerce, between one state and another.

16  Q.   I'm going to show you what's been admitted into

17  evidence as Government's Exhibit 3B.  I'm going to

18  ask, do you recognize that exhibit?

19  A.   Yes, I do.

20  Q.   And you were asked to conduct an examination

21  regarding that exhibit; is that not right?

22  A.   Yes, I was.

23  Q.   Okay.  And can you tell the jury just what is

24  that weapon in there?

25  A.   This is a Ruger model P97DC.  It's a

1    .45-caliber semiautomatic pistol.  And the serial

2    number on the firearm is 663-448667.

3    Q.    Is Ruger one of the manufacturing plants that

4    you toured when you were in the Northeast United

5    States?

6    A.    Yes, I did.  In September of '01, the Ruger

7    facility was one of the -- was the first firearms

8    facility that we toured on that training session.

9    Q.    Based on your examination and your knowledge of

10   the Ruger firearm, do you know where this gun was

11   manufactured?

12   A.    Excuse me.  Yes, I do.  Based on the tour that

13   I took of the Ruger facility and the fact that I've

14   -- I've examined many, many Rugers over the years, I

15   know that they manufacture their semiautomatic

16   pistols such as this one that I have in my hand at a

17   facility in Prescott, Arizona.

18   Q.    Now, assuming that this Exhibit 3B, the Ruger

19   -- that you have identified as a Ruger was recovered

20   by the Peoria Police Department on August 23rd of

21   2006 here in Peoria, do you have an opinion as to

22   whether that gun traveled in interstate commerce

23   prior to that date, that date being August 23rd of

24   2006?

25   A.    Yes.  Based on the fact that this firearm was

1  manufactured in Prescott, Arizona, it would have had

2  to travel in interstate commerce to be recovered

3  here in Illinois in August of '06.

4        MR. BROST:  No further questions.

5        THE COURT:  You may cross, Mr. Slaughter.

6        MR. SLAUGHTER:  Your Honor, we have no

7  questions.

8        THE COURT:  Thank you, sir.

9        MR. MURPHY:  Your Honor, we'd like to close

10 the evidence today with the stipulation, please.

11       THE COURT:  All right.  Do you have a copy?

12       All right.  Members of the Jury, you are

13 about to hear a stipulation that will be read by

14 Government Counsel.  This is an agreement or a

15 stipulation between the government and the defendant

16 that certain facts exist.  This means simply that

17 they both accept these facts; and because there's no

18 disagreement over them, there's no need for evidence

19 by either side on that point.

20       You must accept the stipulation as fact even

21 though nothing else is said about it one way or the

22 other, and the stipulation is received in evidence.

23       You may read the stipulation.

24       MR. MURPHY:  Thank you, Judge.  The

25 stipulation reads as follows.

Ladies and gentlemen:  Now comes the
parties, the United States of America, by and
through its attorneys, Roger A. Heaton, United
States Attorney, and Bradley W. Murphy, Assistant
United States Attorney for the Central District of
Illinois, and the defendant, Cory Mosby, and his
attorney, Chester Slaughter, and hereby agree and
stipulate as follows:

Number one:  That prior to August 23, 2006,
the defendant, Cory Mosby, had been convicted of a
crime punishable by imprisonment for a term
exceeding one year.

The stipulation is signed by Bradley W.
Murphy, Cory Mosby and Chester Slaughter.

That concludes the presentation today,
Judge.

THE COURT:  All right.  As I indicated, the
stipulation is received into evidence.

And, members of the jury, this will conclude
the evidence today.  Because of my scheduling
difficulty, I must stop for today, and we will
resume tomorrow morning at 9.

Again, I would encourage you, if you have
the time available, to drop by the naturalization
proceedings in the adjacent courtroom.  I think you

1    will find it very interesting.

2          So, we are adjourned until tomorrow morning

3    at 9:00.

4          (The jury was taken out, and the proceedings

5          were adjourned at 12:04 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25