1               IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
2
   UNITED STATES OF AMERICA,           )
3                                      )
                        Plaintiff,     )  VOLUME III
4                                      )
             vs.                       )  Case No. 06-10072
5                                      )  Peoria, Illinois
   CORY MOSBY,                         )
6                                      )
                        Defendant.     )
7

8      EXCERPTED TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                        MAY 2, 2007
9

10                       BEFORE:

11          THE HONORABLE JOE BILLY McDADE,
             United States District Judge
12                    And a Jury

13

                     APPEARANCES:
14

           BRADLEY W. MURPHY, ESQUIRE
15            JERRY BROST, ESQUIRE
            United States Attorneys
16            One Technology Plaza
         211 Fulton Street, Fourth Floor
17          Peoria, Illinois  61602
         (Appeared on Behalf of the Plaintiff)
18

19          CHESTER SLAUGHTER, ESQUIRE
              Lyle & Slaughter
20       900 West Jackson Street, Suite 6-W
            Chicago, Illinois  60607
21       (Appeared on Behalf of the Defendant)

22

23

24       Jennifer E. Johnson, CSR, RMR, CRR, CBC
   Proceedings recorded by mechanical stenography,
25 transcript produced by computer

199

**INDEX**

                                                        **PAGE**

**GOVERNMENT WITNESSES:**

    CHAD BATTERHAM

        Direct Examination by Mr. Murphy    201
        Cross-Examination by Mr. Slaughter  224
        Redirect Examination by Mr. Murphy  236

    LOREN MARION III

        Direct Examination by Mr. Murphy    238
        Cross-Examination by Mr. Slaughter  288
        Redirect Examination by Mr. Murphy  302

**PLAINTIFF RESTS**                                     305


**DEFENSE WITNESSES:**

    EBONY LOGAN

        Direct Examination by Mr. Slaughter 306
        Cross-Examination by Mr. Murphy     309
        Redirect Exam by Mr. Slaughter      316
        Recross-Examination by Mr. Murphy   316

    DAVID BROWN

        Direct Examination by Mr. Slaughter 326
        Cross-Examination by Mr. Murphy     329

**DEFENSE RESTS**                                       335


**GOVERNMENT'S EXHIBITS:**

    20A                                     278
    20B                                     278

```
1                    (Jury Not Present.)

2          THE COURT:  Good morning, Counsel.

3          MR. MURPHY:  Good morning, Judge.

4          THE COURT:  I understand there was an

5   accident throughout the area so it interfered with

6   the people coming in to trial today.

7          Are we ready to proceed?  I think the

8   government has --

9          MR. MURPHY:  We have two more witnesses to

10  conclude our case in chief.  It is my anticipation

11  that we'll get at least through the government's

12  case in chief and quite possibly through the defense

13  case before lunch today, Judge.

14         THE COURT:  Very good.  We would do

15  instructions, since we can, after -- if we're done

16  before lunch, we'll do them at lunch.  If it's in

17  between, we'll do them after when we can.

18         Ask the jury to come in.

19         (The jury was brought in.)

20         THE COURT:  Good morning to you.  I'm

21  pleased to see all of you in light of all the

22  accidents that happened this morning.

23         Also, I have been told today was Grump's

24  Day.  Anybody hear of that?  My secretary told me

25  today is Grump Day.  Anyone hear of that?
```

```
1            THE CLERK:  Could it have been Hump Day,
2    Wednesday?
3            THE COURT:  No, Grump.  I don't know if
4    that's true or not.  I guess no one has heard of
5    that except my secretary.  Okay.
6            Ready to start, Mr. Murphy?
7            MR. MURPHY:  Yes.  We call Officer Chad
8    Batterham.
9            (Witness sworn by the Clerk.)
10                    CHAD BATTERHAM,
11   called as a witness, after being first duly sworn,
12   was examined and testified upon his oath as follows:
13                  DIRECT EXAMINATION
14   BY MR. MURPHY:
15   Q.   Sir, would you please state your name and spell
16   your last name?
17   A.   Chad Batterham, B-a-t-t-e-r-h-a-m.
18   Q.   And your occupation is what?
19   A.   Peoria police officer.
20   Q.   And how many years do you have on the force?
21   A.   Over 13 years.
22   Q.   And your current duties are what?
23   A.   I'm assigned to the Peoria Police Department's
24   vice and narcotics unit.
25   Q.   And the nature of your duties in vice and
```

1  narcotics is what?

2  A.   We perform narcotics investigations throughout

3  the city of Peoria.

4  Q.   Direct your attention back to July and August

5  of last year.  In both of those months, one in July

6  and one time in August, did you participate with

7  other fellow officers from vice and narcotics in a

8  surveillance that was conducted of a person you now

9  know to be Cory Mosby?

10  A.   Yes.

11  Q.   In addition to those surveillances, after his

12  arrest on the date of August 23rd of 2006, Officer

13  Batterham, did you have occasion to interview him

14  personally?

15  A.   Yes, I did.

16  Q.   Let's start and take these in chronological

17  order.  Let's go back to, if I can, please, the date

18  of July 27, 2006.  Did you participate on that date

19  in a surveillance of a particular area of Peoria?

20  A.   Yes.

21  Q.   And do you recall approximately what time you

22  began surveillance activities and where that was?

23  A.   I believe the surveillance began around 4:00

24  that evening.  I remember I was late getting

25  involved in the surveillance because I was busy

1  doing another case, so I probably got involved

2  around 4:30 that evening.

3  Q.    And there were other officers that were

4  involved at that time, correct?

5  A.    Yes.

6  Q.    And what was the area that was initially

7  surveilled that day?

8  A.    Apartment complex, Parkview Estates apartment

9  complex, 2401 Gale Street in Peoria.

10  Q.    And direct your attention to shortly after

11  5 p.m. on that day, and understanding that

12  surveillance may well have been commenced before

13  that time, did you have occasion to see Mr. Mosby at

14  a particular motor vehicle at or about the Parkview

15  Estates at that time?

16  A.    Yes.

17  Q.    Tell us what you saw.

18  A.    At that time, I was parked at the intersection

19  of Institute and Gale watching the front of the

20  apartment complex.  I watched Mr. Mosby get inside a

21  black GMC Denali and drive out of the apartment

22  complex towards University Street.

23  Q.    Did you ever see Mr. Mosby come back?

24  A.    Yes, I did.

25  Q.    And was that about 5:00 or shortly after 5:00

1  you saw him come back?

2  A.    Yes.

3  Q.    Okay.  And what kind of a vehicle was he

4  driving on that day?

5  A.    It was the black GMC Denali.

6  Q.    And as far as you could tell, was he alone in

7  that vehicle?

8  A.    Yes.

9  Q.    Now, did you remain at the Parkview Estates

10 area even though he might be coming and going

11 therefrom?

12 A.    I, I stayed in the area when he was there.

13 Then when he would leave, we would all jump in and

14 help try to follow.

15 Q.    Okay.  Directing your attention to about

16 6:20 p.m., did you become aware either by

17 observation or from contact with other officers that

18 Mr. Mosby was again exiting the apartment complex in

19 a different vehicle?

20 A.    Yes.

21 Q.    And do you remember what kind of vehicle this

22 was?

23 A.    It was a tan Pontiac minivan.

24 Q.    And to distinguish, that minivan is a different

25 minivan than the one in which he was arrested in

1  August?

2  A.    Yes.

3  Q.    Tell us what observations you made of Mr. Mosby

4  after he left the apartment complex later in the

5  evening in that tan minivan.

6  A.    Other officers followed him away in the

7  minivan.  I got behind the minivan on Nebraska

8  Street in Peoria, and I was following the minivan

9  west on Nebraska Street.  I watched the minivan turn

10 northbound onto -- I believe it's Indiana Street and

11 then turned westbound into the alley in between

12 Nebraska and Frye Street.  I continued on Nebraska,

13 turned northbound on Wisconsin where I could park

14 along the side of the road, and I could look down

15 the alley where the minivan was parked.

16          When I stopped and looked down the alley,

17 the minivan was parked in the alley.  Mr. Mosby was

18 out of the vehicle, speaking with another black male

19 in the alley.  They just stood there for a couple of

20 minutes.  Mr. Mosby then got back in the minivan,

21 continued in the alley towards Wisconsin and then

22 south on Wisconsin and back eastbound on Nebraska

23 out of my sight.

24 Q.    Did you eventually see Mr. Mosby arrive back at

25 the Parkview Estates about 6:45?

1  A.    Yes, I did.

2  Q.    And was he in that same tan minivan?

3  A.    Yes.

4  Q.    Did you observe, as you recall, anybody in the

5  minivan with him?

6  A.    Not that I saw, no.

7  Q.    And shortly after he returned to the Parkview

8  Estates area about 6:45 or so on July 27th, did the

9  surveillance discontinue?

10  A.    Yes.

11  Q.    I would like to move on then to the date of

12  August 23rd of 2006.  Were you part of the

13  surveillance team on that day, too?

14  A.    Yes, I was.

15  Q.    In fact, did you pretty much commence your

16  surveillance that day?

17  A.    Yes, I did.

18  Q.    And where and about what time, please?

19  A.    11:55 a.m., just before noon, because our plan

20  for the day was to set up surveillance on Mr. Mosby.

21  I was the first one out there on surveillance

22  detail.

23         When I arrived, I parked right in the

24  parking lot of Mr. Mosby's apartment building, and I

25  had an undercover vehicle.  I was just sitting in

1  the back of the vehicle where I couldn't be seen.

2  As I was sitting there, I saw Mr. Mosby pull up in a

3  silver Dodge Intrepid, approximately right around

4  noon, right around 11:55 he showed up.

5          I should go back.  I saw him arrive at

6  11:55.  I had been there about ten minutes prior,

7  before his arrival.  When I saw Mr. Mosby pull up in

8  a silver Intrepid, get out of the car, called the

9  rest of the surveillance units and let them know

10 that Mosby had come home, for the other units to

11 come to the area to help commence surveillance.

12 Q.   And as you sat there over the course of the

13 next few minutes, did you see other people either

14 come or go from this particular Apartment Y10?

15 A.   Yes, I did.

16 Q.   What do you remember at this point in time in

17 terms of observations of people coming or going?

18 A.   Shortly after Mr. Mosby arrived and went inside

19 the apartment, a couple minutes afterwards, Ashley

20 Hunter walked out of the apartment, I believe with

21 one or two children.  They got into that black GMC

22 Denali that we had seen on July 27th.  They got into

23 that vehicle and left.

24          A couple minutes after that, two more black

25 females exited the apartment, I believe with one

1  child, and they got into the black Chrysler Town &

2  Country minivan which he was later arrested in.

3  They got inside of that van, and they left.

4        A couple minutes after that, early '80s

5  white Buick with a blue top pulled into the

6  apartment complex.  Young black male got out of that

7  Buick, walked into Apartment Y10.

8  Q.   That individual you now know has been

9  identified as David Brown?

10  A.   Yes.

11  Q.   Okay.  Directing your attention to long about

12  12:30, 12:35, that time period, did you have to see

13  Mr. Mosby again?

14  A.   Yes, I did.

15  Q.   Tell us what you saw.

16  A.   Mr. Mosby exited Apartment Y10, walked back to

17  the Dodge Intrepid, got in the car, started to back

18  out.  I believe he forgot something because he

19  backed up like he was going to leave, and then he

20  reparked again and walked back inside the apartment

21  complex -- inside Apartment Y10.

22        Short time later, a couple minutes later, he

23  walked back out of Y10, got back into the Dodge

24  Intrepid and then drove out of the apartment

25  complex.

1  Q.   Did you -- were you part of the surveillance

2  team that followed him, or did you remain at

3  Parkview at that point?

4  A.   I joined in the following a short time later.

5  Q.   Okay.  And do you recall where you have further

6  observations of him that afternoon?

7  A.   Mostly in passing.  I was never the eyeball

8  again on Mosby until later on that day; just part of

9  the crew following him around the city of Peoria.

10  Q.   Did you go over on Western Avenue?

11  A.   Yes.

12  Q.   Okay.  Did you go up on the area of West

13  Marquette?

14  A.   Yes.

15  Q.   Did you have occasion to see the vehicle, the

16  Intrepid when he was over at Idaho and Seibold?

17  A.   I did not see it parked there at that time, but

18  I was listening because we were all talking on the

19  Nextels.  You usually have one person keeping an eye

20  on the car, and everybody else is staked in the area

21  parallel so if they would leave or we're ready in

22  any direction in case they go because we don't want

23  to lose them.

24  Q.   Okay.

25  A.   So, I heard he was down there, but I did not

1  drive by and see or have the eye on that.

2  Q.   All right.  Did you follow to the area of the

3  -- after that the Midas muffler shop?

4  A.   Yes.

5  Q.   And did you actually have an eyeball of him

6  there?

7  A.   I believe I might have driven past once, but,

8  no, I didn't have a steady eye on him.

9  Q.   All right.  And then along about 2:20 in the

10  afternoon, did you see Mr. Mosby back at Parkview

11  Estates?

12  A.   Yes.

13  Q.   What, what vehicle was he in at that point?

14  A.   The Dodge Intrepid.

15  Q.   After he arrived back there at the Parkview

16  Estates, did you take up a surveillance position at

17  that time?

18  A.   At that point, I was just -- I was just one of

19  the cars that went into the area.

20  Q.   Okay.  Were you aware that other officers were

21  watching directly his coming and going at that time?

22  A.   Yes.

23  Q.   Was Officer Marion one of those?

24  A.   Excuse me, yes, he was.

25  Q.   Did Officer Marion keep you advised throughout

1  that time period of about 3:45, going on to 4:00 of

2  events he was observing?

3  A.   Yes.

4  Q.   I'm not going to ask you to relate what those

5  were at this point, but somewhere along about 4:00

6  or so, in the area of 4:00 to 4:15, did you have

7  again the opportunity to personally see Mr. Mosby?

8  A.   Yes, I did.

9  Q.   And please tell us where you were at the time.

10  A.   I saw Mr. Mosby standing at the intersection of

11  Gale and University Street.  That would be on the

12  northwest corner.  Mr. Mosby was standing with

13  Ashley Hunter on, on the corner, and they seemed to

14  be arguing.  My observation was I was just traveling

15  on University southbound, rather slowly past them as

16  they stood on the corner.

17  Q.   Were you able to see anything in Mr. Mosby's

18  hands at that point?

19  A.   Yes, I did.

20  Q.   And describe what it was.

21  A.   He was holding a white trash bag.

22  Q.   Okay.  And did you see a cell phone at some

23  point?

24  A.   I believe he was talking on his cell phone.

25  Q.   And when you say they seemed to be arguing, can

1  you give us a little better description of what you

2  saw that led you to that conclusion?

3  A.    Well, just -- when I drove past, just see them

4  jawing at each other, just back and forth, appeared

5  -- didn't appear to be happy.

6  Q.    Did you just drive past at that point in time,

7  Officer Batterham, or did you then park at some area

8  you could watch the goings-on there?

9  A.    I had driven past, but then I went and pulled

10  into the cemetery parking lot and waited down there

11  in case they were to walk down that way or get into

12  a vehicle and help commence the surveillance.

13  Q.    What further observations of either or both of

14  those individuals there at the corner did you have?

15  A.    That was all.

16  Q.    Okay.  At some point in time did you become

17  aware that they had, in fact, gotten into a vehicle?

18  A.    Yes.

19  Q.    Now, you didn't see that, right?

20  A.    No.

21  Q.    Okay.  But then did you take up the

22  surveillance again after -- understanding they were

23  in another vehicle?

24  A.    Yes.

25  Q.    Which vehicle did you observe them in?

1   A.   The black Chrysler Town & Country minivan.

2   Q.   Okay.  You had earlier seen that van, right?

3   A.   Yes.

4   Q.   Tell us what further observations you had of

5   Mr. Mosby and Miss Hunter at that point.

6   A.   At that point, the whole surveillance team

7   followed them to the Lexington Hills apartment

8   complex and then down to Methodist Hospital.

9        Once they got to the hospital, Officer

10  Marion had called out that they had parked at the

11  hospital, and Mr. Mosby had exited the minivan and

12  was walking down Hamilton Street.

13       Like I said, I was still part of the mobile

14  surveillance.  And during the mobile surveillance, I

15  drove past, down Hamilton street, watched Mr. Mosby.

16  He was walking down the -- it would be the west side

17  of the street, down Hamilton, towards the river.

18  Q.   And what, if anything, did you observe about

19  his personal -- on his person?

20  A.   Mr. Mosby was still carrying the white trash

21  bag, and he was talking on the cell phone, walking

22  down the street.

23  Q.   Okay.  So, again -- you again saw him talking

24  on the cell phone?

25  A.   Yes.

1  Q.    Now, did you see where he went to or what

2  happened eventually to him?

3  A.    At that point, no.  Like I said, I was just

4  driving past, and other officers observed him get

5  back into a van.

6  Q.    Okay.  Did you again -- in a mobile

7  surveillance mode -- understand that the van was

8  eventually stopped over on Lincoln Street?

9  A.    Yes.

10  Q.    And is that the 1000 block of Lincoln?

11  A.    Yes.

12  Q.    Did you go to that location at some point in

13  time after the stop?

14  A.    I was actually there during the stop.  As the

15  marked unit came in to stop the minivan, I was

16  behind them on Lincoln Street so I was kind of

17  driving past as the stop was being made.  As the

18  minivan pulled over to stop, and the marked unit --

19  the passenger side door flew open on the minivan.

20  And I was thinking, Oh, I'm going to have to run

21  since somebody's going to run from the van.

22        But the officers walked up there, and the

23  door closed again so I thought the threat for

24  running seemed to be -- so I just continued on past.

25  Q.    And when you say the passenger door opened,

1  which one of the passenger side doors would that be

2  that you recollect seeing open on it?

3  A.   The front passenger door.

4  Q.   It wasn't the rear slider door?

5  A.   No, it was not.

6  Q.   And now, you weren't part of the search of the

7  van, correct?

8  A.   Correct.

9  Q.   However, later on that evening, you did become

10  aware that there was a search of an apartment --

11  actually Apartment Y10 that had been under

12  surveillance, right?

13  A.   Yes.

14  Q.   And did you become aware that a gun had been

15  located out there?

16  A.   Yes.

17  Q.   Now, after the search of the apartment that

18  evening, long about 9:20, thereabouts, were you back

19  down at the station?

20  A.   Yes, I was.

21  Q.   And did you go on into Interview Room Number 3?

22  A.   Yes, I did.

23  Q.   Who was there?

24  A.   Myself, Officer Loren Marion and Mr. Cory

25  Mosby.

1  Q.   And is the Cory Mosby that you've been

2  testifying about when he was arrested on that

3  occasion present here in court today?

4  A.   Yes, he is.

5  Q.   Would you point directly at him?

6  A.   (Witness complies.)

7          MR. MURPHY:  Thank you.  Will the record

8  reflect the identification, Your Honor?

9          THE COURT:  The record will so reflect.

10 BY MR. MURPHY:

11 Q.   Let me just ask generally, what was your

12 purpose in going into the interview room with

13 Officer Marion at that time?

14 A.   Purpose was to interview him in regards to the

15 drugs and money and the gun found in the van and the

16 gun found out at the apartment.

17 Q.   And you are aware that, since he was in your

18 custody, that he had certain rights, correct?

19 A.   Yes.

20 Q.   And was Mr. Mosby advised of his Miranda

21 warnings?

22 A.   Yes, he was.

23 Q.   How was that done, please?

24 A.   Officer Marion first -- when we all get hired

25 on the job, they give us a Miranda card.  Officer

1  Marion began by reading him his Miranda warnings

2  from his Miranda card.  After he read him his

3  Miranda warnings from the Miranda card, he presented

4  him with a Miranda waiver form which the defendants

5  can read for themselves, initial and sign, showing

6  that they have been read their Miranda warnings.  He

7  was then presented with that form, which he

8  initialed in the appropriate spaces and signed, and

9  myself and Officer Marion also signed for him.

10  Q.   Now, before we go into the statement, at this

11  point I want to talk to you briefly about a couple

12  exhibits that are lying up there to your right.  The

13  first is the bag there marked as Government Exhibit

14  Number 1.  Do you see that?

15  A.   Yes, I do.

16  Q.   And is it fair that that's described as a

17  kitchen garbage bag?

18  A.   Yes.

19  Q.   How does that appear -- either similar or

20  different -- to the bag that you observed Mr. Mosby

21  carrying on the date of August 23rd?

22  A.   This is similar to the bag he was carrying,

23  just a large plain white trash bag.

24  Q.   As it appears now, we know that it's got

25  fingerprint powder all over it, correct?

1  A.   Yes.

2  Q.   You weren't close enough to tell whether or not

3  it had fingerprint powder on it then, were you?

4  A.   No.

5  Q.   The other exhibit is Number 4 lying up there to

6  your right, the envelope.  Would you open that up

7  for us, please?  And what is the -- what is inside

8  Exhibit Number 4?

9  A.   This is the Miranda waiver form that was filled

10  out on that date.

11  Q.   Okay.  Now let's go back and talk about this

12  Miranda admonition.  You indicate, first of all,

13  that Officer Marion advised him of his rights from a

14  card?

15  A.   Correct.

16  Q.   Correct?  And he was asked if he understood

17  those rights?

18  A.   Yes.

19  Q.   And asked if he would be willing to waive those

20  rights and talk to you?

21  A.   Yes.

22  Q.   Did he indicate affirmatively both to those?

23  A.   Yeah.  He just said, Yep.

24  Q.   Okay.  And then you produced a written form

25  that is Exhibit Number 4?

1   A.    In fact, all that happened after this.  He read

2   him the Miranda from the card.  After reading the

3   card, then showed him the form.  Read the form, gave

4   him the form.  And then after everything was signed,

5   then we asked him, Having all this, do you want to

6   talk to us?  That's when he said yep.

7   Q.    Okay.  And did he sign the form?

8   A.    Yes, he did.

9   Q.    Where does his signature appear on the form?

10  If you would hold it up and point to it for us,

11  please.

12  A.    Signature is right there, Person Signing

13  Waiver.

14  Q.    Okay.  Did you sign the form as well as the

15  witness?

16  A.    Yes, I did.

17  Q.    And who else signed it?

18  A.    Officer Marion.

19  Q.    Okay.  How did you begin the questioning of

20  Mr. Mosby at that point -- or who said what first, I

21  guess I should ask?

22  A.    After Miranda was read, Mr. Mosby was concerned

23  and he asked if she was going to get into any

24  trouble for this, assuming meaning Miss Ashley

25  Hunter, if she was going to get into any trouble.

1    I said, Well, it just depends on her

2  involvement, if she was involved with anything or

3  not.

4         Mr. Mosby then said, Well, I'll take it all,

5  you know.  I'll take the case; it's mine.

6         I said, well, I appreciated him admitting

7  that, but in order for him -- for me to be sure it

8  was his and he's just not covering for somebody, I

9  needed basically an itemized list of everything that

10 was found because if it was theirs, they know

11 exactly what it was, where it was found.

12        So, we began talking about what was found in

13 the van.

14 Q.   And did you begin by talking about the

15 marijuana?

16 A.   Yes.

17 Q.   And what did you ask him, and what did he say?

18 A.   I asked him how much marijuana was found in

19 there, and he said it was approximately 3 ounces of

20 hydro, which is a street term for hydroponic

21 cannabis.  He said there were three separate ounces

22 packaged separately.  He said he had bought that for

23 $500, and he didn't sell; he just smokes.

24 Q.   Okay.  And then what did you ask him next?

25 A.   After that I asked him about the crack cocaine

1  that was found inside the van.  He said the crack

2  cocaine was his.  I asked him how much crack cocaine

3  was in there, and he says probably around a half

4  kilo.  I asked him how it was packaged.  He said

5  that the crack cocaine was in two separate Ziploc

6  baggies.  One baggy had just loose crack cocaine in

7  it, and the other Ziploc bag had -- it was already

8  bagged-up crack cocaine inside that bag.

9  Q.   And did you ask him about the money?

10  A.   Yes, I did.

11  Q.   And what did you ask him?

12  A.   I asked him how much money was in there.  He

13  said probably around $15,000.

14  Q.   Did you then ask him about a gun?

15  A.   Yes.

16  Q.   And what did you say; what did he say?

17  A.   I asked him if, if there was a gun inside the

18  van.  He said, yeah, there was a gun in the van.  I

19  asked him where it was at.  He said it was behind

20  the passenger seat of the van.  I asked him what

21  kind of gun it was.  He said it was a black

22  9-millimeter handgun and that it was loaded.  He did

23  not know the make or model of the gun.  He said that

24  he had bought that gun just from somebody off the

25  streets for $150.

1  Q.   And did you ask him if he knew the person he

2  bought it from?

3  A.   Yes.

4  Q.   What did he say?

5  A.   He did not know.   They don't remember.   Said he

6  just got it off the street from somebody.

7  Q.   Did you ask him about another gun?

8  A.   Yeah.

9  Q.   What did you say; what did he say?

10  A.   I just asked him about the gun found in the

11  apartment.   He said that gun was also his.   I asked

12  him to describe that handgun for me.   He said it was

13  a .45-caliber handgun; he said it was chrome on the

14  top and black on the bottom.   He said he did not

15  know the make or the model of that handgun either.

16  He said he had bought that gun approximately three

17  months ago for $200 from somebody that he only knows

18  as Big Boy.

19  Q.   Want to go back to the first gun that you

20  discussed with him and ask you if you asked him or

21  if he stated why he had that particular gun?

22  A.   Yeah.   Well, I asked him how the handgun got in

23  the van, and he said that earlier that day in the

24  morning, he was driving that minivan; he had put the

25  gun behind the seat then.   And I asked him why would

1  he carry a gun around.  He said he carries it for

2  his own protection.

3  Q.    Okay.  After talking about the two guns, then

4  did you ask him where the crack cocaine came from?

5  A.    Yeah.  He said that he buys and sells -- he

6  buys cars and fixes the cars up and then sells them

7  for a profit.  And he did say that that's even where

8  the $15,000 came from; he said just from selling the

9  cars.

10          I asked him where the cocaine came from.

11 And he said about three weeks ago, he had fixed up

12 an '88 Chevy Caprice, and he had traded it to

13 somebody who didn't -- they didn't have money to pay

14 for the car so they gave him the half kilo of

15 cocaine for the car.  I asked him who this was.  He

16 didn't know this guy's name.

17          I asked him, Well, how did you meet him?  He

18 met this guy through a friend.  I asked him who the

19 friend was, and he couldn't remember who the friend

20 was.

21          That's how he said he came across the crack

22 cocaine, was trading a car for it.

23 Q.    And at that point did you pretty much conclude

24 the conversation with him?

25 A.    Yes.

1  Q.   And did this take approximately half an hour,

2  this conversation you've related to us?

3  A.   Yes.

4  Q.   Okay.  That would include the Miranda warnings

5  and everything?

6  A.   Correct.

7  Q.   I want to go back and ask you one -- follow up

8  on one detail here, when he indicated he traded a

9  vehicle.  What kind of a vehicle did he indicate he

10 had traded for this crack cocaine?

11 A.   A 1988 Chevy Caprice.

12      MR. MURPHY:  Thank you.  Those are my

13 questions.

14      THE COURT:  You may cross, Mr. Slaughter.

15                **CROSS-EXAMINATION**

16 **BY MR. SLAUGHTER:**

17 Q.   Officer, on August 23rd of 2006, you were

18 involved in the surveillance of Cory Mosby, right?

19 A.   Correct.

20 Q.   Now, on that day, during the course of your

21 surveillance, were you equipped with a camera?

22 A.   No, I was not.

23 Q.   Did you take any photographs of the comings and

24 goings of Mr. Mosby on that day?

25 A.   No, sir.

1  Q.    Now, on the 23rd of August did you see

2  Mr. Mosby driving the black Town & Country minivan?

3  A.    No, I did not.

4  Q.    In your statement you say that Mosby told you

5  on the night of the 23rd that he had been driving

6  the black minivan earlier that day; is that right?

7  A.    He said he was driving it in the morning hours.

8  Q.    All right.  Now, did you through your

9  investigations or get information from any of your

10  fellow officers that they saw him driving the black

11  Town & Country the morning of the 23rd?

12  A.    No.

13  Q.    During the course of your investigation, have

14  you gone through the various reports that have been

15  made by your fellow officers involving the

16  surveillance and arrest of Mr. Mosby that day?

17  A.    Did I go through on August 23rd, did I review

18  reports?

19  Q.    No.  Since then, have you reviewed the reports

20  that your fellow officers made in this case?

21  A.    I reviewed my reports and surveillance

22  documents.

23  Q.    Okay.  In the surveillance documents, is there

24  any mention at all of Cory Mosby driving the black

25  minivan on the 23rd?

1  A.    No.

2  Q.    All right.  So, when the statement was made to

3  you that Mr. Mosby -- that he put the gun in the

4  minivan earlier that day, did you ask him what time

5  that happened?

6  A.    He just said that morning.  I didn't ask him an

7  exact time; no, I did not.

8  Q.    Did you ask him where he was when he did that?

9  A.    No.

10  Q.    Did you ask him, What did you do with the

11  minivan after you put the gun in it?

12  A.    No.

13  Q.    You didn't ask him where he went in that

14  minivan, right?

15  A.    I don't believe so, no.

16  Q.    Did you ask him how it came to be that this

17  lady named Ebony had the minivan in the evening

18  hours?

19  A.    In the evening hours of that day of

20  August 23rd?

21  Q.    Yes, on August the 23rd.

22  A.    I don't believe so, no.

23  Q.    Now, on August the 23rd, you told us that you

24  saw Cory Mosby and Ashley Hunter at the intersection

25  of Gale and University; is that right?

1  A.    Yes, sir.

2  Q.    And you say at that time you saw Mr. Mosby

3  carrying that white bag?

4  A.    Yes.

5  Q.    The white bag that you said you saw him

6  carrying, did it have a red drawstring to it?

7  A.    I don't remember a red drawstring.

8  Q.    Okay.  You were situated, I believe you said,

9  in the cemetery?

10  A.    When I saw him, I was driving past.

11  Q.    Okay.

12  A.    Then I went to the cemetery where I can no

13  longer see.

14  Q.    When you got to the cemetery, you could not see

15  Mr. Mosby or Miss Hunter at the corner of Gale and

16  University, right?

17  A.    Correct.

18  Q.    Okay.  Did you ever see them get picked up, or

19  did they get in a taxi or get on a bus or anything

20  while you were there?

21  A.    No, I did not observe them get into anything,

22  no.

23  Q.    You drove by -- you said you saw them talking?

24  A.    Yeah.  As I drove past, it appeared they were

25  standing there arguing.

1  Q.   Did you make the statement on direct that it

2  appeared that they were happy, or did I just

3  misunderstand?

4  A.   They were unhappy.

5  Q.   Unhappy.  Okay.  And you were able -- were they

6  touching each other?

7  A.   I don't believe so, no.

8  Q.   While you were driving past, did you notice

9  this woman, Miss Hunter, grabbing Mr. Mosby by the

10 back of his shirt?

11 A.   No, sir.

12 Q.   How long did it take you to go from Gale and

13 University where you saw them standing to the spot

14 near the cemetery?

15 A.   10 seconds, 15 seconds.

16 Q.   When you got to the spot in the cemetery, you

17 said you couldn't see them, but you were in contact

18 with your fellow officers?

19 A.   Yeah.  We're just in contact with the Nextel

20 telephones.

21 Q.   Did you hear anybody say, "They just got into a

22 black minivan"?

23 A.   Yes.

24 Q.   And -- but you didn't see that?

25 A.   Correct.

1  Q.   Then your fellow officers told you where the

2  black minivan was going?

3  A.   Correct.

4  Q.   Now, you also said during the course of this

5  interview with Mr. Mosby wherein he told you he'd

6  take the weight for everything, right?

7  A.   Yes.

8  Q.   Okay.  He didn't tell you that until after you

9  told him that Miss Hunter would be in trouble, and

10 she might possibly lose her children?

11 A.   No, I didn't say anything about her children,

12 no.

13 Q.   Are you saying you never mentioned to her that

14 if she didn't cooperate that her children would be

15 taken away from her?

16 A.   Correct.

17 Q.   Did you talk to Miss Hunter that night?

18 A.   Yes, I did.

19 Q.   Did you talk to Miss Hunter before you talked

20 to Mr. Mosby?

21 A.   Yes, I did.

22 Q.   You also had possession of that white bag

23 before you went in to talk to Mr. Mosby, didn't you?

24 A.   Yes.

25 Q.   And you knew what everything that was in that

1  bag when you talked to Cory Mosby?

2  A.    No.

3  Q.    You didn't know what was in the bag?

4  A.    I knew what was in the bag, but I didn't have

5  weights and ounces, any of that --

6  Q.    Oh, I'm not talking about --

7  A.    -- information.

8  Q.    I'm not talking about weights.  You knew that

9  there was money in there?

10  A.    Yes.

11  Q.    You knew how much money was in there?

12  A.    I don't think we had a count on it at that

13  point.

14  Q.    Did you know that there were drugs in there?

15  A.    Yes.

16  Q.    Did you know how much drugs were in there?

17  A.    I knew there was a large quantity of crack

18  cocaine.

19  Q.    And you also knew that there was marijuana in

20  there?

21  A.    Yes.

22  Q.    You had all that information before you went in

23  to talk to Cory Mosby?

24  A.    Sure.

25  Q.    You also had all that information before you

1  talked to Miss Hunter?

2  A.    Yes.

3  Q.    You're telling us Cory Mosby told you that he

4  repairs and he sells cars, right?

5  A.    Yes.

6  Q.    But he didn't give you the names of anybody

7  that he sold a car to?

8  A.    Correct.

9  Q.    And you had been watching him for the last

10  couple of months.  Did you see him going around

11  selling cars?

12  A.    No, we had only watched him for two days.

13  Parts of two days.

14  Q.    Well, you watched him in July?

15  A.    Yes.  That was one day in July.

16  Q.    Then you watched him again on the 23rd?

17  A.    Yes, two days.

18  Q.    23rd of August?

19  A.    Correct.

20  Q.    That was only the second time that you had ever

21  been involved in the surveillance of him; is that

22  right?

23  A.    I believe so, yes.

24  Q.    Did you ask him who the license plates belonged

25  to that were found in that bag?

1  A.   No, I don't think I even knew there was license

2  plates found in the bag.

3  Q.   Did you ask him who, who -- who those persons

4  were whose names was on the letters that was found

5  in the bag?

6  A.   No, I didn't see any letters that were found in

7  the bag.

8  Q.   Now, during the course of your surveillance on

9  that particular day, you didn't see Cory Mosby with

10  that white bag that you're talking about before you

11  saw him up on Gale and University; is that right?

12  A.   Correct.

13  Q.   You saw him go in and out of the house many

14  times that day?

15  A.   I saw him go into the apartment once, then come

16  out, get into the car, go back in, come out one

17  other time.  And then there was a time later where I

18  saw him come back in.

19  Q.   By the way, when you went in to talk to

20  Mr. Mosby, you also knew about the guns, right?

21  A.   Yes.

22  Q.   You knew where the guns were recovered from?

23  A.   I don't -- I knew there was a gun in the

24  minivan.  I don't remember if I knew exactly where

25  it was in the van.

1  Q.    According to you, when you were asked -- or did

2  you ask him about the guns, or did he just say, "By

3  the way, I hid a gun in that car earlier today"?

4  A.    I believe I asked him about the gun.

5  Q.    You asked him, "Where did this gun come from"?

6  A.    I asked him about -- if he knew about the gun

7  found in the minivan.

8  Q.    And again, according to -- he couldn't give you

9  the name of the person that he purchased the gun

10 from?

11 A.    Correct.

12 Q.    As a matter of fact, he couldn't give you any

13 names --

14 A.    Correct.

15 Q.    -- about any of these transactions other than

16 somebody by the name of --

17 A.    Big Boy.

18 Q.    Big Boy?

19 A.    Big Boy.

20 Q.    And you didn't -- did you run that name through

21 your computer or check any of your records to see if

22 there was a Big Boy around?

23 A.    No, sir.

24 Q.    Well, you do keep records of the various street

25 names that drug dealers use in Peoria, don't you?

1  A.    The gang unit -- or I guess the street crimes

2  unit now, they have a database where they have

3  nicknames and whatnot in there, yes.  But, no, I did

4  not check that.

5  Q.    But that would be helpful for you in

6  determining who these people are.

7          If I tell you that Big Boy shot somebody,

8  you'd go into the database, find that name, see if

9  you got a real name and address and telephone

10  number, right?

11  A.    Sure.  If I had something that I thought needed

12  to be followed up on, had some credence to it, sure,

13  I'd look into it.

14  Q.    Now, the Intrepid that you saw on the 23rd,

15  that's the automobile where the tires were slashed?

16  A.    Correct.

17  Q.    Did you witness that?

18  A.    No, I did not.

19  Q.    Did you witness Mr. Mosby walk from his house

20  up to the corner of University and Gale?

21  A.    No, I did no not.

22  Q.    Did you see Miss Hunter come out of that house,

23  then walk up to the corner of University and Gale?

24  A.    No, I did no.

25  Q.    Now, you were telling us that after the reading

1  of the Miranda warnings -- and those are the rights

2  that tell you that you have a right to remain

3  silent, right?

4  A.   Yes, sir.

5  Q.   It was after -- let me go back.

6       When you first went in to talk to him, did

7  you read the warnings as soon as you got inside the

8  room?

9  A.   No, sir.

10 Q.   There was some talking before you read the

11 warnings to him?

12 A.   Yes.

13 Q.   But he told you, "I will take the weight for

14 all of this," right?

15 A.   Yes.

16 Q.   He wasn't trying to be evasive or anything?

17 A.   No, he was not.

18 Q.   All right.  But he didn't say he'd take the

19 weight until you told him that the lady would

20 possibly be in trouble?

21 A.   No, he, he asked -- the first question he asked

22 was, was she going to get in any trouble for this?

23 I told him it depended on her involvement whether

24 she got in trouble or not.

25 Q.   Right.  That's when he told you, "It's all

1  mine.  I'll take it"?

2  A.   Yes.

3  Q.   Right?

4  A.   Yes.

5       MR. SLAUGHTER:  Okay.  Thank you, sir.  I

6  have no other questions.

7                **REDIRECT EXAMINATION**

8  **BY MR. MURPHY:**

9  Q.   On August 23rd of '06, what time did the

10  surveillance start?

11  A.   Approximately 11:55 a.m.

12  Q.   So, there was -- except for maybe five, ten

13  minutes of the morning of August 23rd, there was no

14  surveillance on Mr. Mosby?

15  A.   Correct.

16  Q.   So, when you interviewed him, you had to

17  concede to him the possibility that maybe he had

18  been driving that van in the morning?

19  A.   Yes.

20       MR. SLAUGHTER:  I'm going to -- never mind,

21  Judge.

22  BY MR. MURPHY:

23  Q.   You had talked to Ashley Hunter briefly before

24  you talked to Mr. Mosby, correct?

25  A.   Yes.

1  Q.   Did you talk to Ms. Hunter again after?

2  A.   Yes.

3  Q.   And do you know that evening if charges were

4  lodged against Miss Hunter or whether she was taken

5  to the county jail?

6  A.   No, she was not.

7  Q.   Now, Mr. Slaughter repeatedly asked you about

8  whether Mr. Mosby -- I think he said -- he asked --

9  he couldn't give you information about who he had

10 bought the cocaine -- or he had gotten the cocaine

11 from or who his friend was that had introduced him

12 to this individual.  You don't know whether that was

13 a couldn't or a wouldn't, do you?

14 A.   No.

15      MR. MURPHY:  All right.  Thanks.  That's

16 all, Judge.

17      THE COURT:  Any recross, Mr. Slaughter?

18      MR. SLAUGHTER:  No, Your Honor.

19      THE COURT:  Thank you.

20      THE WITNESS:  Do you want me to leave these

21 here or bring them to you?

22      MR. MURPHY:  Leave them there.  That's fine.

23      We call Loren Marion.

24      (Witness sworn by the Clerk.)

25                LOREN MARION III,

1    called as a witness, after being first duly sworn,

2    was examined and testified upon his oath as follows:

3                        DIRECT EXAMINATION

4    BY MR. MURPHY:

5    Q.    State your name, sir.

6    A.    Loren Marion III.

7    Q.    And your occupation?

8    A.    I'm a Peoria police officer.

9    Q.    And how long have you been so employed, sir?

10   A.    Just over 12 1/2 years.

11   Q.    Excuse me just a moment.

12            Loren, when you first came on the

13   department, what was your assignment at that time?

14   A.    When I first got hired by the police

15   department, I had to go to the Police Academy, which

16   is at the University of Illinois Police Training

17   Institute.

18   Q.    Did you have, as part of that course of

19   instruction way back then, training with regard to

20   drugs in general, cocaine or crack cocaine and the

21   use and/or distribution of those drugs?

22   A.    Yes, there's a very short block of instruction

23   on drugs.

24   Q.    And I mean -- I'm sorry.  I neglected to ask

25   you.  Your current duties are obviously with the

1  vice and narcotics division?

2  A.    Yes.

3  Q.    And on a daily basis, what is it that you are

4  doing?

5  A.    I investigate drug crimes that violate state

6  and federal laws.  We also prepare and execute

7  search warrants, and I'm also assigned to the DEA as

8  a task force officer.

9  Q.    You are actually a sworn federal officer as

10  well?

11  A.    Yes.

12  Q.    Over the years, have you had both experience

13  and training with regard to the means and methods of

14  distribution of crack cocaine in Peoria?

15  A.    Yes, I have.

16  Q.    Now, let's talk about the training that you've

17  had over the years.  Can you go back and explain to

18  us and briefly summarize what the training was and

19  about when it was?

20  A.    Yes.  As I stated, in 1994 I went to the police

21  academy as a 400-hour course.  I successfully

22  completed academy and graduated.  I was then

23  assigned to the patrol division with a field

24  training officer.  Worked with a training officer

25  for approximately three to four months.  And then

after that, I was assigned to the patrol division.

After about a year and a half in the patrol

division, I was assigned to -- it was called the

community area target team.  What that is is a -- it

was a proactive unit that concentrated on

quality-of-life issues in high-crime areas.  One of

our focuses was street-level drug dealing.

        During the time on the C.A.T. team, we

performed several surveillance operations.  I

witnessed hand-to-hand drug buys, and we did do

reverse drug buy operations.

        After the C.A.T. team, about the first year,

they combined the C.A.T. team with the gang unit,

and that unit became the street crimes unit.  I was

assigned to the street crime unit for three -- about

two and a half to three more years.  The function of

that unit was primarily the same thing, concentrated

on quality-of-life issues in high-crime areas.

        And then after that, I transferred to the

vice and narcotics unit, special investigations

division.  That was in 2001.

        In 2001, I went to Ft. Leonard Wood,

Missouri, and received a course of instruction on

basic narcotics investigations.  And during that

time, I received several different courses in

1  narcotics classes.  And we also have annual

2  conferences with the Illinois Drug Enforcement

3  Officers Association where we received classes

4  during that also.

5  Q.   And your current assignment to vice and

6  narcotics has been for how long?

7  A.   This will be my seventh year in the vice and

8  narcotics unit.

9  Q.   And specifically during those last seven years,

10 have you been involved in investigations, arrests,

11 search warrants and -- repeatedly for drug

12 traffickers here in the Peoria area?

13 A.   Yes.

14 Q.   Have you, during the course of not just these

15 seven years but even prior to that, had occasions to

16 interview not only individuals arrested but to talk

17 to cooperating individuals, individuals who are

18 users, if you will, about what's going on in drug

19 trafficking in the streets of Peoria?

20 A.   Yes.

21      MR. SLAUGHTER:  Your Honor, I'm going to

22 object as being irrelevant.

23      THE COURT:  Overruled.

24 BY MR. MURPHY:

25 Q.   Loren, do you have any estimate of the number

1  of narcotics cases that you have worked since being

2  assigned to the special investigations division?

3  A.   Yes.  Since I've been assigned to the unit,

4  I've personally been responsible for over 115 cases

5  myself, and then I've prepared over 63 search

6  warrants in relation to those cases.  Then I've also

7  been a part of -- we assist the other officers that

8  are in our unit with their investigations as well,

9  and there are a total of eight investigators and two

10  supervisors in our unit.

11  Q.   And are you, on a regular basis, executing

12  search warrants as part of your investigations on

13  the streets of Peoria?

14  A.   Yes.

15  Q.   Have you made not only surveillance

16  observations of street-level dealers but other level

17  dealers in Peoria?

18  A.   Yes.

19  Q.   And can you describe for us what other level

20  dealers that you come in contact with?

21  A.   Yes.  As I was asked about the street-level

22  dealers, those are your typical dealers that stand

23  on the street corners or on the street that cars

24  pull up, and they go out and we call it serve, which

25  means to sell the drugs to the person.  They simply

1  just work the streets and go out and sell small

2  amounts of cocaine, crack cocaine, marijuana,

3  cannabis.

4         There's also -- after you get to a certain

5  level, they kind of move up.  The street-level

6  dealers start off with smaller quantities.  When

7  they make enough money, they are able to buy more;

8  therefore, they're able to start selling more and

9  make more of a profit and keep moving up.

10        The -- from street-level dealer, it goes to

11 probably a mid-level dealer where the person's

12 dealing with larger quantities.  And then you have

13 your larger level dealers that are dealing in large

14 quantities of the illegal drugs, depending on what

15 their drug of choice is.

16 Q.   When you're talking about a street-level

17 dealer, what is the typical quantity -- or is there

18 one -- that you're talking about as it relates to

19 crack cocaine?

20 A.   In relation to crack cocaine, your typical

21 street-level dealer will have the packages in $20

22 bags, which is .2 of a gram.  Two-tenths of a gram

23 of crack cocaine will sell for $20.  They typically

24 package it in plastic, and they'll carry -- maybe an

25 eighth of an ounce would be a high-end street level

1  dealer.

2  Q.    Is there a street-level term for an eighth of

3  an ounce?

4  A.    Yes.  It's called an 8-ball or a ball.

5  Q.    Mid-level dealers, what quantity are you

6  talking about there?

7  A.    After the street level dealer moves up, then

8  anywhere from quarter ounce all the way up to -- I

9  would say roughly a couple ounces would be your

10 mid-level range.

11 Q.    Okay.  And when you start talking about your

12 higher-level distributors, what quantities are you

13 talking about?

14 A.    The upper-level distributors would be anywhere

15 from the 2 1/4 ounces up to close to kilo level

16 dealers.  And then you have your main suppliers,

17 your sources after that.

18 Q.    Have you -- in addition to using surveillance,

19 search warrants, making arrests, you have developed

20 other means of gathering evidence and, and

21 furthering your investigations; is that correct?

22 A.    Yes.

23 Q.    One of those would be collecting trash?

24 A.    Yes.

25 Q.    What is that?

245

1  A.    It's where -- we call them trash rips.  When

2  someone discards their trash for garbage pickup, we

3  go collect the trash.  And then we have to go

4  through the trash and find -- see if there's any

5  evidence of trafficking.

6  Q.    Have you, in your experience of interviewing

7  individuals arrested and/or cooperating individuals

8  and others, specifically become aware of the means

9  and methods of trafficking of crack cocaine in

10 Peoria?

11 A.    Yes, I have.

12 Q.    Have you learned to observe and to collect as

13 evidence some of the tools of the drug trafficking

14 trade?

15 A.    Yes.

16 Q.    Can you list some of those for us?

17 A.    Commonly you would find tools of the trade.

18 Would be plastic baggies; that's what is used to

19 package the crack cocaine.  We'd find scales; that's

20 used -- kind of twofold.  That way when the person

21 buys the drugs, they know that they're getting the

22 amount that they're paying for.  And then also when

23 they package it, they would weigh it out to make

24 sure that they're not giving the person that they're

25 going to be selling to more than what they should

1  be.

2          And then there are guns that are commonly

3  found.  Guns are used to protect not only the

4  product, but they're used to protect the proceeds,

5  the money.  It is not uncommon for drug dealers to

6  get what is called ripped off or home invasions

7  committed to where other people will go around and

8  target drug dealers and break into their house and

9  steal their drugs or money.

10          There's also cell phones that are common.

11  When you get to -- you don't usually find it on

12  street level where they're working off of a

13  telephone, but when you get into the mid- to

14  upper-level range, the drug dealers will use

15  telephones to coordinate with the person that is

16  buying from them where to meet them, how much they

17  want, that sort of thing with the cell phones.

18  Q.   Is there such a thing that you come into also

19  as stash houses?

20  A.   Yes.

21  Q.   Explain what that is.

22  A.   A stash house or a safe house is where the

23  dealer would keep the quantity of the drugs.  They,

24  they do not sell out of that place because when a

25  person is selling directly out of a place, that

1  associates traffic to that place.  That means that

2  there would be people coming up, knocking on the

3  doors and buying the drugs from there.

4         So, a stash house, they will not sell out of

5  the house because then that way they don't get the

6  traffic -- constant traffic, and they don't get the

7  complaints of the people calling in.

8         We receive several phone calls a day, and --

9  saying that this place, we suspect that dealing is

10 going on; there's constant foot traffic.  A stash

11 house avoids that constant foot traffic.

12        MR. MURPHY:  At this point in time, Judge, I

13 would like to ask that Officer Marion be qualified,

14 Judge, as an expert in the specific area of the

15 means and methods of drug trafficking in Peoria.

16        THE COURT:  Do you wish to voir dire on that

17 point, Mr. Slaughter?

18        MR. SLAUGHTER:  No, I don't wish to voir

19 dire on that, Your Honor.  We'll accept his

20 testimony based on his experiences as a police

21 officer.

22        THE COURT:  All right.  You may proceed,

23 Mr. Murphy.

24        MR. MURPHY:  Thank you, Judge.

25 BY MR. MURPHY:

1  Q.   I'd like to start by going back to July 27th of

2  2006 and ask you if, on that afternoon, did you

3  cause an investigation of Mr. Mosby to be commenced,

4  specifically with the direction of surveillance that

5  afternoon out at 2401 North Gale, Apartment Y10?

6  A.   Yes, I did.

7  Q.   Were you part of that surveillance team that

8  afternoon as well?

9  A.   Yes, I was.

10 Q.   Now, originally was Officer Couve the officer

11 with what you call the eye on the apartment?

12 A.   Yes.

13 Q.   Did you, however, have some specific

14 observations of the comings and goings of Mr. Mosby

15 that particular afternoon?

16 A.   Yes, I did.

17 Q.   Specifically just shortly before 6 p.m., did

18 you see Mr. Mosby exit the apartment and go

19 somewhere?

20 A.   Yes, I did.

21 Q.   Where did you observe him go?

22 A.   At approximately 5:57 p.m., I observed

23 Mr. Mosby, who I had identified previously when I

24 started my investigation, exit the rear of the

25 apartment and -- Apartment Y10 at 2401 North Gale

1  and walk towards a black GMC Denali.  From my

2  observation point, he went out of my sight at that

3  time.

4  Q.   Okay.  Did you later learn that he had gotten

5  into a beige Pontiac minivan?

6  A.   Yes.

7  Q.   And did you and other officers then kind of

8  take off surveilling him after he left?

9  A.   Yes.  I was informed that he got into the beige

10  Pontiac minivan, drove away, and then we continued

11  surveillance on him.

12  Q.   And did you go over to the area of the 1000

13  block of West Virginia?

14  A.   Yes.

15  Q.   And that was just a couple of minutes away,

16  correct?

17  A.   Yes.  West Virginia is approximately three or

18  four blocks from Gale and University.  It's one

19  block north of McClure, so it's about four to five

20  blocks maybe from where we were stationed.

21  Q.   And tell us what you observed about Mr. Mosby

22  and/or that van he was in at that time, shortly

23  after 6:00.

24  A.   At approximately 6:01 p.m., I observed

25  Mr. Mosby pull to the south curb or -- we would

1  refer to it as the even side of the street; that's

2  where the houses on the south side of the street

3  have even numbers.  He pulled to the even side in

4  front of -- in the 1000 block of West Virginia.

5  Q.   What did you further observe?

6  A.   At approximately 6:02 p.m., I observed a white

7  male walk up to the passenger side of the minivan.

8  Q.   Could you observe whether there was anybody

9  else in the van at this point in time with the

10  defendant?

11  A.   At that time, there was not.

12  Q.   Okay.  And what happened after the white male

13  walked up to the passenger side of the van?

14  A.   He stayed at the passenger side of the van for

15  approximately one minute.

16  Q.   And from your vantage point, could you see what

17  was going on there at the van?

18  A.   No, I could not.

19  Q.   And what happened then?

20  A.   After approximately one minute, the white male

21  walked away, and Mr. Mosby drove away going

22  eastbound on West Virginia.

23  Q.   And do you know what area he went to next?

24  A.   I believe at that time he went to the -- left

25  there and went to the 700 block of East Nebraska.

1  Q.   Now, you didn't have the eye on him there,

2  correct?

3  A.   No, I did no.

4  Q.   That was Officer Couve?

5  A.   Yes.

6  Q.   At some point shortly after the happenings

7  there on East Nebraska, did you see that Mr. Mosby

8  was back at the Parkview Estates?

9  A.   Yes.

10 Q.   Along about 6:20 p.m. that day, did you see

11 Mr. Mosby again?

12 A.   Yes.

13 Q.   And did he exit the apartment?

14 A.   Yes.

15 Q.   And did he get into this, again, this beige

16 Pontiac minivan?

17 A.   Yes.

18 Q.   And where did he go, if you know?

19 A.   I, I don't remember at this time.

20 Q.   Okay.  Now, you heard Officer Batterham just

21 testify about observations he made that evening,

22 correct?

23 A.   Yes.

24 Q.   Were you part of that mobile surveillance, too?

25 A.   Yes.

1  Q.   All right.  And then sometime after he returned

2  back to the apartment that evening, the surveillance

3  was terminated?

4  A.   Yes.

5  Q.   And then you didn't take up the surveillance

6  again until August 23rd, correct?

7  A.   Correct.

8  Q.   Now, you've heard Officer Batterham testify

9  about his early observations, correct?

10 A.   Yes.

11 Q.   And at some point that afternoon, did you go

12 out and become part of the surveillance team?

13 A.   Yes, I did.

14 Q.   And do you recall about what time you may have

15 commenced your part of the surveillance?

16 A.   Shortly right after it started because I had a

17 court case in the morning, and then Officer

18 Batterham called out that he had just arrived; so,

19 shortly after noon.

20 Q.   I want to now direct your attention more

21 specifically to a time period that starts at about

22 3:46 that afternoon.

23 A.   Yes.

24 Q.   Do you recall what your surveillance position

25 was at about that time in the afternoon?

1  A.    I do.

2  Q.    And where were you?

3  A.    I was in -- behind the Davis-- Davison Fulton

4  -- called The Chapel.  It's a mortuary.  In the

5  northwest corner of the parking lot.

6  Q.    And what did that allow you to be viewing at

7  that point?

8  A.    The back door of Apartment Y10.

9  Q.    At about that time, did you happen to see

10  Mr. Mosby and Ms. Hunter?

11  A.    Yes, I did.

12  Q.    And tell us what you saw happen at that point

13  in time.

14  A.    I observed Mr. Mosby exit the rear door of

15  Apartment Y10, walk over to a -- it was kind of like

16  a silverish color Dodge Intrepid.  He got into the

17  driver's door -- or driver's side, sat down in the

18  driver's seat and left the door open.  Miss Hunter

19  was probably a few seconds behind him, and she also

20  walked over to the driver's door.

21  Q.    From their actions or what was going on, could

22  you surmise what was happening at that point?

23  A.    It appeared to me as if they were arguing.

24  Miss Hunter was throwing her arms in the air as if

25  to animate herself.  It appeared that she was angry.

1  Q.   After he got -- at some point -- in the

2  vehicle, did you see Ms. Hunter do anything with

3  regard to the door?

4  A.   Yes, I did.

5  Q.   What did you see?

6  A.   Miss Hunter attempted to slam the door.

7  However, from where I was at, I could tell that the

8  door didn't close, but I don't know why it didn't

9  close.

10  Q.   Okay.  What happened next?

11  A.   She attempted to slam the door again.  Again,

12  it didn't close.  And then she walked into the --

13  back into the apartment.

14  Q.   What did you see occur at or about the Intrepid

15  then?

16  A.   Mr. Mosby exited the Intrepid and went back

17  into the apartment also.

18  Q.   Five minutes later, did you see Ms. Hunter

19  again?

20  A.   Yes, I did.

21  Q.   Tell us what you saw.

22  A.   Ms. Hunter, about five minutes later, exited

23  the apartment and walked over to the Intrepid and

24  went to the driver's side by the driver's front

25  tire.

1  Q.   And what could you observe?

2  A.   I observed her making a poking action at the

3  tire.  But from where I was at, I couldn't see

4  anything in her hand so I don't know why she was

5  poking at the tire.

6  Q.   Then what happened then?

7  A.   She then walked to the rear of the vehicle.

8  Again, I could not see the rear tire so I don't know

9  what she did at the rear of the vehicle.  And then

10  she went inside.

11  Q.   Which side of the vehicle was she on at that

12  time; the driver's or the passenger's?

13  A.   Driver's side.

14  Q.   A few minutes after that, did you see

15  Ms. Hunter again?

16  A.   Yes, I did.

17  Q.   And what did -- what did you see then?

18  A.   This time, she again exited the rear of the

19  apartment and -- however, this time I could clearly

20  see that she had a large kitchen knife in her hand,

21  and she went over to the passenger side of the

22  vehicle and stabbed the front passenger tire.

23  Q.   And then what did she do?

24  A.   She went to the side of the building out of my

25  sight for -- I estimated a minute, 45 seconds.  And

1  then she went back into the apartment.

2  Q.   Going in the rear door?

3  A.   Yes.

4  Q.   That was in your view?

5  A.   Yes.

6  Q.   Directing your attention to shortly after

7  4 p.m. now, did you have occasion to see Mosby and

8  Hunter one more time?

9  A.   Yes, I did.

10  Q.   Again, where were you?  Or were you at the same

11  place?

12  A.   I was in the same position.

13  Q.   And tell us what you saw at that point in time.

14  A.   At that time, I was watching the rear of the

15  apartment.  And into my view, walking northbound --

16  or, correction, southbound on Gale towards

17  University, Mr. Mosby came in my view, shortly

18  followed by Miss Hunter.

19  Q.   Did they leave out of the back of the apartment

20  that you were viewing?

21  A.   They did not.

22  Q.   Did you later find that there was another exit

23  there at the front of the apartment?

24  A.   Yes.

25  Q.   Tell us what you saw then of Mosby and Hunter

1  out walking on Gale.

2  A.    Mr. Mosby, he was walking in front of

3  Miss Hunter.  Again, she was a few seconds behind

4  him.  I can clearly see that he had a white plastic

5  garbage bag that he was carrying, and he was talking

6  on the phone.  He was walking towards University on

7  Gale.

8  Q.    Now, from your vantage point were you able to

9  see that intersection?

10  A.    Yes, I was.

11  Q.    Okay.  And where did they go?  What happened?

12  A.    At the intersection, it's an old gas station

13  now.  I believe they work on cars or they detail

14  cars there.  The front door is kind of angled to

15  where it really doesn't face -- it more so faces

16  Gale rather than facing east and facing University.

17  They went up and stood pretty close to the front

18  door.

19  Q.    Okay.  And were you able to see any interaction

20  between the two of them there --

21  A.    Yes.

22  Q.    -- at that intersection?

23  A.    Yes.

24  Q.    Describe what you saw.

25  A.    It appeared that -- let me back up.

1         As they were walking up the street, I

2    observed Miss Hunter.  She caught up to Mr. Mosby,

3    and she tugged on him, and it appeared as they were

4    still arguing.  He pulled away from her and

5    continued walking up to the corner.

6         She turned around, started to walk back to

7    the apartment, and then she turned back around and

8    went back up to Gale and University.

9         Now, while they were standing on the corner,

10   Mr. Mosby had a phone with him.  I observed him

11   talking on the phone.  Miss Hunter also had a phone

12   with her.

13   Q.   Was she talking on her phone as well?

14   A.   Yes, from -- at certain times.

15   Q.   Okay.  For how long did they stay down there at

16   the corner when they both finally got down to the

17   corner?

18   A.   It was approximately five minutes.

19   Q.   Okay.  And again, did the -- were you able to

20   observe the interaction between the two of them and

21   they continued to be animated or arguing?

22   A.   Yeah.  Yes, it kind of appeared that Mr. Mosby

23   was basically ignoring her.  He, he wasn't -- she

24   seemed to be the aggressor.  She, she was the one

25   that was more animated.  Mr. Mosby just kind of

1  basically ignored her.

2  Q.    Now, at some point in time did you see a black

3  van come to their location?

4  A.    Yes.

5  Q.    And I think you've indicated this was after

6  about five minutes or so that they're down there on

7  the corner?

8  A.    Yes.

9  Q.    Had you seen this van before?

10 A.    Yes.

11 Q.    And this is a -- the black Town & Country

12 Chrysler van?

13 A.    Yes.

14 Q.    And you -- did you know who that was registered

15 to?

16 A.    Yes.

17 Q.    And to whom is it registered?

18 A.    Ashley Hunter.

19 Q.    She wasn't driving it that day, at least up to

20 that point, correct?

21 A.    Correct.

22 Q.    When the van got to this location, what

23 happened to Mosby and to Hunter?

24 A.    When the van got to that location, the way the

25 van stopped, I could not see the passenger side of

1  the van.  I was informed by surveillance officers

2  that they got into the van.

3  Q.   At that point did you become mobile?

4  A.   Yes.

5  Q.   And did you and the other officers follow this

6  vehicle to a couple different locations?

7  A.   Yes, we did.

8  Q.   Where did you go first?

9  A.   First we went to Lexington Hills apartment

10 complex.

11 Q.   And what happened there, if you were able to

12 observe?

13 A.   Again, I did not personally observe.  Different

14 officers had the eye, but I was informed to what was

15 going on.

16 Q.   Okay.  And at some point in time did the van

17 leave the Lexington Hills apartment complex?

18 A.   Yes, it did.

19 Q.   And where did it go then?

20 A.   It went to the Methodist Medical Center

21 emergency room entrance.

22 Q.   And did you at some point in time see the

23 vehicle on the street driving before it got to the

24 hospital?

25 A.   Yes, I did.

1  Q.   Who's driving it?

2  A.   Miss Hunter was driving, and I could clearly

3  see that Mr. Mosby was in the back, behind the

4  passenger seat.

5  Q.   What happened as they pulled into the emergency

6  room parking lot there of Methodist?

7  A.   The way the parking lot is set up, in case you

8  haven't seen Methodist Hospital, when you pull into

9  the entrance off of Hamilton street, before you pull

10 into the actual parking lot, there's a small

11 entranceway.  They pulled into the entrance of the

12 emergency room, stopped the vehicle, and Mr. Mosby

13 exited the vehicle and began walking -- it would be

14 either south or east towards the river on Hamilton.

15          At that time, I could clearly see that he

16 still had the white plastic bag, similar to the one

17 that he had earlier walking up Gale -- or down Gale.

18 Q.   Okay.  And what happened then?

19 A.   At that point, other surveillance officers kept

20 an eye on Mr. Mosby.  I drove into the emergency

21 room parking lot to keep an eye on Miss Hunter to

22 see what she was doing, so I -- she pulled into the

23 parking lot of the emergency room, stopped.  I

24 parked also in the parking lot and was watching the

25 emergency room door.

1  Q.    How long did she remain in the emergency room?

2  A.    Only approximately three minutes.

3  Q.    When she left, did she get out and leave in the

4  van?

5  A.    Yes.

6  Q.    Now, at this point in time, what did you do?

7  A.    After she left in the van, I went into the

8  emergency room to inquire why she was there.

9  Q.    And again let me ask the question this way.

10  Without relating anything that anybody said in

11  there, did you discover that she had an injury?

12  A.    Yes.

13  Q.    After learning of this, did you -- did you

14  leave the E.R.?

15  A.    Yes, I did.

16  Q.    And where did you go, and what did you do?

17  A.    Well, as soon as I left the E.R., I was

18  notified by the surveillance officers that the

19  vehicle was coming back to the E.R.  So, I got into

20  my vehicle and had to jump in the back seat and

21  appear not to be obvious.  So, I just sat in the

22  parking lot in my vehicle.

23  Q.    What did you see at that point?

24  A.    At that point, I again saw Miss Hunter pull up

25  to the emergency room door.  This time I could see

1  that Mr. Mosby was in the front passenger seat.  And

2  they stopped.  They did not pull into a parking

3  space.  They just parked along the curb.

4  Q.   Okay.  And how long did they remain?

5  A.   Approximately two minutes.

6  Q.   What happened then?

7  A.   They then drove away.

8  Q.   And so did you?

9  A.   Yes.

10  Q.   And what happened then?

11  A.   After they drove away, I radioed for a street

12  crimes unit car.  Being in the vice and narcotics

13  unit, the street crimes unit is -- since they don't

14  answer radio calls, they're more accessible to help

15  us initiate car stops.  Our vehicles are unmarked

16  cars; we do not have lights.  Therefore we, a lot of

17  times, use street crimes unit cars to stop vehicles

18  for us if they're available.  So, I radioed Sergeant

19  Mushinsky and asked him if they were able to stop a

20  car for us.

21  Q.   And did you give him a description of the car

22  and briefly the reasons that you wanted to stop the

23  vehicle?

24  A.   I did.

25  Q.   Did you advise him that you had earlier seen

1  the driver of the vehicle with a large knife?

2  A.    Yes, I did.

3  Q.    Did you, shortly after 5 p.m., cause the

4  vehicle to be stopped here in Peoria?

5  A.    Yes.

6  Q.    And where was the scene of the stop?

7  A.    In the 1000 block of West Lincoln.

8  Q.    And you went to that vicinity, I take it?

9  A.    I did.

10  Q.    You were only there a short time before you

11  went down to the station?

12  A.    Yes.

13  Q.    What did you do at the station?

14  A.    When I went to the police department, I grabbed

15  the video camera and got into the vehicle with

16  Officer Couve, and we drove back to the car stop.

17  Q.    And was it you that we saw doing the video of

18  Sergeant Theobald there pulling things out of this

19  white plastic bag?

20  A.    Yes, it was.

21  Q.    And was it you that we've already seen videoing

22  the location of the gun that was found in the

23  vehicle?

24  A.    Yes, it was.

25  Q.    And that was done down at the station?

1  A.    Yes.

2  Q.    And was it you that we have seen doing the

3  videoing of the apartment that was searched, Y10 out

4  at 2401 Gale?

5  A.    Yes, it was.

6  Q.    And you, you were present that evening when

7  both Ms. Hunter and Mr. Mosby were interviewed at

8  the police station?

9  A.    Yes.

10  Q.    After the interviews of Ms. Hunter and

11  Mr. Mosby, did you arrest Miss Hunter?

12  A.    No.

13  Q.    Did you refer the matter to the state's

14  attorney's office with regard to certain

15  observations that you made?

16  A.    Yes, I did.

17  Q.    Tell us what it is you -- after she was

18  released, what did you refer to the state's

19  attorney's office?

20  A.    I requested that the state's attorney's office

21  review for charges of criminal damage to property

22  less than $300 and possession of cannabis less than

23  2.5 grams and domestic battery.

24  Q.    The criminal damage to property, what actions

25  had you observed you were referring to?

1  A.    The flattening or damaging of the tires that

2  were on the Intrepid.

3  Q.    And, indeed, you found later when you went back

4  out there that three of the tires were flat?

5  A.    Yes.

6  Q.    The possession of the small amount of

7  marijuana, what marijuana were you referring to?

8  A.    The marijuana that was in the apartment.  Kind

9  of hard to see on the video because of the light,

10  but it was a very small amount of marijuana in the

11  apartment.

12  Q.    And in your experience and training, was that

13  consistent with a personal use amount of marijuana?

14  A.    Yes.

15          MR. MURPHY:  May I approach, please, Judge?

16          THE COURT:  You may.

17  BY MR. MURPHY:

18  Q.    Mr. Marion, I want to ask you about several

19  physical exhibits at this point.  The first one I

20  just handed to you was 6A and 6B.  Do you see those?

21  A.    I do.

22  Q.    And do you recognize those as being marijuana?

23  A.    I do.

24  Q.    And are those the exhibits that came out of the

25  white plastic bag in the vehicle that was stopped?

1  A.    Yes.

2  Q.    Now, you just talked to us about what, in your

3  experience, is a personal use amount of marijuana.

4  Is 6A and 6B consistent with personal use amount of

5  marijuana?

6  A.    6A would be consistent with personal use.  But

7  6A and 6B together would not be.

8  Q.    And would you explain why?

9  A.    A personal use amount of marijuana would be

10 approximately an ounce.  Usually anything over an

11 ounce of marijuana is not consistent with personal

12 use.

13 Q.    It is consistent with what?

14 A.    Distribution.

15 Q.    Have you, in your experience and training,

16 become familiar with user amounts of crack cocaine?

17 A.    Yes, I have.

18 Q.    And what amounts -- or is there up to a certain

19 amount that is consistent with personal use?

20 A.    Yes, there is.

21 Q.    And would you tell us what that is and why?

22 A.    Consistent use -- personal use amount of crack

23 cocaine would be approximately an eighth of an ounce

24 or roughly 3 1/2 grams.  That would be consistent

25 with personal use.  The reason for that, there are

1  several reasons.  First of all, a lot of times the

2  users of crack cocaine -- crack cocaine is a highly

3  addictive drug; therefore, they are drug addicts.

4  They simply cannot afford to buy more than that

5  amount at a time.

6          And the personal use, they use it to smoke

7  themselves.  They don't usually share.  They're

8  selfish, and so they just buy an amount that they

9  smoke for themselves.

10  Q.   Lying before you are Government Exhibits 5A and

11  then 5B through F.  Is that correct?

12  A.   Yes.

13  Q.   In your experience and training -- let's talk

14  about 5A first.  Is that amount of crack cocaine

15  consistent with personal use?

16  A.   No.

17  Q.   Why not?

18  A.   Due to the amount of the drug and the value of

19  it.

20  Q.   Okay.  We'll get to the value here in a few

21  moments.  The -- well, let's talk about it now since

22  you brought it up.

23          You have become familiar with what wholesale

24  price of crack cocaine, both at the upper level and

25  the mid-level distributors as well as the -- if I

1  can call it the retail level, down at the street

2  level, the price of crack cocaine is in your

3  business?

4  A.    Yes.

5  Q.    Give us some idea, please, of what the retail

6  value of 5A alone is.  We've heard testimony that

7  that's approximately a quarter of a kilogram,

8  250-some grams or thereabouts.  What is the retail

9  value of that on the streets if it's sold on the

10  streets?

11          MR. SLAUGHTER:  Your Honor, I'm going to

12  object to the question.  I don't know if the officer

13  is capable of doing that or not because I don't know

14  if there's any set prices that everybody in every

15  location pays that's the same all the way around.

16  So, I'm objecting to this.

17          THE COURT:  Would you lay a better

18  foundation for the price information?

19          MR. MURPHY:  Sure.

20  BY MR. MURPHY:

21  Q.    First of all, Loren, in your experience, do you

22  and other officers with which you work actually buy

23  crack cocaine on the streets here in Peoria?

24  A.    Yes, we do.

25  Q.    In addition to actually buying it and paying

money for it, do you and have you interviewed not

only arrested individuals who have sold it but users

who themselves also are buying it?

A.   Yes.  We've interviewed users all the way up --

from street level all the way up to upper-level

dealers on what they sell crack cocaine for.

Q.   And my next question then is, Have you as well

been able to interview the upper-level distributors

to determine what they're selling it for at

wholesale level and mid-level distributors to

determine what they're selling it for here in

Peoria?

A.   Yes, I have.

Q.   Has your interview of all of these individuals

over the many years, has there been a consistent

pricing for crack cocaine up to today at the street

level and at the mid and upper levels?

A.   Yes.

        MR. MURPHY:  Judge, that would conclude my

foundation.

        THE COURT:  Objection overruled.

        MR. MURPHY:  Thank you.

        THE COURT:  You may proceed.

BY MR. MURPHY:

Q.   Let's talk about 5A now, 5A alone.  If sold at

1  the street level, what's the value of that, sir?

2  A.    $26,300.

3  Q.    Tell us how you calculated that.

4  A.    Very simple.   There's 263 grams of crack

5  cocaine in the bag, and a gram of crack cocaine goes

6  for $100.   The retail value is $100.

7  Q.    You were referring to -- the weight you were

8  referring to was the gross weight that was put on

9  the package originally, right?

10 A.    Yes.

11 Q.    You weren't talking about the net weight that

12 the lab lady talked about?

13 A.    Correct.   Just going by the number that is on

14 the exhibit.

15 Q.    But roughly $100 a gram?

16 A.    Yes.

17 Q.    So, a quarter kilo is roughly $25,000?

18 A.    Yes.

19 Q.    That's at the street level?

20 A.    Street level.

21 Q.    Okay.   Let's move up to mid-level and the upper

22 level for that same package.

23 A.    Mid to upper level would be anywhere from 5500

24 to $6300 that the larger-level dealers would pay for

25 that.

Q.   And would the upper-level dealers be paying a

lesser amount?

A.   Yes.

Q.   Is that often because they're buying an even

larger quantity of it at a time?

A.   Yes.  It could be because they're buying a

larger quantity, and it also depends on how long

that they have dealt with the same person.  Someone

that has established a -- for lack of a better word

-- business relationship in the drug dealing with

this person, they would knock off a little bit of

money for that.

Q.   Let's move on to 5B, C, D, E and F.  Now, you

saw these come out of the white plastic bag in the

van, correct?

A.   Yes.

Q.   You videoed it?

A.   Yes.

Q.   And you have reviewed the video?

A.   Yes, I have.

Q.   Referring to that particular exhibit, you

understand now that the laboratory indicates that

that's also roughly another quarter of a kilo?

A.   Yes.

Q.   From the time you first observed it until you

1  actually had the contents weighed, did you observe

2  that it was, first of all, packaged differently?

3  A.   Yes, I did.

4  Q.   What about the packaging of that quantity is

5  indicative of distribution?

6  A.   The weights that four of the five packages were

7  packaged in is consistent with a weight that is

8  commonly sold to the mid to level upper -- mid-level

9  drug dealer.

10  Q.   Can you give more explanation when you say what

11  the weight was?

12  A.   Yes.  Again, going off of what is on the bag at

13  64 grams, roughly that's 2 1/4 ounces of crack

14  cocaine.  That is a common weight that is sold on

15  the streets.

16  Q.   2 1/4?

17  A.   Yes.

18  Q.   63 or 64 ounce -- 63 or 64 grams?

19  A.   Yes.

20  Q.   And 28 grams is roughly the ounce?

21  A.   Yes.

22  Q.   Okay.  And then there was a -- there was a

23  fifth package there that didn't have the 2 1/4,

24  correct?

25  A.   Correct.

Q.    And how much, if you recall, was it?

A.    Again, off of the exhibit it says 23 grams.

Q.    Okay.  And is that -- that's a little less than an ounce, right?

A.    Yes.  An ounce is 28.2.  This is 23.

Q.    I'm going to ask the same questions about those Exhibits 5A, B, C, D, E and F that I did about 5A. Is that quantity or any one of those single five quantities consistent with possession for personal use?

A.    No.

Q.    And why?

A.    Again, due to simply the quantity of the drug.

Q.    And in your opinion and your experience and training, are those five quantities consistent with possession with intent to distribute?

A.    Yes.  Not only are they consistent by the weight, but they were packaged for distribution in the amounts that are commonly seen at the distribution level.

Q.    As packaged here, as you see them in court -- I ask you about the large package.  But as packaged here, can you give us a street value for those exhibits, 5A through 5F?

A.    Again, going off of the 279 grams which is not

1  the net weight -- I don't know the net weight of it

2  -- be roughly $27,900.

3  Q.   Again, that would be at the street level?

4  A.   Yes, street level.

5  Q.   At the mid-level, can you give us an idea of

6  what the value of that was?

7  A.   Yes.  Mid-level would be -- for the 64-gram

8  packages those would sell anywhere from 15 to $1700.

9  Q.   And the ounce or the light ounce, the 23 grams?

10  A.   If someone sold that less of an ounce, usually

11  ounces go for anywhere from 7 to $900.  That amount

12  they'd probably even knock off more so it would be

13  probably less than $700.

14  Q.   The -- I'm going to direct your attention next

15  to Exhibit Number -- I believe it's 8 lying in front

16  of you there.  Actually, it's 7 and 8 there

17  together; is that correct?

18  A.   Yes.

19  Q.   What's 7?

20  A.   7 is a digital scale.

21  Q.   And you -- you know that that came out of the

22  bag -- white plastic bag, correct?

23  A.   Yes.

24  Q.   Is that scale, that small digital scale,

25  consistent with the scales that you have earlier

1  mentioned to us about the scales that are used as

2  one of the tools of drug trafficking?

3  A.    Yes.

4  Q.    And what is it about the size of the scale or

5  its capacity that makes it useful to traffickers?

6  A.    It's small enough to where if they go and meet

7  someone to either make a purchase or make a sale,

8  it's small enough they can carry it on their person

9  and that they can verify the weights when they make

10 the transaction to make sure that they're not

11 getting shorted the amount that they're buying.  Or

12 vice versa.  When they're packaging, make sure

13 they're not packaging too much.

14 Q.    And referring to the other part of that Exhibit

15 Number 8, do you observe what that is?

16 A.    Yes.

17 Q.    What are those?

18 A.    Miniature Ziploc baggies.

19 Q.    And are they consistent with the type of

20 packaging that you have seen commonly used by

21 traffickers here in Peoria?

22 A.    As far as trafficking in marijuana, it would be

23 consistent.  We've seen small Ziploc baggies for

24 marijuana, but we haven't seen too much where

25 they're packaging crack cocaine in Ziploc baggies.

1  Q.   Exhibit Number 1 lying up there to your right,

2  is that consistent with the bag you indicated you

3  had seen Mr. Mosby carrying a couple of occasions on

4  August 23rd of 2006?

5  A.   Yes, it is.

6  Q.   Loren, did you have any personal observations

7  that you can remember of this -- the red tie thing

8  at the top?

9  A.   No, I do not.

10 Q.   Did you have observations of any color tie at

11 the top of it?

12 A.   No.

13 Q.   Okay.  When you saw Mr. Mosby holding a bag

14 similar to that, can you stand up and demonstrate

15 how you observed it in his hand?

16 A.   Yes.  Kind of hard to demonstrate because

17 there's no weight in the bag so there's nothing to

18 hold this down.  But the bag had weight in the

19 bottom, holding this down, and then it was twisted

20 and the -- and wrapped.  And the excess plastic --

21 the excess plastic was used as a makeshift handle,

22 and it was simply twisted and held.

23 Q.   Was that consistent on both occasions that you

24 saw him outside the van with the bag?

25 A.   Yes.

1  Q.   Thank you.  Number 4, I think lying right there

2  in front of you, is the Miranda warning form?

3  A.   Yes.

4  Q.   Is that the form that you used -- along with

5  your card that you had -- is that the form that you

6  used to admonish Mr. Mosby of his Constitutional

7  rights?

8  A.   Yes, it is.

9  Q.   Did he sign that form in your presence?

10  A.   Yes, he did.

11  Q.   Did you sign it, too?

12  A.   Yes, I did.

13  Q.   And lastly, I want to ask you to look at the

14  exhibit marked Number 20.  I think it's an envelope

15  lying there in front of you.

16  A.   Yes.  Sealed.

17  Q.   Would you go ahead and open it up?

18       It just occurred to me, there's multiple

19  items in there, correct?

20  A.   Yes, two.

21  Q.   I want to mark those separately.

22       MR. MURPHY:  May I approach, please, Judge?

23  Mark this first one as 20A and the second one as

24  20B.

25                   (Exhibits marked)

BY MR. MURPHY:

Q.   Loren, what's 20A?

A.   20A is a consent to search by subject of search, signed by Cory Mosby.

Q.   And approximately when did he sign that?

A.   6:10 p.m. on August 23rd, 2006.

Q.   Was that down at the station?

A.   Yes, it was.

Q.   And that consent to search form gives you permission to search what, please?

A.   A silver Dodge Intrepid, and it has the license plate number.

Q.   Okay.  Is this the same one that had the tires flattened on it out at the Parkview Estates?

A.   Yes, it was.

Q.   Did you, in fact, search that vehicle that evening?

A.   Yes, we did.

Q.   Did you find anything of evidentiary value?

A.   No.

Q.   Other than three flat tires?

A.   Correct.

Q.   Okay.  What is 20B, please?

A.   20B is a consent to search by subject of search signed by Ashley Hunter.

1  Q.   And again, did she sign that down at the police

2  station that evening?

3  A.   Yes, she did.

4  Q.   About what time did she sign it?

5  A.   5:35 p.m.

6  Q.   And the purpose of that consent search form was

7  to give you permission to search what, please?

8  A.   Two things.  First of all, the apartment at

9  2401 North Gale, Apartment Y10, and a black GMC

10 Denali.

11 Q.   And you videoed the search of the apartment,

12 correct?

13 A.   Yes.

14 Q.   And we have items of physical evidence that

15 were taken from the apartment that have been

16 admitted here?

17 A.   Yes.

18 Q.   Did you search the Denali as well?

19 A.   Yes, we did.

20 Q.   And was there anything of evidentiary value

21 recovered from the Denali?

22 A.   No.

23 Q.   Now, you did do some follow-up work with regard

24 to who these vehicles belonged to, correct?

25 A.   Yes.

1    Q.    The -- first of all, the silver Dodge Intrepid,

2    to whom was that registered?

3    A.    Ebony Logan.

4    Q.    Okay.  And do you know of any relationship she

5    has to any of the people in this case?

6    A.    I do.

7    Q.    And what is that?

8    A.    Ebony Logan is the cousin of Cory Mosby.

9    Q.    The black Chrysler minivan that was stopped and

10   in which the defendant was taken into custody, whose

11   vehicle is that?

12   A.    Ashley Hunter.

13   Q.    The black Denali that we've heard testimony

14   about, whose vehicle was that?

15   A.    Brenda Bowie or Bowie.  That is Ashley's

16   mother.

17   Q.    Can you spell that last name?

18   A.    B-o-w-i-e.

19   Q.    Then we've heard about a beige Pontiac,

20   believe, minivan as well?

21   A.    Yes.

22   Q.    And did you run that vehicle as well?

23   A.    Yes.

24   Q.    And who was that registered to?

25   A.    Cory Mosby.

1  Q.    Having videoed the contents of the bag, you're

2  aware that there were a pair of large size shorts in

3  them -- or jean shorts in the bag that had a

4  substantial amount of money in them?

5  A.    Yes.

6  Q.    And did you -- did you or one of the

7  investigators at your direction actually count that

8  up?

9  A.    Yes, one of the other investigators counted it.

10 Q.    And you know that that amounted to almost

11 $15,000?

12 A.    I believe actually over $15,000.

13 Q.    And it was all in cash or U.S. currency?

14 A.    Yes.

15 Q.    My question with regard to that is, Is the

16 amount of cash and the denominations in which it was

17 found, is that consistent with what you, in your

18 experience, have found being carried by drug

19 traffickers?

20        MR. SLAUGHTER:  Your Honor, I'm going to

21 object to that.

22        THE COURT:  What's the legal basis for your

23 objection?

24        MR. SLAUGHTER:  This is purely speculative,

25 Judge, that the officer can recover money on the

1  street based on the denominations and say that, oh,

2  this is coming from drug dealing.  It could have

3  been gambling, Your Honor.

4       THE COURT:  I will sustain the objection

5  unless you wish to expand the foundation.

6       MR. MURPHY:  I agree, Judge, and I will do

7  that.

8  BY MR. MURPHY:

9  Q.  Let me ask -- start a little bit different way.

10 Have you, in your experience of having arrested

11 individuals who are trafficking, and interviewed and

12 having spoken to individuals who are purchasing

13 crack cocaine, have you found that there is a common

14 either amounts or denominations of bills that are

15 used in the trafficking of crack cocaine in Peoria?

16 A.  Yes.  Moreso with the distributors, not the

17 users.

18 Q.  Okay.  And is the -- not only the amount but

19 the denominations of the moneys that were found in

20 this white bag in the van consistent with

21 individuals that, in your experience, have been

22 trafficking in crack cocaine?

23 A.  Yes.

24 Q.  And explain that, please.

25 A.  The way that the money is folded or banded

1  together and the denominations, there were several

2  $20 bills, a few $100 bills.  But several different

3  denominations.  And then a lot of times, the drug

4  traffickers will band the money in $1,000 increments

5  and put a rubber band around it.  That way it's easy

6  to count.  And then they'll -- to keep track of it,

7  to know how much they have, they will count it;

8  count out $1,000 increment, fold it in half, band it

9  together.  And then when they go through their

10  money, they're able to count out the different

11  denominations.

12  Q.   This money that you videoed coming out of the

13  pockets, was it banded in half?

14  A.   Some of it was, yes.

15  Q.   And was it in these $1,000 increments?

16  A.   I don't know if the money that came out, if it

17  was actually in $1,000 increments, but it was banded

18  together in several different denominations.

19       MR. MURPHY:  Excuse me just a moment, Judge.

20  BY MR. MURPHY:

21  Q.   One last area that I want to talk about.  Is

22  there, in your training and experience, on the

23  streets here in Peoria, is there something that has

24  to be done to cocaine to make crack cocaine out of

25  it?

1  A.    Yes.

2  Q.    And is this, in your experience, a deliberate

3  act?  It's not something that accidentally happens?

4  A.    Correct.

5  Q.    Have you had demonstrations of how to make the

6  cocaine into crack cocaine?

7  A.    Just on video.  I've never seen it in person.

8  Q.    Okay.  Can you explain to us the process of

9  making the cocaine into the crack cocaine?

10  A.    Yes.  It's a very simple process.  You take the

11  powder cocaine or cocaine hydrochloride, dissolve it

12  in water, add baking soda usually to a ratio of

13  50/50, 50 percent baking soda or sodium bicarbonate

14  and 50 percent cocaine.  Add those together.

15  Sometimes they will use 60/40, 60 percent sodium

16  bicarbonate and 40 percent cocaine.  Add those

17  together.  Use a heating source, either a microwave,

18  a stove, something along that line, a heating

19  source.  And you coke it -- cook it up, and the

20  substance turns into a solid substance and that is

21  crack cocaine.  As soon as it dries, it is now in

22  crack cocaine base form.

23  Q.    The water that it's dissolved in, that's what's

24  boiled off?

25  A.    Yes.  The water and the -- believe the sodium

1  bicarbonate gets boiled off.

2  Q.   Okay.   Then when the substance dries, do you

3  have what is seen -- similar to what's here in

4  Exhibits 5A and 5B through 5F?

5  A.   Yes.

6        MR. MURPHY:   Your Honor, those are my

7  questions.

8        THE COURT:   All right.   Before we have

9  cross, let's take a break, please.

10       (The jury was taken out and a recess was

11       taken.)

12       THE COURT:   Ask the jury to come in, please.

13       (The jury was brought in.)

14       THE COURT:   Were you done, Mr. Murphy?

15       MR. MURPHY:   I thought I was, Judge, but if

16 I could beg the Court's indulgence, I have a couple

17 more questions.

18       THE COURT:   All right.

19 BY MR. MURPHY:

20 Q.   First, to follow up with that last area of

21 questioning about the crack cocaine, why would

22 someone make the cocaine powder into crack cocaine

23 before selling it?   Why is that done, Loren, in your

24 experience?

25 A.   Because that is what is -- that's the form of

1  the drug that is in demand by users.

2  Q.   Such that if someone who's a user, there was

3  $100 worth of crack laying in front of them and $100

4  of just powder cocaine, are you saying that the

5  demand would be for the crack cocaine?

6  A.   Yes.

7  Q.   Okay.  Lastly then, as you've indicated, you

8  did the videoing in this case, correct?

9  A.   Yes.

10  Q.   There's one portion of Exhibit 2A that we need

11  to further show at this point.

12       And do you recall taking some video of

13  Ashley Hunter down at the police station that

14  evening after you got back, after the van was

15  searched?

16  A.   Yes.

17  Q.   And what was your purpose in taking that video?

18  A.   To show the extent of her injury.

19  Q.   And was the injury to one of her hands?

20  A.   One of her fingers.

21  Q.   And does this short video clip we're going to

22  show here truly and accurately show the condition of

23  her finger as you saw it down at the police station

24  that evening?

25  A.   Yes.

1  Q.   Okay.

2        MR. MURPHY:  We'd ask permission to show

3  that at this time, please, Judge.

4        THE COURT:  You may.

5                   (Video commenced.)

6  BY MR. MURPHY:

7  Q.   Is this Ashley Hunter?

8  A.   Yes, it is.

9  Q.   And where are you?

10 A.   In an interview room at the Peoria Police

11 Department.

12       THE CLERK:  Something just happened.  Hold

13 on.

14       MR. MURPHY:  Okay.  I think that's enough.

15                  (Video concluded.)

16 BY MR. MURPHY:

17 Q.   Did that show the extent of her injury?

18 Appeared to be to her right index finger?

19 A.   Yes.

20       MR. MURPHY:  Judge, that concludes my

21 questioning.

22       THE COURT:  All right.  Mr. Slaughter, you

23 may cross-examine.

24                  **CROSS-EXAMINATION**

25 **BY MR. SLAUGHTER:**

1  Q.    Investigator, you were involved in a narcotics

2  investigation; is that correct?

3  A.    Yes, sir.

4  Q.    Okay.  This was not an investigation about a

5  cut finger or slashed tires.  Am I correct?

6  A.    Correct.

7  Q.    As a matter of fact, when you or your fellow

8  investigators saw the misdemeanor criminal damage to

9  property, you just pretty much ignored that,

10 correct?

11 A.    Yes.

12 Q.    At that time you had witnessed the crime, you

13 knew what the crime was, you knew what instrument

14 was used, and you knew who actually committed it,

15 correct?

16 A.    Yes.

17 Q.    All right.  But you were actually doing

18 something else?

19 A.    Yes.

20 Q.    Now, did I understand you to say that before

21 August the 23rd of 2006 you saw Cory Mosby driving

22 the black Town & Country Chrysler van?

23 A.    You must have misunderstood.  I may have said

24 that I have seen the black Town & Country van, but I

25 did not say that I'd seen him drive it.

1  Q.   I see.  Where did you see the Town & Country

2  van?

3  A.   At 2401 North Gale.

4  Q.   Okay.  And at that time, can you tell us who

5  was driving it?

6  A.   It was parked in the parking lot.

7  Q.   Okay.  Now, is it correct that on the 23rd of

8  August there was no surveillance in the morning

9  hours concerning Mr. Mosby?

10  A.   Correct.

11  Q.   All right.  On the 23rd, did you see Mr. Mosby

12  drive any cars at all?

13  A.   Yes.

14  Q.   Okay.  What car did he drive?

15  A.   The Dodge Intrepid.

16  Q.   That's the one that had the tires slashed?

17  A.   Yes, sir.

18  Q.   Okay.  Was that car subsequently searched after

19  your arrest?

20  A.   Yes.

21  Q.   Was there any contraband of any nature in

22  there?

23  A.   No.

24  Q.   Then there were some other cars that were

25  searched, the black GMC Denali?

1  A.    Yes.

2  Q.    Okay.  Was that car at the Gale Street address?

3  A.    Yes, it was.

4  Q.    Okay.  And again, that car was searched, no

5  contraband or anything found in that car?

6  A.    Correct.

7  Q.    And that is the car that you saw Mr. Mosby

8  drive?

9  A.    Yes.

10 Q.    Okay.  What about the Pontiac?  Was the Pontiac

11 searched?

12 A.    On the date of August 23rd, I don't think that

13 the Pontiac van was at 2401 Gale.

14 Q.    Okay.  But the cars that were there and the

15 cars that you had seen Mr. Mosby driving other than

16 the Pontiac, all of those cars were searched, and it

17 was determined that there were no drugs there?

18 A.    Yes.

19 Q.    Okay.  And now you were telling us that you had

20 taken up a position, I believe, in the mortuary so

21 that you could watch the apartment on Gale Street?

22 A.    Yes.

23 Q.    That mortuary would be south of the apartment?

24 A.    Kind of southeast.

25 Q.    All right.  You could see the rear door, but

1  you could not see the front door?

2  A.    Correct.

3  Q.    Were you aware of the fact that in addition to

4  the rear door there was another entrance to that

5  apartment?

6  A.    Yes.

7  Q.    Were there officers that were surveilling that

8  front door?

9  A.    Yes.  At times there were officers that did

10 cover the side that I could not see and the front

11 door.

12 Q.    Okay.  Now, you witnessed Mr. Mosby come out,

13 get in the passenger side of the Intrepid.  And the

14 door was open, and you saw Miss Hunter standing in

15 that door.  Is that correct?

16 A.    No.

17 Q.    You did not?

18 A.    No.

19 Q.    Did you see Mr. Mosby get into the Intrepid

20 that afternoon?

21 A.    Into the driver's side, not the passenger.

22 Q.    I'm sorry.  He got in the driver's side?

23 A.    Yes.

24 Q.    Left the door open?

25 A.    Yes.

1  Q.    Miss Hunter came up to the door?

2  A.    Yes.

3  Q.    At that point, could you see what Mr. Mosby was

4  doing?

5  A.    No.   It appeared he was just sitting in the

6  vehicle.

7  Q.    Okay.   But Ms. Hunter was talking, and she

8  appeared to be agitated; is that right?

9  A.    Yes.

10 Q.    She then left and went back into the apartment?

11 A.    After she tried slamming the door, she did go

12 back in the apartment.

13 Q.    Okay.   Then Mr. Mosby went back into the door

14 -- into the apartment?

15 A.    Yes.

16 Q.    So, you never actually witnessed him say

17 anything at all to her; is that correct?

18 A.    If he was saying anything, I was too far away

19 to hear.   So, I don't know if anything was said or

20 not.

21 Q.    Okay.   At some point Ms. Hunter comes back out,

22 and this time you can see her with a knife, right?

23 A.    No.

24 Q.    Okay.   When is it that you saw her with the

25 knife?

1  A.    The first time she came out I could not see

2  anything in her hand.   However, I could see that she

3  went up to the driver's side tire, appeared to make

4  a poking action, walked to the rear of the vehicle

5  out of my sight, and then she went back inside.   The

6  second time she came out is when I could clearly see

7  that she had a large knife.

8  Q.    Okay.   Where was Mr. Mosby when she came out

9  the second time with the knife, or do you know?

10  A.    Inside.

11  Q.    He was inside.

12  A.    Yes.

13  Q.    After she slashed the tires, she goes back

14  inside?

15  A.    Correct.

16  Q.    Then Mr. Mosby comes back out, looks at the

17  Intrepid?

18  A.    No, I did not see -- he did not come outside

19  and look at the Intrepid.

20  Q.    Okay.   Next time you saw him -- that is,

21  Mr. Mosby, he was walking towards University?

22  A.    On Gale, yes.

23  Q.    Right.

24  A.    Yes.

25  Q.    It's at that time that you say you saw him

1  carrying a bag?

2  A.   Correct.

3  Q.   But you didn't see which door he came out of

4  because you were -- let me rephrase that.

5       He came out the front door because you

6  didn't see him come out of the back door, right?

7  A.   Correct.

8  Q.   Okay.  And he traveled some distance before you

9  saw him walking up to University?

10  A.   He would have had to clear the length of the

11  building, and then he would have been in my sight.

12  Q.   How far away were you when you saw him?

13  A.   My best guess estimate, maybe 100 yards.

14  Q.   And about the length of a football field?

15  A.   Roughly.

16  Q.   You have demonstrated for us how you saw him

17  carrying the bag at that time; is that right?

18  A.   Yes.

19  Q.   And to the best of your memory, you don't

20  recall that bag having a red drawstring or you

21  didn't see a red drawstring?

22  A.   Correct, I could not see a red drawstring.

23  Q.   Okay.  And Mr. Mosby continued up towards

24  University.  Is he walking in what you would call a

25  normal pace, or was he running or what?

1  A.   Just walking.

2  Q.   All right.  While he was doing that, someone

3  was coming from behind him?

4  A.   Correct.

5  Q.   That would have been Miss Hunter?

6  A.   Correct.

7  Q.   They get up to -- at least Mr. Mosby gets to

8  University and Gale, and then he crosses the street

9  to where this auto repair place used to be?

10  A.   No.

11  Q.   What does he do when he gets up there?

12  A.   He was walking on the same side -- he would

13  have been walking on the north side of the street.

14  And he walked up to the corner where the auto repair

15  place is.  It's on the same side of the street so he

16  did not have to cross the street.

17        From the time he came into my sight, he had

18  been on the north side of the street.  Prior to

19  getting to that location, Miss Hunter had caught up

20  to him.  They appeared to still be arguing.  She --

21  Q.   Let me put a question to you.  In other words,

22  Mr. Mosby was across the street from where the

23  apartment was located, correct?

24  A.   Yes.

25  Q.   Okay.  And that's where you see him walking up

1  the street?

2  A.    Yes.

3  Q.    And then you say that when he got up to the

4  corner, he was on the same side of the street that

5  this -- I don't know if it's a garage or old gas

6  station or what; is that right?

7  A.    Correct.

8  Q.    Did he go inside that building?

9  A.    No.

10  Q.    All right.  Now, from wherever it was that you

11  were at the time, were you able to see the black

12  Town & Country van come -- going north on

13  University?

14  A.    I saw it arrive.  I don't remember if it turned

15  onto Gale from the north or the south.  However, I

16  did see it arrive, but again, I could not see the

17  passenger side of the vehicle so I couldn't tell

18  what was taking place at the van.

19  Q.    Okay.  So, you don't know who got into the

20  front seat, who got into the back seat?

21  A.    Other -- me personally, I did not see it.

22  Q.    Okay.  Then the black van takes off and goes

23  somewhere?

24  A.    Correct.

25  Q.    Now, you told us about going into the hospital

1  to find out what had happened with Miss Hunter?

2  A.   Yes.

3  Q.   You went in there, you got some information?

4  A.   Yes.

5  Q.   And at this point, your concern was for the

6  injuries that she may have suffered; is that

7  correct?

8  A.   I did have concern for that, yes.

9  Q.   Okay.  Now, at the point when you went into the

10  hospital, how did you know she had an injury?

11  A.   I did not know.

12  Q.   Okay.  You went into the hospital just to find

13  out why she went into the hospital?

14  A.   Yes.

15  Q.   Then after that, while you were checking in the

16  hospital, you also found out that Mr. Mosby had

17  gotten out of the car and was walking somewhere; is

18  that correct?

19  A.   No.

20  Q.   Did you ever find out that he got out of the

21  car once she went into the emergency room?

22  A.   I'm the one that observed him get out of the

23  car.  From the time she pulled into the entrance

24  before parking, into the parking lot, I observed him

25  get out of the vehicle and start walking south on

1   Hamilton.

2   Q.   He didn't walk into the hospital with her, did

3   he?

4   A.   No.

5   Q.   He was walking away from wherever she was

6   going; is that correct?

7   A.   Yes.

8   Q.   All right.  Let me go back and ask you

9   something that I had forgotten.  When you saw

10  Mr. Mosby and Miss Hunter at the corner of Gale and

11  University, was he talking at all?

12  A.   The -- there was times that he was on his

13  phone, and I couldn't -- I was too far away to hear

14  if he was talking.

15  Q.   Okay.  He was talking on his cell phone; he was

16  not talking to Ms. Hunter?

17  A.   I should say he had his phone up to his ear.  I

18  figured he was talking on his phone, and I was too

19  far away to hear if he was having a conversation

20  with Miss Hunter also.

21  Q.   Now, was she touching him in any manner when

22  they were standing on that corner?

23  A.   Not when they were on the corner.

24  Q.   Okay.  Before that, had she been grabbing him,

25  or did she touch him?

1  A.   Yes, she tried -- the first time that she

2  caught up to him when she was walking up to the

3  corner, she tried tugging on him to get him to go

4  back -- appeared that to get him to go back.  And he

5  pulled away from her and continued walking.  She

6  turned, walked away, ended up turning around, going

7  back up to him.

8  Q.   So, I believe you described it as she was being

9  the aggressor?

10  A.   Yes.

11  Q.   He appeared to be trying to remove hisself from

12  the situation; is that right?

13  A.   Yes.

14  Q.   You never saw him strike her or push her in any

15  manner, did you?

16  A.   Correct.

17  Q.   Now, you were telling us about various

18  investigative techniques that you use in this -- in

19  your fight on the war on crime, on drugs.  And one

20  of the things that I wanted to ask you about is when

21  you execute your search warrants and you go into

22  various apartments and houses, do you try to collect

23  names and information on people who may be

24  associated with the various residences?

25  A.   I'm not sure I understand what you mean by

1  being associated.  Just people that come over or if

2  the people that live there?

3  Q.    People that live there.

4  A.    Yes.

5  Q.    Okay.  And you try and recover mail because

6  that helps you determine who lives there or who may

7  be receiving mail there?

8  A.    Yes.

9  Q.    And do you attempt to find out what, if any,

10 connection that these people may be involved in with

11 the drugs and that sort of stuff?

12 A.    We try to determine -- we collect mail and

13 things with the addresses on it to show that the

14 person actually lives there or uses that as a

15 residence.  However, it is common not to find mail

16 to the subject at that target location.

17         MR. SLAUGHTER:  May I have just one minute,

18 Your Honor?

19         THE COURT:  Sure.

20 BY MR. SLAUGHTER:

21 Q.    Investigator, just one other question.  At the

22 end of your direct examination when we were looking

23 at a video and the video was showing the injury to

24 Ms. Hunter's finger --

25 A.    Yes.

1    Q.    -- and you videoed that for a specific reason;

2    is that correct?

3    A.    Yes.

4    Q.    What was your reason for videoing the cut to

5    the finger?

6    A.    To show the extent of the injury and that she

7    actually did have an injury at the time that we made

8    contact with her.

9    Q.    Okay.  So, that had nothing to do with the

10   recovery of guns and the drugs; is that correct?

11   A.    Correct.

12        MR. SLAUGHTER:  All right.  Thank you.  I

13   have no other questions.

14        THE COURT:  Redirect, Mr. Murphy?

15        MR. MURPHY:  Just a few, please, Judge.

16                **REDIRECT EXAMINATION**

17   **BY MR. MURPHY:**

18   Q.    However, videoing Ms. Hunter's injury could be

19   an important piece of evidence to establish that

20   some object cut her hand that day?

21   A.    Yes.

22   Q.    Is there a particular reason, Officer Marion,

23   why when you saw her with a knife going towards the

24   car and seeing whatever you saw, as you've

25   indicated, that you didn't rush up there and arrest

1  her at that very moment?

2  A.    Yes.

3  Q.    Tell us why.

4  A.    At that time, her actions of damaging a vehicle

5  that was associated with her boyfriend, I did not

6  feel that it was necessary to give up our

7  surveillance and go interact at that point.

8  Q.    You clearly saw a crime, a misdemeanor of

9  damaging a vehicle?

10  A.    Yes.

11  Q.    And you felt that if you would go and interrupt

12  your investigation that you would have to compromise

13  yourself as being an officer, too?

14  A.    Yes.

15  Q.    And you stuck with the investigation that day?

16  A.    Yes.

17  Q.    At any time -- Counsel asked you about your

18  viewing of Mr. Mosby with this white bag.  At any

19  time that day did you ever see Ashley Hunter with a

20  white bag?

21  A.    No.

22  Q.    And who's the only person you saw that day with

23  the white bag?

24  A.    Cory Mosby.

25  Q.    Actually, I think you probably saw Sergeant

1  Theobald taking things out of the bag, didn't you?

2  A.    Yes.

3          MR. MURPHY:  Thank you, Judge.  Those are my

4  questions.

5          THE COURT:  Any recross, Mr. Slaughter?

6          MR. SLAUGHTER:  No, Your Honor.

7          THE COURT:  All right.  Thank you, sir.

8          Mr. Murphy, do you have all your exhibits

9  admitted in?

10          MR. MURPHY:  Judge, that's one of the two

11  things I was going to do.  I don't think we have

12  admitted all of them, but I now want to move to

13  admit all of those that have not been at this point.

14  There are several, I think, that have been.  We want

15  to move to admit those.

16          Then I have two requests for judicial notice

17  to finish our case in chief.

18          THE COURT:  All right.  In terms of the

19  exhibits, I know -- Mr. Slaughter, do you have any

20  objection to admission of any of the exhibits which

21  have not yet been admitted?

22          MR. SLAUGHTER:  No, we do not, Your Honor.

23          THE COURT:  All right.  All government

24  exhibits will be admitted.

25          MR. MURPHY:  Thank you, Judge.  The first

1  request for judicial notice would be that Peoria,

2  Illinois, and Peoria County are within the Central

3  Federal District of Illinois.  And secondly, that

4  cocaine base or crack cocaine is a Schedule II

5  controlled substance.

6         THE COURT:  Okay.  Members of the jury, even

7  though no evidence has been introduced about it, I

8  have decided to accept as proved the fact that the

9  City of Peoria and the County of Peoria is within

10 the Central District of Illinois, which is the

11 jurisdiction of this court; and that crack cocaine

12 and marijuana are scheduled -- controlled substances

13 which are illegal to possess or distribute.

14        You may treat these facts as proved even

15 though no evidence was brought out on them.  Of

16 course, this fact, as with any fact, you will have

17 to make up your mind as to the final decision as to

18 these facts so you are not required to agree with

19 me.  All right.

20        MR. MURPHY:  Thank you, Judge.  We will

21 formally rest our case in chief at this point.

22        THE COURT:  All right.

23        Defense counsel, do you wish to present any

24 evidence?

25        MR. SLAUGHTER:  We do, Your Honor.  We do

1  have possibly three witnesses that we would be

2  calling.

3          THE COURT:  Okay.  The Court would allow you

4  to make any procedural motions at the end.  You have

5  not waived that.

6          MR. SLAUGHTER:  All right.  Thank you,

7  Judge.

8          THE COURT:  So you may proceed.

9          MR. SLAUGHTER:  Do you want me to call

10 witnesses now, Judge?

11         THE COURT:  Yes.  Yes.

12             (Witness sworn by the clerk.)

13         THE CLERK:  Thank you.  Please have a seat.

14                      **EBONY LOGAN,**

15 **called as a witness, after being first duly sworn,**

16 **was examined and testified upon her oath as follows:**

17                   **DIRECT EXAMINATION**

18 **BY MR. SLAUGHTER:**

19 Q.  Miss, I want you to keep your voice up so

20 everyone can hear what you're saying.

21         State your name and spell your name for the

22 court reporter, please.

23 A.   Ebony Logan.  E-b-o-n-y, L-o-g-a-n.

24 Q.   Miss Logan, where do you live?

25 A.   I live in Lexington Hills apartment complex.

1  Q.    And that is located in what city?

2  A.    Peoria, Illinois.

3  Q.    Okay.  Were you living there on the 23rd of

4  August in 2006?

5  A.    Yes.

6  Q.    On the 23rd of August, 2006, were you driving

7  any type of automobile?

8  A.    Yes.

9  Q.    What automobile were you driving?

10  A.    A black Chrysler van.

11  Q.    And how long -- on the 23rd of August, how long

12  had you been driving that automobile?

13  A.    Are you talking about that particular day?

14  Q.    Well, how long had that car been in your

15  possession?

16  A.    Maybe about four days.

17  Q.    Now, on August 23rd, how long had you had the

18  car?  Did you have it all day?

19  A.    No.

20  Q.    All right.  What time did you come in

21  possession of that car?

22  A.    Earlier that morning.

23  Q.    And about what time?

24  A.    Maybe 11, 11:30.

25  Q.    Did you have an occasion in the afternoon hours

1  to see the defendant, Mr. Cory Mosby?

2  A.    Yes.

3  Q.    All right.  And where did you see him?

4  A.    On University and Gale.

5  Q.    All right.  Was he with anyone, or was he

6  alone?

7  A.    His -- well, Ashley was there where he was, but

8  I was coming to pick him up.

9  Q.    Okay.  And did you, in fact, pick him up?

10  A.    Yes.

11  Q.    Where did you pick him up from?

12  A.    I picked him up on University.

13  Q.    And when you picked him up, what did he do?

14  A.    He got in the van.

15  Q.    Now, as you were coming to pick him up, could

16  you see him from a distance?

17  A.    Yeah.

18  Q.    When you first saw him, can you tell us what he

19  was doing?

20  A.    He was on the phone.  He was standing there.

21  Q.    That would be a cell phone?

22  A.    Yes.

23  Q.    Did you notice anything else about him?

24  A.    No.  He was standing, scratching his head.

25  Q.    All right.  And you also said you saw

1  Miss Hunter; is that correct?

2  A.    Yes.

3  Q.    Did she get into the automobile?

4  A.    Yes.

5  Q.    Where did each one of the people seat

6  themselves?

7  A.    Cory sat behind me, and Ashley sat in the

8  passenger seat.

9  Q.    Was she in the rear or in the front?

10  A.    In the front.

11  Q.    And after they got in the car, where did they

12  go?

13  A.    They drove to the Lexington Hills.

14  Q.    What happened when you got to Lexington Hills?

15  A.    I got my belongings, and I exited the vehicle.

16  Q.    Did you see the vehicle any more that night?

17  A.    No.

18        MR. SLAUGHTER:  Thank you.  I have no other

19  questions.

20                    **CROSS-EXAMINATION**

21  **BY MR. MURPHY:**

22  Q.    Ma'am, you're related to Cory how?

23  A.    I'm his cousin.

24  Q.    And you lived out at Lexington Hills that day,

25  right?

1  A.   Yes.

2  Q.   You had had this van for about four days or so?

3  A.   Yes.

4  Q.   And whose van is it?

5  A.   It's Ashley's van.

6  Q.   Okay.  And your vehicle is the Intrepid?

7  A.   Yes.

8  Q.   And you had been letting Cory drive the

9  Intrepid?

10  A.   Yes.

11  Q.   You kind of traded vehicles with him?

12  A.   Yes.

13  Q.   And had Cory had your Intrepid for four days?

14  A.   Yes.

15  Q.   And you had had the van for four days?

16  A.   Yes.

17  Q.   Now, did you have the van that morning of

18  August 23rd?

19  A.   Yes, about 11.  11:30.

20  Q.   Okay.  Well, was the van somewhere else?

21  A.   He washed it, and he brought it to me.

22  Q.   Who's "he"?

23  A.   Cory.

24  Q.   I thought you had the van for four days?

25  A.   I did.

Q.   Okay.   What happened?   How did he get the van?

A.   He came and got it.   He went and washed it, and
he brought it back to me.

Q.   Okay.   And what time of the day was that?

A.   When he brought it back to me?

Q.   Yes.

A.   11:30.

Q.   Okay.   He brought the van to you about
11:30 a.m. in the morning?

A.   A.M., yes.

Q.   Okay.   And were you home at the time?

A.   Yes, I was.

Q.   Okay.   Are you employed?

A.   Yes, I am.

Q.   Where?

A.   I work at Gebby's Family Restaurant.

Q.   Okay.   And you weren't at work that day?

A.   No.

Q.   You didn't work any at all that day?

A.   No.

Q.   He called you that afternoon out of the blue,
right?

A.   Yes.

Q.   You weren't expecting him to call you?

A.   No.

1  Q.   And what's your best guess as to what time it

2  was?

3  A.   I have no recollection.

4  Q.   You do know it was after noon?

5  A.   Yeah.

6  Q.   So, do you have any idea, ma'am, what time he

7  called you?

8  A.   Maybe a little bit after noon or something.

9  Q.   Okay.  But you're absolutely sure it was 11:30

10  that he got that car washed?

11  A.   He came and brought the van to me.  It was in

12  the morning.  It was after 10, so it had to be like

13  11, 11:30.

14  Q.   Okay.  You're fairly sure of that time?

15  A.   Yes.

16  Q.   All right.  Now, when he called you, what did

17  he tell you?

18  A.   Told me to come and pick him up.

19  Q.   What else did he tell you?

20  A.   He told me to come and pick him up.

21  Q.   Did he tell you that Ashley had cut the tires

22  on the Intrepid?

23  A.   No.

24  Q.   Did he ever tell you that?

25  A.   No.

Q.   Well, did you ask why you had to come pick him
up?

A.   I asked him what was wrong because he sounded
funny on the phone.  And --

Q.   Could you hear Ashley there in the background
from --

A.   Yeah.

Q.   And was she like yelling at him?

A.   Yeah.

Q.   You knew they were fighting?

A.   Yeah, when I heard her.

Q.   Now, you're sure that Cory didn't tell you that
Ashley had cut the tires on the Intrepid?

A.   No.  She did.

Q.   She told you that later?

A.   She told me because she apologized for it.

Q.   But on the telephone now -- let's stop there
with the telephone.  On the phone call that you got
that afternoon, did he tell you that she had cut the
tires on the Intrepid?

A.   No.

Q.   Did she tell -- did he tell you that Ashley was
stealing money from him?

A.   Yes.

Q.   On the phone call?

1  A.   Yeah.

2  Q.   Now, he gets in the back -- or the middle seat,

3  I guess, in that van when you picked him up?

4  A.   Uh-huh.

5  Q.   And she gets up front?

6  A.   Yes.

7  Q.   Now, are you kind of upset by this whole thing?

8  I mean, this is --

9  A.   No.

10  Q.   You learned that your vehicle's tires had been

11  slashed, and you're not upset, ma'am?

12  A.   No.

13  Q.   Okay.  Now, do they tell you to go somewhere?

14  A.   No, they didn't.

15  Q.   What -- you just took it on yourself to go

16  driving back to Lexington Hills?

17  A.   Yes, I did.

18  Q.   Which puts you back at Lexington Hills without

19  the van, right?

20  A.   Yes.

21  Q.   And without your Intrepid, right?

22  A.   Yep.

23  Q.   Okay.  And you're not upset about this?

24  A.   Not at all.

25  Q.   Okay.  And who drove off in the van?

1  A.   Ashley.

2  Q.   And was Cory still in the back at that time?

3  A.   Yes.

4  Q.   Now, prior to -- prior to you getting the phone

5  call, were you over at their place earlier that day?

6  A.   No, I wasn't.

7  Q.   You weren't there at all?

8  A.   No.

9         MR. MURPHY:  Excuse me just a moment, Judge.

10  BY MR. MURPHY:

11  Q.   When, when you got out of the van back at your

12  apartment complex, did you leave a pair of shoes

13  there in the van?

14  A.   Yes.

15  Q.   And did you leave anything else?

16  A.   No.

17  Q.   Nothing else was there?

18  A.   No.

19  Q.   Did you know there was a gun in that van?

20  A.   No.

21  Q.   Did you know Cory had a gun?

22  A.   No.

23         MR. MURPHY:  Thank you, Judge.  Those are my

24  questions.

25         THE COURT:  Any redirect?

```
 1              MR. SLAUGHTER:  Yes, Your Honor.
 2                    REDIRECT EXAMINATION
 3   BY MR. SLAUGHTER:
 4   Q.   Ebony, was there some reason why Cory had your
 5   Intrepid?
 6   A.   No particular reason.
 7              MR. SLAUGHTER:  Thank you.  I have no other
 8   questions.
 9                   RECROSS-EXAMINATION
10   BY MR. MURPHY:
11   Q.   Cory have a vehicle of his own?
12   A.   No.
13   Q.   Didn't --
14              THE COURT:  I didn't hear you, ma'am.
15              THE WITNESS:  No, he doesn't.
16   BY MR. MURPHY:
17   Q.   Did he have a beige-colored Pontiac minivan?
18   A.   No.  I believe that that was his sister's car.
19   Q.   The Intrepid is not his, is it?
20   A.   No.
21   Q.   And the minivan that you had that day, that's
22   not his, is it?
23   A.   The Chrysler van?
24   Q.   Yes.
25   A.   No.
```

1          MR. MURPHY:  Thank you.  That's all.

2          MR. SLAUGHTER:  May I call my next witness,

3 Your Honor?

4          THE COURT:  You -- it's 12 now.  Maybe we

5 should break for lunch unless there's going to be a

6 short witness.

7          MR. SLAUGHTER:  He won't be short, Judge.

8          THE COURT:  Let's break for lunch now and

9 start back at -- do you need more than 30 minutes

10 for lunch?

11          THE CLERK:  It is the noon -- it's 12, but

12 30 minutes may be kind of short for all the jurors,

13 depending on where they go.

14          THE COURT:  1:00 then.

15          THE CLERK:  Court's in recess.

16          (The jury was taken out.)

17          MR. SLAUGHTER:  Your Honor, we would be

18 moving for a directed finding as to the charges

19 contained in the indictment.

20          THE COURT:  Okay.  The Court would deny the

21 Rule 29 motion.  The Court believes there is

22 sufficient evidence in the record, if believed by

23 the jury, sufficient to convict the defendant of the

24 indictment.  So, the motion is denied.

25          MR. MURPHY:  Judge, just a couple of things,

 1  housekeeping kind of things I want to alert the

 2  Court of.

 3       We have been advised that the defendant

 4  probably is not going to testify, but we would ask

 5  the Court to have its colloquy on the record with

 6  him at some point in time before the defense rests

 7  to assure you that that's his decision.

 8       THE COURT:  Well, I would like to do it

 9  outside the presence of the jury.  So, if that

10  decision is final, I can do it now unless

11  Mr. Slaughter would like to wait until his last

12  witness.

13       MR. SLAUGHTER:  No, we can do it now, Your

14  Honor.

15       THE COURT:  Okay.  Mr. Slaughter, is it your

16  intention to have your witness -- your defendant,

17  your client testify?

18       MR. SLAUGHTER:  It is not, Your Honor.  I

19  have discussed this matter with Mr. Mosby on several

20  occasions, and we discussed it again today, Your

21  Honor, and it is not my intention to call him as a

22  witness.

23       THE COURT:  Mr. Mosby, you realize you have

24  a right to testify in this case, if you wish?

25       DEFENDANT:  Yes, sir.

1          THE COURT:  If you do testify, you realize

2    that you would be subject to cross-examination by

3    the government.  You understand that?

4          DEFENDANT:  Yes, sir.

5          THE COURT:  From what Mr. Slaughter says, he

6    has also advised you of your right to testify and

7    that has been discussed with you and he.  And I take

8    it he's also discussed with you the pros and cons of

9    you testifying?

10          DEFENDANT:  Yes, sir.

11          THE COURT:  And you have decided not to

12    testify?

13          DEFENDANT:  Yes, sir.

14          THE COURT:  Which is your right also.  You

15    don't have to testify.

16          DEFENDANT:  Right.  Right.

17          THE COURT:  You choose to exercise that

18    right.  Is that right?

19          DEFENDANT:  Yes, sir.

20          THE COURT:  Okay.  Thank you.

21          MR. MURPHY:  Thanks, Judge.  The only other

22    matter is, Judge -- maybe Mr. Slaughter and I can

23    confer when we break here, but I do notice that

24    Ashley Hunter is here and that she may give

25    testimony at some point in time.  We oftentimes run

1  into these situations.  I can check with

2  Mr. Slaughter, but if Miss Hunter is going to try to

3  claim any responsibility for this very large amount

4  of drugs, it's my opinion that she's going to need

5  the advice of counsel before she testifies.

6        So, Mr. Slaughter and I can confer -- and

7  maybe she's not and I don't have this concern, but

8  in all these cases where people are going to be

9  testifying about what they saw, what they possessed

10  kind of thing, I always have that concern, that they

11  may need independent counsel.  So, we'll advise the

12  Court when we get back after lunch.

13        THE COURT:  Well, if she is going to take

14  responsibility for the drugs and/or the -- any other

15  illegal act, I think she should be aware of her

16  rights against self-incrimination and the fact that

17  anything she said could be used against her in

18  prosecution.

19        And before -- if she is going to testify to

20  that, I certainly will want the record to show that

21  her testimony is knowingly done, fully aware of the

22  possible consequences.  So, whether or not that's

23  the result of the colloquy with the Court or whether

24  or not that's with Counsel, but I do want some

25  assurance that she's been so advised.

1          MR. MURPHY:  Judge, I tell you what.  We'll

2    confer right now, and then first thing when we come

3    back at 1:00, we'll take that up on the record.  I

4    will let your chambers know if I think you need to

5    contact an outside -- have a CJA counsel or somebody

6    here at 1:00.

7          THE COURT:  Okay.

8          MR. MURPHY:  Okay.  Thank you very much.

9          THE COURT:  You bring up an interesting

10   point.  It would be important that she does have the

11   advice of independent counsel in connection with

12   this decision to testify and possibly incriminate

13   herself, and I suspect it might be a conflict

14   between her and Mr. Slaughter if he advises her,

15   which I'm sure he has, but that's not the same as

16   independent advice.  So, it is an important subject

17   that should be discussed.

18         MR. MURPHY:  I will get right back with the

19   Court.  Frankly, I thought it was probably

20   inappropriate for either me or Mr. Slaughter to help

21   her make that decision, whether she should or

22   shouldn't.

23         To be up-front with you, Judge, we had

24   subpoenaed her to have her here.  However, she's

25   refused to talk to me.  She basically has told us in

1  no uncertain terms she's not here to help the

2  government; she's here to help her boyfriend.  I

3  don't -- I don't know what that means.  That's all

4  she'll tell us.

5          THE COURT:  It increases the need to have

6  her have independent counsel advising her because it

7  could very well be that if that is her position, the

8  government may say, Well, we are going to look at

9  the charges we may or may not bring against her.

10 So, I think she should really know what she's

11 getting into by her position.

12         MR. MURPHY:  I agree, Judge.

13         THE COURT:  I tell you what.  I think I'm

14 going to ask that we have an independent counsel

15 here anyway, whether we need him or her or not.  I

16 think I want to be prepared.  So, I will direct the

17 clerk to see if we can't have counsel here as early

18 as we possibly can, at 1:00.

19         Okay.  We'll break for lunch.

20         (Whereupon, a noon recess was taken.)

21         THE COURT:  Counsel, over the lunch hour,

22 have -- do you know whether or not Miss Hunter has

23 had the benefit of consulting with an attorney?

24         MR. MURPHY:  Yes.  Mr. Inman, Judge, has

25 been here and consulted with her briefly.

1           THE COURT:  Mr. Inman, thank you for

2   cooperating and coming over on such short notice.

3   You probably know what's involved here.  Miss Ashley

4   Hunter is a prospective witness in this case, and

5   there is the possibility that she may testify, take

6   responsibility for various quantities of illegal

7   drugs and perhaps one or more firearms that,

8   according to the indictment, are charged against

9   this defendant.

10          And we all feel that it's necessary that she

11  be fully advised of her -- of the ramifications of

12  such testimony and knows her rights before she

13  testifies.  I wanted independent counsel.  I'm sure

14  the defense attorney and government attorney may

15  have spoken to Miss Hunter and brought this issue

16  up, but I felt she should have the benefit of

17  independent advice.

18          Have you had an opportunity to talk with

19  Miss Hunter?

20          MR. INMAN:  Your Honor, I did briefly, and

21  I've cut those consultations short after Miss Hunter

22  informed me that Mr. Slaughter had informed her that

23  he did not intend to call her.  But I wanted to

24  remain here in case anything came up and see what

25  the disposition of that would be.

1          THE COURT:  Thank you, Mr. Inman, for your

2    attentiveness here to the Court.

3          Mr. Slaughter, is that true, that at this

4    point you don't intend to call Miss Hunter?

5          MR. SLAUGHTER:  That is correct, Your Honor.

6          THE COURT:  Okay.  And is it still your

7    client's intent not to testify, or has that changed?

8          MR. SLAUGHTER:  No, that has not changed,

9    Your Honor.  We did discuss that also.

10          THE COURT:  Mr. Mosby, is that still the

11    case?  You do not wish to testify?

12          DEFENDANT:  Yes.

13          THE COURT:  All right.  Thank you.

14          MR. MURPHY:  Judge, could I ask one further

15    thing for clarification on the record?  I also

16    believe that Mr. Slaughter and Mr. Mosby discussed

17    this issue of calling or not calling Ms. Hunter.

18    And if the Court could inquire just briefly of

19    Mr. Mosby that it also is his decision, he agrees

20    with this decision not to call Ms. Hunter?

21          THE COURT:  Fair enough.  Mr. Mosby, I have

22    been advised by Mr. Slaughter, your attorney, that

23    he does not intend to call Ashley Hunter as a

24    witness in your defense.  Was this decision

25    discussed with you --

```
1              DEFENDANT:  Yes, sir.

2              THE COURT:  -- by Mr. Slaughter?

3              DEFENDANT:  Yes, sir.

4              THE COURT:  It's also your agreement with

5    him that she not be called?

6              DEFENDANT:  Yes, sir.

7              THE COURT:  Okay.  And I take it you

8    appreciate the ramifications of not calling her --

9              DEFENDANT:  Yes, sir.

10             THE COURT:  -- at this stage of this trial?

11             DEFENDANT:  Yes, sir.

12             THE COURT:  And you have no problems with

13   that.  Is that right?

14             DEFENDANT:  Yes, sir.

15             THE COURT:  You have no problems with

16   Mr. Slaughter's advice to you in that regard, do

17   you?

18             DEFENDANT:  No, sir.

19             THE COURT:  You feel he has fully advised

20   you of your rights and his advice as to what the

21   pros and cons are of this course of action?

22             DEFENDANT:  Yes, sir.

23             THE COURT:  All right.  Then, Mr. Inman, are

24   you going to stay around?

25             MR. INMAN:  I don't plan to unless the Court
```

1 orders, but I can tell the Court that -- or request,

2 either one, but I can tell the Court that I will be

3 -- I expect to be at my office all afternoon so

4 would be available if anything changed.

5          THE COURT:  Thank you, Mr. Inman.  We have

6 your number if we need to call you.

7          MR. INMAN:  Okay.

8          THE COURT:  Ask the jury to come in, please.

9          (The jury was brought in.)

10          THE COURT:  Anymore witnesses on behalf of

11 the defendant, Mr. Slaughter?

12          MR. SLAUGHTER:  Yes, Your Honor.

13          (Witness sworn by the Clerk.)

14          THE CLERK:  Thank you.  Have a seat.

15                    **DAVID BROWN,**

16 **called as a witness, after being first duly sworn,**

17 **was examined and testified upon his oath as follows:**

18               **DIRECT EXAMINATION**

19 **BY MR. SLAUGHTER:**

20 Q.   Sir, would you state your name and spell your

21 name for the court reporter?

22 A.   David Brown.  D-a-v-i-d, B-r-o-w-n.

23 Q.   Mr. Brown, where do you live?

24 A.   2629 North Wood Dale, Apartment 2A.

25 Q.   Are you related in any manner to Mr. Cory

1  Mosby, the defendant here?

2  A.   He's my brother-in-law.

3  Q.   And do you know where he was living in May of

4  2006?

5  A.   My sister.

6  Q.   And where -- do you know the address that they

7  lived at?

8  A.   I'm not sure.

9  Q.   Is it in a set of apartments?

10  A.   Yes.

11  Q.   Did you go there on various occasions?

12  A.   Probably a couple times a week.

13  Q.   Were you at the apartment on August the 23rd of

14  2006 when the police came?

15  A.   Yes.

16  Q.   Before the police came, had you been at that

17  apartment -- that is, earlier during the day?

18  A.   No, I was there when -- I was there like --

19  after they came.

20  Q.   I'm sorry, say that again.

21  A.   I was there for like a couple after they came,

22  an hour or two.

23  Q.   Did you see Cory Mosby at the apartment that

24  day?

25  A.   Yes.

1  Q.   And can you tell us approximately what time it

2  was when you saw him?

3  A.   I'm not sure what time it was.

4  Q.   Did you speak with Cory that day?

5  A.   Yes.

6  Q.   Did you and he do anything that day?

7  A.   We were playing a game.

8  Q.   What type game?

9  A.   Basketball game.

10  Q.   Is that a video game?

11  A.   Yes.

12  Q.   Did you ever notice Mr. Mosby to leave out of

13  the apartment?

14  A.   Not until a little later.

15  Q.   Okay.  Well, that's -- a little later did you

16  see him go out of the apartment?

17  A.   Yes.

18  Q.   All right.  And when he went out of the

19  apartment, do you know where he was going?

20  A.   I'm not sure.  I think he was going up the

21  street to go get something, tires for a car.

22  Q.   Okay.  And when you saw him go out of the

23  apartment, do you know whether or not he was

24  carrying anything with him?

25  A.   I didn't see anything in his hand.

1  Q.   What door did he exit the apartment from?

2  A.   The back door.

3  Q.   Now, when you say the back door, will you

4  describe to us where the back door is located in the

5  apartment?

6  A.   Toward the parking lot in the back of the

7  house.

8  Q.   Is there another door to that house?

9  A.   Yes, a front door.

10 Q.   Okay.  And do you know what street the front

11 door is facing?

12 A.   I don't know what street it is.  I'm not sure

13 what street it is.

14 Q.   All right.  Now, after you said that Mr. Mosby

15 left the house, did you ever see him again that day?

16 A.   No.  He never came back in.  I didn't see him

17 after that.

18 Q.   All right.

19      MR. SLAUGHTER:  Thank you.  I have no other

20 questions.

21      THE COURT:  You may cross.

22                   **CROSS-EXAMINATION**

23 **BY MR. MURPHY:**

24 Q.   Your sister and Cory Mosby were living over on

25 North Gale street in that apartment building, right?

1  A.   Yes.

2  Q.   That Apartment Y10, I think it was?

3  A.   Yeah, I guess that's what it is.

4  Q.   That's the apartment that you went over to

5  about noon, right?

6  A.   I guess.  Whatever time it was when I was over

7  there, I don't know.

8  Q.   Okay.  You went over there by yourself, right?

9  A.   Yes.

10  Q.   And you pretty much stayed in the apartment

11  most of the day?

12  A.   Yes.

13  Q.   You did go outside one time, though, didn't

14  you?

15  A.   For like a split second.

16  Q.   And when you went outside, you went out the

17  back door, didn't you?

18  A.   Yes.

19  Q.   You looked over at the Dodge Intrepid, didn't

20  you?

21  A.   I looked at my sister.

22  Q.   And what was going on with your sister and the

23  Dodge Intrepid?

24  A.   I'm not sure.  When I came out, she was walking

25  towards me.  I don't know.

1  Q.    Did she have a knife in her hand?

2  A.    I don't know what she had in her hand.

3  Q.    Didn't you look at the Intrepid and see that

4  the tires were flat, David?

5  A.    The tires weren't flat when I came outside.

6  Q.    Pardon?

7  A.    They weren't flat when I came outside.

8  Q.    Okay.  Let's start back earlier in the

9  afternoon.  Had Cory and Ashley been fighting that

10  day?

11  A.    They were arguing.

12  Q.    Okay.  Arguing.  They were verbally going back

13  and forth?

14  A.    Yes.

15  Q.    And she wanted some money, didn't she?

16  A.    Yeah, for food, for something to eat.

17  Q.    And he basically sat there and played video

18  games with you, didn't he?

19  A.    Yep.

20  Q.    He was ignoring her, wasn't he?

21  A.    No.  He talked to her, but he just told her

22  that he wouldn't give her none at that time.

23  Q.    But he wasn't giving her any money, was he?

24        MR. SLAUGHTER:  Your Honor, I'm going to

25  object to this.  I think it's outside the scope of

1    the direct, whether or not he was giving her money.

2            THE COURT:  If this is the end of that line

3    of questioning, I will overrule the objection,

4    but --

5            MR. MURPHY:  It is, Judge.

6            THE COURT:  All right.

7    BY MR. MURPHY:

8    Q.   During this argument, did Cory tell Ashley that

9    he was leaving?

10            MR. SLAUGHTER:  Again, I'm going to object,

11    Your Honor, as being irrelevant.

12            THE COURT:  Again, outside the scope?

13            MR. SLAUGHTER:  Yes, Your Honor.

14            THE COURT:  Overrule that.

15            THE WITNESS:  Can you repeat that, please?

16    BY MR. MURPHY:

17    Q.   Didn't Cory tell Ashley that he was leaving?

18    A.   Not until she told him to leave, when they were

19    arguing.  That's when they started arguing.

20    Q.   Now, did you know that Ashley had gone out and

21    had slashed the tires so that he couldn't leave?

22    A.   Not at that moment.  She didn't -- she didn't

23    leave out until like later after he said that he was

24    going to leave.

25    Q.   Okay.  She -- he said that he was going to

1  leave, she and he were arguing, and she went outside

2  and slashed his tires so he couldn't leave, correct?

3  A.    I guess that's what it is.

4  Q.    Okay.  And then did you see them both come back

5  in?

6  A.    No, I'm not sure after that.  I don't think

7  they came back in.

8  Q.    Okay.  So, you didn't see the two of them

9  walking down the street towards University at all,

10 did you?

11 A.    I seen -- well, at first I seen him going down

12 the street.  I didn't see her leave with him.

13 Q.    Now, tell me this.  When you're at that

14 computer game, playing on the computer, your back is

15 to the front door, isn't it?

16 A.    Yes.

17 Q.    You could have seen somebody leaving the back

18 door, right, but you couldn't see somebody going out

19 the front door?

20 A.    Yeah, but I would have heard it open.

21 Q.    So, you don't have any -- you don't remember

22 anything about anybody going out the front door?

23 A.    Huh-uh.

24 Q.    Is there any other way out besides the front

25 and back?

1  A.    No.

2  Q.    There's no window that they couldn't have gone

3  out?

4  A.    No.

5  Q.    All right.  Now, you didn't know they left

6  together, did you?

7  A.    No.

8  Q.    And did you just keep playing on the computer?

9  A.    Yes.

10  Q.    Were you still playing on the computer when the

11  police showed up at 6:30 or so?

12  A.    Yes.

13  Q.    Did you get any phone calls there at the

14  apartment after either Cory or Ashley went outside?

15  A.    No.

16  Q.    Do you have any idea what time it was when you

17  remember seeing -- the time that you do remember

18  Cory seeing -- seeing Cory go out the back door?

19  I'm sorry.

20  A.    I seen him last leave out after he left.  He

21  just left after they got done arguing.  He looked at

22  his car, and then I guess he walked down the street

23  to go look for some tires.  That's the last time I

24  seen him.

25  Q.    So, the tires he was going to go look at were

1  because he now knew that the tires had been slashed?

2  A.    Yes.

3  Q.    David, were you at all times in the downstairs

4  part of the apartment that day?  Did you ever go

5  upstairs?

6  A.    No.

7  Q.    Now, are you -- you referred to Mr. Mosby as

8  your brother-in-law?

9  A.    Yes.

10  Q.    He and Ashley are married?

11  A.    No, they're not, but I just refer to him as

12  that.

13  Q.    That's okay.  But are they still together?

14  A.    Yes.

15         MR. MURPHY:  Thank you.  That's all, Judge.

16         THE COURT:  Redirect, Mr. Slaughter?

17         MR. SLAUGHTER:  No, Your Honor.  I have no

18  other questions.

19         THE COURT:  All right.  Thank you, sir.  You

20  may step down.  Any further witnesses?

21         MR. SLAUGHTER:  No, Your Honor.  Mr. Mosby

22  would be resting his case in chief.

23         THE COURT:  Anything in rebuttal,

24  Mr. Murphy?

25         MR. MURPHY:  No, Your Honor.

```
 1          THE COURT:  Okay.  Members of the jury, you
 2   have now heard all of the evidence to be presented
 3   in connection with this case, and the next phase of
 4   the case is instructions of law and argument by the
 5   lawyers.
 6          As I indicated, the argument is the
 7   opportunity the lawyers have to argue the facts to
 8   you from their perspective and what they suggest
 9   your verdict should be based on the facts and the
10   law which the Court will give you.  I need time to
11   prepare my instructions of law for you, so at this
12   time we will take a break to allow me to prepare my
13   instructions with the lawyers, and that shouldn't
14   take more than 30 minutes unless there's a snag, in
15   which case we will then come back and -- for closing
16   arguments, and then you will have the case for
17   deliberation.  So, if we just --
18          MR. MURPHY:  Judge, can I ask one quick
19   question, please?  At some point in time -- I just
20   thought maybe this break would be a good time.  We
21   want to publish the guns to the jury.  That might
22   save time later if we go ahead and do that now.
23          THE COURT:  This would be the time to do it.
24   You may publish the weapons and -- you can't take
25   the -- the jury will have all the evidence back in
```

1   the jury room with you except we don't allow weapons

2   and drugs to go back there, so that's why you are

3   looking at them now.

4           (Exhibits published.)

5           THE COURT:  Okay.  We will be in recess

6   until -- I'm estimating -- about 30 minutes.  If we

7   get done sooner, we'll come back to court sooner.

8   So, please.

9           THE CLERK:  Court's in recess.

10          (The jury was taken out.)

11                     * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF ILLINOIS   :
                         :   SS
 2   COUNTY OF PEORIA    :

 3


 4

             I, JENNIFER E. JOHNSON, CSR, RMR, CRR, CBC,
 5   and Notary Public in and for the County of Tazewell,
     State of Illinois, do hereby certify that the
 6   foregoing transcript of proceedings is true and
     correct to the best of my knowledge and belief;

 7
             That I am not related to any of the parties
 8   hereto by blood or marriage, nor shall I benefit by
     the outcome of this matter financially or otherwise.

 9

10

11

12

13                   _____
                     JENNIFER E. JOHNSON
14                   License #084-003039
                         CSR, RMR, CRR, CBC
15                   Notary Public, State of
                     Illinois at Large
16

17           My Commission expires May 8, 2009.

18

19

20

21

22

23

24

25
```